UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



**CV**   04 5513

---
x

APRIL SCALISI, as custodian for her
minor children, and SCOTT
McDONOUGH,

              Plaintiffs,

      v.

FUND ASSET MANAGEMENT, L.P.,

            Defendant,

      - and -

MERRILL LYNCH FOCUS TWENTY
FUND, INC.,

          Nominal Defendant.

---
x

**VERIFIED DERIVATIVE
COMPLAINT**

**JURY TRIAL DEMANDED**

PLATT, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT
★ DEC 17 2004 ★

WALL, M.J.

BROOKLYN OFFICE

        Plaintiffs allege the following upon personal knowledge as to themselves and their own

acts, and as to all other matters upon information and belief, based upon the investigation made

by and through their attorneys, which investigation includes, <u>inter alia</u>, review of Securities and

Exchange Commission filings, press releases, news articles, and other publicly available

materials.

<b><u>NATURE OF THE ACTION</u></b>

      1.     Plaintiffs are investors in nominal defendant the Merrill Lynch Focus Twenty

Fund, Inc. (the "Fund"), a mutual fund promoted by Merrill Lynch & Co. ("Merrill Lynch") as

being appropriate for investors with, <u>inter alia</u>, "long-term goals in mind such as retirement or

funding a child's education."  Plaintiffs bring this action derivatively on behalf of the Fund

against a Merrill Lynch wholly-owned subsidiary, Fund Asset Management, L.P. ("FAM"), the

Fund's investment adviser, for breach of fiduciary duty in violation of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 - 80a-43 (the "ICA"), as well as common law breaches of fiduciary duties, negligence, gross negligence, and negligent misrepresentation.

2.      FAM served the interests of its parent Merrill Lynch at the expense of the Fund and its shareholders by purchasing the common stock of Enron Corporation ("Enron") while Merrill Lynch and its affiliates were helping to engineer fraudulent financial transactions to artificially boost Enron's publicly reported earnings, thereby wasting tens of millions of dollars in public Fund monies.[1] Exacerbating the conflicts and entanglements, Merrill Lynch its affiliates, and its executives were generating millions of dollars in fees and other consideration for themselves through private intercourse with Enron and its affiliates. This conduct artificially

_____

[1] See the complaint filed by the United States Securities and Exchange Commission (the "SEC") against Merrill Lynch and several senior executives (annexed hereto as Exhibit A), outlining in more detail the fraudulent Nigerian barge and energy trade transactions. As summarized by the SEC:

> Merrill Lynch and its senior executives . . . helped their client, Enron Corp., commit securities fraud.
>
> *      *      *
>
> Merrill Lynch and Enron completed the two fraudulent transactions in the last days of December, 1999. In the first, an asset parking arrangement, Enron purportedly "sold" an interest in Nigerian energy barges to Merrill Lynch. In fact, the risk of ownership never passed to Merrill Lynch. Instead, this was in effect a short term loan and Merrill Lynch earned a specified rate of return. Pursuant to a side deal between Enron and Merrill Lynch, Enron took Merrill Lynch out of the transaction in June 2000. Enron reported, as Merrill Lynch knew it would, $12 million in income from this sham "sale." In the second fraudulent transaction, Enron and Merrill Lynch entered into two energy option contracts that were designed to substantially cancel each other out. Enron agreed to pay Merrill Lynch a $17 million dollar fee for participating in what was essentially a risk-free transaction. Enron reported, as Merrill Lynch knew it would, $50 million in income from this sham energy trade.

Merrill Lynch paid $80 million to settle the SEC's charges.

increased the price investors had to pay for Enron stock and ultimately resulted in civil and criminal investigations directed against Merrill Lynch and certain of its senior executives. The investigations resulted in indictments and most recently criminal convictions against several former Merrill Lynch executives and a "settlement" agreement by Merrill Lynch itself in order to avoid criminal charges being filed against it. Indicative of these patent entanglements and conflicts of interest, at least 97 of Merrill Lynch's most senior executives, including three of the four Merrill Lynch executives convicted of crimes in Texas Federal court, and Senior Executive Management members Robert J. McCann, the Head of Global Securities Research and Barry S. Friedberg, the Chairman of Global Markets and Investment Banking, invested millions of dollars and profited from the notorious Enron off-balance sheet private partnership, known as LJM2 Co-Investment, L.P. ("LJM2").[2]

3.       Notably, FAM is a Merrill Lynch wholly-owned entity and the adviser to dozens of Merrill Lynch mutual funds, and thereby has access to a vast reservoir of private information known to Merrill Lynch and its executives. Such information included, without limitation, the LJM2 partnership private placement documents which partnership was underwritten, sponsored, financed, and/or promoted heavily by Merrill Lynch. Therefore, FAM was in a privileged position to know that there was a substantial disconnect between Enron's actual financial condition and that reported to the investment community. FAM's knowledge is especially likely as it used Fund assets to purchase "research" from its affiliate, another wholly-owned subsidiary

---

[2]A list of the 97 Merrill Lynch executives who invested a total of $17.6 million in the LJM2 Enron off-balance sheet private partnership is annexed hereto as Exhibit B.

of Merrill Lynch, which was actively engaged in assisting Enron in creating its fraudulent

financial statements.

4.     With little regard for the Fund and its shareholders, and in order to advance the

private pecuniary interests of its parent, its affiliates, and Merrill Lynch senior executives, FAM

abetted the Enron fraud and breached its fiduciary duties of loyalty, good faith, and due care by

causing the Fund to invest and lose nearly 5% of its entire portfolio, wasting tens of millions of

dollars of Fund assets.

## JURISDICTION AND VENUE

5.     This action is brought pursuant to ICA Section 36(a), 15 U.S.C. § 80a-35(a), and

the common law.  Subject matter jurisdiction exists under 15 U.S.C. § 80a-43, 28 U.S.C. § 1331,

and U.S.C. § 1367.

6.     Venue is proper in this District because defendant transacts business in this

District.

7.     In connection with the acts, conduct, and other wrongs alleged herein, defendant,

directly and indirectly, used the means and instrumentalities of interstate commerce, including

the mails and telephone communications.

## PARTIES

8.     Plaintiffs April Scalisi and Scott McDonough have been, and continue to be,

shareholders of the Fund.

9.     Defendant FAM serves as investment adviser to the Fund.  It is a Delaware

limited partnership with principal offices located near Princeton, New Jersey.

10.    Nominal defendant, the Fund, is a Maryland corporation.  Its principal offices are located at defendant's offices in New Jersey.  The Fund is a non-diversified, open-end investment company, registered under the ICA.  No claims are asserted against the Fund and any recovery from this action will belong to the Fund.

### STATEMENT OF FACTS

**A.    Merrill Lynch Acts To Curry Favor With Enron**

11.    In 1997, John Olson, Merrill Lynch's well respected Houston-based energy analyst, with over twenty-five years of experience in the energy industry, downgraded his estimate of Enron to "neutral."  Enron responded by threatening to cut Merrill Lynch out of a $750 million stock offering.  In an April 1998 e-mail, in order to win back that lucrative business, Merrill Lynch investment bankers Schuyler Tilney, head of energy investment banking, and Richard Gordon asked Merrill Lynch's senior management to intervene.  The e-mail, in part, indicated that Enron's decision to deny Merrill Lynch participation in the offering was:

> based solely on the research issue and was intended to send a
> strong message as to how "viscerally" Enron's senior management
> felt about [the Merrill Lynch] research effort!

12.    Recognizing that the huge fees to be earned by Merrill Lynch through its relationship with Enron were in jeopardy as a result of candid research, senior management acted quickly to force out John Olson.  By August 1998, John Olson "resigned" and was replaced by Donato Eassey, a Merrill Lynch generalist analyst more inclined to see things as Enron desired.  By November 1998, Donato Eassey had upgraded Enron's rating to "Accumulate."

13.    An e-mail dated on or about January 18, 1999 from Merrill Lynch investment banker Schuyler Tilney to Herb Alison, then Merrill Lynch's president, stated:

It is clear that your response message was appreciated by [Enron]
and any animosity in that regard seems to have dissipated.

14.    By January 1999, Merrill Lynch's analyst had upgraded its Enron rating to "Long-Term Buy," and continued, in at least quarterly research reports and newspaper interviews, to be unabashedly bullish on Enron until at least August 2001.[3]

15.    During 1999 alone, investment banking fees and underwriting fees realized by Merrill Lynch as a result of its relationship with Enron exceeded $40 million.

16.    In October 1999, LJM2, the notorious Enron off-balance sheet partnership, was formed with Merrill Lynch and its affiliates providing structuring, financing, and underwriting assistance. In fact, Merrill Lynch was engaged as the exclusive financial adviser and private placement agent for LJM2. Merrill Lynch helped to prepare the private placement documents (which were not public documents) and at least 97 Merrill Lynch senior executives representing virtually every strategic area within Merrill Lynch participated as investors, including without limitation, executives from Executive Management, investment banking, research, equity and

---

[3]Following the purge of John Olson, Donato Eassey and/or Merrill Lynch issued unrestrained bullish analyst reports on Enron rating the stock a "Long-Term Buy" or "Buy" on at least the following dates 1/20/99; 3/31/99; 4/15/99; 7/14/99; 10/12/99; 1/18/00; 1/4/00; 4/12/00; 7/24/00; 10/17/00; 4/18/01. In addition, Eassey heavily promoted Enron's prospects in various business interviews. For example, in the January 1, 2000 edition of the Economist, Eassey is quoted as stating "Enron is uniquely positioned to be the General Electric of the new economy." In the December 2000 Business Week Online edition, Eassey was quoted as describing Enron's broadband concept as follows: "What's the difference between measuring the gas pumped through a pipeline or data transmitted through a voice line." In the June 11, 2001 edition of the Houston Business Journal, and in the face of mounting evidence of fraud, Eassey continued to promote an Enron buying opportunity: "we think that seasoned investors should step up and take advantage of the weakness should be handsomely rewarded over the next twelve months". In the July 13, 2001 edition of The Street.com, Eassey is quoted as stating "We believe Enron at current prices offers investors a free call option on the future of broadband, and the ultimate turnaround in the telecom market once it occurs."

bond sales.[4] In addition to its executives, as a Merrill Lynch sponsored product, LJM2 was peddled throughout the Merrill Lynch organization, to officers and directors, and to its private client network. Merrill Lynch secured approximately $390 million in capital commitments for LJM2.

**B.    Merrill Lynch Helps Its Client To Commit Fraud**

17.    Inextricably linked to Enron and its senior executives through LJM2, Merrill Lynch and its executives, in late 1999, helped its client Enron commit fraud.

### 1.    The December 1999 Nigerian Barge Fraud

18.    In order to continue its efforts to deceive the investment community regarding its actual revenue and profit generating ability, and maintain an artificially high price for its stock, Enron executives approached Merrill Lynch to "purchase" three partially completed power plants mounted on barges off the coast of Nigeria at a profit to Enron with assurances that Enron would repurchase Merrill Lynch's "interest" in the project at a substantial profit by mid-year 2000. Enron could not book profits from these power plants because they were incomplete, not operating and therefor not generating any revenue.

19.    In mid-December 1999 Enron's Treasurer, Jeff McMahon, contacted Robert Furst, a Merrill Lynch investment banker, about buying an interest in the Nigerian barge project.

---

[4]Examples of Merrill Lynch executives and their respective investment in LJM2 include, Barry S. Friedberg, member Executive Management, Chairman of Global Market and Investment Banking, $500,000; Daniel M. Bayly, Head of Investment Banking, $200,000; Robert T. McCann, the Head of Global Securities Research Group, $200,000; Schuyler Tilney, Head of Energy Investment Banking Houston, $750,000; Munir Dauhajre, Head of U.S. Government Bond Sales, $200,000; Louis Chiavacci, Senior VP, Private Client Group, $1,000,000; Gary Baker, Director of Research, $100,000; and Ronald Ullman, Chief Operating Officer Global Research, $200,000; Thomas Davis, President of Corporate and Institutional Client Group, $150,000. See Exhibit B for the complete list.

By December 21, 1999, a Merrill Lynch document makes clear that as a result of the transaction: (a) Enron would be able to book $12 million in earnings; (b) the deal had to close by December 31, 1999; (c) Merrill Lynch was guaranteed a return of $250,000 plus 15% per annum, or a flat 22.5% per annum; and (d) a $7 million financial commitment by Merrill Lynch was required. Merrill Lynch and its executives, despite knowing the "sale" was a sham, approved the transaction because, as described in a Merrill Lynch Appropriation Request, Enron was a "top client" of Merrill Lynch and Merrill Lynch had earned "approximately $40 million in fees in 1999 [from Enron] and is expected to do so again in 2000." Merrill Lynch's senior executives signed off on the transaction and it closed in the waning days of 1999.

20.    In accordance with its side agreement, Enron bought back the Merrill Lynch "investment" at the agreed to profit on or about June 30, 2000.

21.    In or about March 2003, Merrill Lynch paid $80 million to settle SEC charges in connection with the Nigerian barge fraud, and most recently (on or about November 3, 2004), Merrill Lynch executives Robert Furst (Managing Director; Enron relationship manager), Daniel Bayly (Global Head of Investment Banking Division), James Brown (Head of Strategic Asset Lease and Finance Group), all investors in LJM2, and William Fuhs (Vice President), were convicted in Federal court for their role in the Nigerian barge fraud. (See Exhibit C).

**2.    The December 1999 Fraudulent Power Swaps**

22.    Similar to the incomplete Nigerian barge project, Enron had incomplete power plant construction projects in the United States.

23.    In connection with one such project, Midwest Continental, Enron approached Merrill Lynch and asked that it "purchase" contracts based on future revenues of the incomplete

power plant. Enron secretly promised to ensure that the contracts would be repurchased or cancelled out after the close of Enron's fiscal year ended December 31, 1999. The Enron swap transaction created $60 million of phony profits and helped to maintain Enron's fraudulently inflated stock price by meeting market expectations for profit in 1999.

24.     At Enron's request, Merrill Lynch "purchased" future power swaps in a series of transactions on the eve of the close of Enron's fiscal year 1999. Four months into the new year, the transactions were cancelled before Midwest Continental was built. Merrill Lynch received an $8 million fee for assisting Enron in connection with this fraud.

**C.    Merrill Lynch Continues To Support Enron's Stock's Artificially Inflated Price As The Result Of Its Subsidiary FAM Causing The Fund To Purchase Enron Common Stock**

**1.    The Merrill Lynch Focus Twenty Fund Is Created**

25.     In or about December 1999, when Merrill Lynch, its affiliates, and its executives were actively aiding, abetting, and profiting from fraud at Enron, the Fund was created by Merrill Lynch and FAM.

26.     In order to distinguish itself from other investment companies and attract investors, Merrill Lynch and its subsidiary FAM traded heavily on the then good Merrill Lynch name, heavily promoting the Fund and its investment policy as being particularly rigorous based on access to a vast reservoir (i.e., Merrill Lynch) of "fundamental research and a bottom-up approach to investing."

27.     In promoting itself to investors, Merrill Lynch and FAM repeatedly represented that, as a result of investments limited to approximately 20 companies, FAM would carefully evaluate the "quality of each company's earnings" and employ a "disciplined investment

-9-

process" to "construct a portfolio" with "strong growth prospects." FAM represented that the Fund was appropriate for investors with "long term goals in mind such as retirement or funding a child's education."

28.     Prominently displaying and leveraging the blue-chip Merrill Lynch name gave investors further assurance that based on its "own fundamental research" and "bottom-up approach," each selection for this limited 20 company portfolio would be carefully scrutinized, free from any conflict, and satisfy fully the Fund's investment objective and policies.

**2.      The Assets of the Fund Are Wasted by FAM To Serve Merrill Lynch and Its Executives' Interests**

29.     By the time the Fund began to sell its shares to the public, Merrill Lynch, its affiliates including FAM, and its executives, knew of the sham Nigerian barge transaction, the bogus power swaps, and the LJM2 transactions, falsely inflating Enron's publically reported profits to meet the investment community's expectations. Merrill Lynch, its affiliates including FAM, and its executives, knew that if these targets had not been met, Enron's stock price would have plummeted, threatening Merrill Lynch's and its executives lucrative arrangements with Enron.

30.     In addition to the expectation of continued multi-million dollar benefits to be derived from its relationship with Enron, during 2000 and 2001 Merrill Lynch was earning millions of dollars by writing hundreds of millions of dollars of credit default puts on Enron's publically-traded debt securities. As a result, Merrill Lynch was at risk for large losses should Enron not perform as well as the investment community had been fraudulently led to believe.

31.     However, with the active assistance of a more compliant bullish Merrill Lynch analyst and the ability to have affiliates like FAM purchase Enron common stock to maintain an artificially high price, Merrill Lynch affiliates and its executives could continue to enjoy its lucrative private intercourse with Enron.

32.     Accordingly, and contrary to representations concerning the methodology of selecting companies, FAM in violation of, inter alia, its fiduciary duty of loyalty, in order to benefit Merrill Lynch and its executives, caused the Fund to invest heavily in the common stock of Enron, a stock in which its parent, affiliates, and executives were actively abetting a fraud and had numerous undisclosed material, irreconcilable conflicts by virtue of its lucrative investment banking relationship and by directly investing in, lending money to, acting as a placement agent for, and promoting to its high net worth clients, LJM2.

33.     As a result of this undisclosed, incestuous, self-interested, conflicted position, with special access to a wealth of data and information including, without limitation, material information regarding off-balance sheet partnerships unavailable to the public, FAM knew that Enron's financial condition was far weaker than known to the investment community in general.

34.     At all relevant times, and as painfully evident as a result of investigations conducted by the SEC and the New York State Attorney General, there was no adequate "Chinese Wall" among Merrill Lynch and its affiliates, including FAM, so that information known to one affiliate was generally available to all affiliates.[5]

---

[5]See the complaint filed by the SEC against Merrill Lynch's research subsidiary for undue influence and conflict of interest between Merrill Lynch investment banking and research divisions, annexed hereto as Exhibit D.

-11-

35.     While FAM was reaping millions of dollars in advisory, distribution, underwriting, and administrative fees from the Fund,[6] and its affiliates were engaged in undisclosed conflicted transactions earning themselves huge fees and returns on bogus investments with LJM2, FAM caused the Fund to acquire at least 610,000 shares of Enron common stock representing at one point almost 5% of the Fund's portfolio. That investment of tens of millions of dollars is now worthless.

36.     As a result of its conflicted, wasteful, improvident investment in the securities of Enron, the Fund incurred a material loss, while FAM, its parent, and its affiliates have reaped huge profits.

## DERIVATIVE ALLEGATIONS REGARDING DEMAND

37.     Plaintiffs bring this action as a derivative action on behalf of, and for the benefit of, the Fund to remedy FAM's wrongdoing alleged herein.

38.     Plaintiffs will fairly and adequately represent the interests of the Fund and its shareholders in enforcing and prosecuting its rights. This action is not a collusive one to confer jurisdiction on this Court which would not otherwise exist.

39.     The serious charges of conflict raised in this complaint were initially asserted in a complaint filed in this Court in October 2002.

---

[6]FAM and other Merrill Lynch subsidiaries earned tens of millions of dollars in advisory (.85% of average daily assets through December 18, 2001, .60% afterwards) distribution (.75% of average daily net assets) underwriting (.25% of average daily net assets) transfer agent and administrative (.25% of average daily net assets) fees from the Fund and its shareholders.

40.     In connection with defendant FAM's and nominal defendant's motion to dismiss

for, inter alia, failure to make a demand on the board, the Court In re Merrill Lynch Focus

Twenty Fund Inv. Co. Act. Litig., 218 F.R.D. 377 (E.D.N.Y. 2003) found that:

> while the directors service on the Board of 49 Merrill Lynch funds
> combined with their large compensation package [$160,000-
> $250,000] does raise questions of good corporate governance...

The Court could not state:

> as a matter of law, that directors' service upon multiple boards,
> with significant remuneration is enough to demonstrate the futility
> of demand upon them.

Id. at 381.

41.     The Court stated that under Maryland law, a demand of the board is "not

particularly onerous and any refusal of demand can subsequently be reviewed under the business

judgment rule." (Id. at 381) The decision finding demand was not excused was affirmed by the

Second Circuit in Scalisi v. Fund Asset Management, L.P., 380 F.3d 133, 141 (2d Cir. 2004),

which interpreted Maryland law as requiring demand "even [on] interested, non-independent

directors."

42.     Accordingly, on August 31, 2004, counsel for plaintiffs sent, by certified mail, a

letter to the Board of Directors demanding that action be taken against FAM for the wrong

alleged herein.  A copy of the letter of August 31st, without exhibits, is annexed hereto as Exhibit

E.

43.     By letter dated September 8, 2004, a third counsel to represent the Fund or the

directors wrote to plaintiffs' counsel and requested that plaintiffs identify other information, if

any, available to plaintiffs which the Board should consider.  A copy of the September 8th letter is annexed hereto as Exhibit F.

44.     In response thereto, and by letter dated September 20, 2004, plaintiffs' counsel further informed the Board of the misconduct and again demanded that the Board take appropriate legal action.  A copy of the September 20, 2004 letter is annexed hereto as Exhibit G.

45.     Rather than responding to plaintiffs' demand, the Fund's directors retained new counsel, the fourth firm to appear for the Fund or its directors with respect to plaintiffs' claims.

46.     By letter dated November 24, 2004, that fourth firm advised plaintiffs that the Fund's board "has appointed directors Stephen B. Swensrud, Joe Grills and Robert S. Salomon, Jr. as the Independent Investigation Committee to review and investigate" plaintiffs' claims.  The letter contained no estimated time frame for the completion of such review and investigation.  A copy of the November 24, 2004 letter is annexed as Exhibit H.

47.     Messrs. Swensrud, Grills and Salomon, Jr. have known about plaintiffs' claims for longer than the past two years.  Messrs. Grills and Salomon, Jr., act as directors for 39 Merrill Lynch registered investment companies overseeing 56 separate portfolios.  Mr. Swensrud acts as director for 40 Merrill Lynch registered investment companies overseeing 57 separate portfolios. During 2003, Messrs. Swensrud, Grills and Salomon, Jr. earned an aggregate of $513,657 from their service as directors of Merrill Lynch mutual funds.  At December 31, 2003, Messrs. Salomon, Jr. and Swensrud had absolutely no investment in the Fund and Mr. Grills had a nominal investment.

48.     Despite the passage of sufficient time, the Fund's directors have not responded to plaintiffs' demand nor, despite being asked to do so, have they advised plaintiffs as to when they

-14-

expect to consider the matter. Rather, the directors apparently have engaged in law firm shopping and the appointment of an "Independent Investigation Committee," consisting of directors who received more than half a million dollars in fees from Merrill Lynch mutual funds in 2003, alone, and which Committee has no purpose other than delay and cover-up.

49.     The Fund's directors were fully aware of the matters raised in the demand letter and subsequent correspondence at all relevant times and at least since the commencement of the Scalisi action in or about October 2002, and therefore have had sufficient time to respond to the wrongs identified in the demand letter but have failed to do so. Whatever information was requested by the Fund's counsel was either provided to the directors by plaintiffs' counsel or was readily available to directors or solely in their knowledge.

50.     Moreover, under the circumstances, the directors have manifested hostility to Fund shareholders for the following reasons:

a.     In the Scalisi derivative action the directors authorized the Fund to join in all of the litigation positions advanced by defendant FAM, including the argument by FAM that there is no private right of action under ICA Section 36(a), thereby seeking to eviscerate the only avenue of Federal redress available to investors to hold investment advisers accountable for breach of fiduciary duty under the ICA, other than in respect of fees. The position joined in by the directors of the Fund is inimitable to Fund shareholder interests and demonstrates unequivocally the directors' hostility to bringing any claim against FAM;

-15-

b.      The directors are presently members of the Board, and they have for years

been aware of the wrongs forming the basis for the claims alleged herein.

However, given repeated opportunities, they have chosen not to take

action to protect the Fund or recover amounts due to it because any such

action would require them to sue FAM, their benefactor, and Merrill

Lynch, FAM's corporate parent.

51.     Demand on the Fund's shareholders is not feasible because the Fund is publicly-held.

### CLAIM I

### Breach Of Fiduciary Duty Pursuant To ICA Section 36(a) And The Common Law

52.     Plaintiffs repeat and reallege all previous paragraphs, as if fully set forth herein.

53.     Plaintiffs bring this claim derivatively pursuant to Federal Rule of Civil Procedure

23.1 in the right of and for the benefit of the Fund to redress injuries suffered by the Fund as a

direct result of the breaches of fiduciary duty complained of herein, which has resulted in a harm

to the Fund as set forth above.

54.     Defendant FAM owes fiduciary duties of loyalty, good faith, and due care to the

Fund and its shareholders.  Defendant has breached its fiduciary duties of loyalty, good faith, and

due care to the Fund and its shareholders.  Specifically, defendant FAM breached its duty of

loyalty and due care by serving the interests of its parent, Merrill Lynch, its affiliates and Merrill

Lynch senior executives by causing the Fund to invest in the securities of Enron notwithstanding

that FAM knew, or in the exercise of due care should have know, that (a) affiliates of FAM were

-16-

irreconcilably conflicted and directly profiting at the expense of Enron common stockholders; and (b) Enron's financial condition was far weaker than the public had been led to believe and that, therefore, FAM could not have formed a reasonable belief that Enron would, consistent with the Fund's publicly represented investment strategy, have strong earnings growth and capital appreciation potential.

55.    The breaches of fiduciary duty described above, including intentionally subordinating the interests of the Fund's investors to its own interests and those of its affiliates, and employees of its affiliates, involve personal misconduct within the meaning of ICA Section 36(a), 15 U.S.C. § 80a-35(a).

56.    As a result, the Fund has suffered damages under ICA Section 36(a), and the common law.

## CLAIM II

### Negligence, Gross Negligence, And Negligent Misrepresentation

57.    Plaintiffs repeat and reallege all previous paragraphs, as if fully set forth herein.

58.    FAM owed the Fund and its shareholders a duty to use such care in providing investment advisory services to the Fund as a reasonably prudent and careful person would use under the circumstances.

59.    In light of the overt conflicts between FAM, its parent, affiliates, and the Fund, FAM breached that duty by continually purchasing, and failing to sell, Enron stock under the circumstances where a reasonable and prudent person having the knowledge concerning Enron which FAM and its affiliates had, would have refrained from doing so.

60.    Moreover, pursuant to prospectuses, other public documents, and marketing brochures, defendant negligently misrepresented material facts and omitted to state material facts

necessary in order to make the statements made concerning the selection of the Fund's portfolio and the Fund's investment objective and policies, in light of the circumstances under which they were made, not misleading, all as more fully described above.

61.    Plaintiffs and nominal defendant relied to their detriment upon the misrepresentations and omissions and were damaged by the negligence, gross negligence, negligent misrepresentations, and omissions, and other action complained of in this complaint.

WHEREFORE, plaintiffs demand judgment as follows:

A.    awarding damages against FAM, and for the benefit of the Fund, equal to the Fund's losses as a result of its investment in the securities of Enron;

B.    awarding interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and.

C.    · such other and further relief as may be just and proper.

Plaintiffs demand trial by jury.

Dated: December 16, 2004

WECHSLER HARWOOD LLP

By: _____
      Joel C. Feffer (JF 2608)
      Daniella Quitt (DQ 1963)
      488 Madison Avenue
      New York, New York 10022
      Ph:  (212) 935-7400
      Fax: (212) 753-3630

GARWIN, BRONZAFT, GERSTEIN & FISHER, L.L.P.

By:  _____
      Scott W. Fisher (SF-8756)
      1501 Broadway, Suite 1416
      New York, NY  10036
      Ph: (212) 398-0055
      Fax: (212) 764-6620

-18-

PASKOWITZ & ASSOCIATES

By: _____

Laurence D. Paskowitz (LP 7324)
60 East 42nd Street - 46th Floor
New York, NY 10165
Ph:   (212) 685-0969
Fax: (212) 685-2306

*Attorneys for Plaintiffs*

## Verification

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF SUFFOLK    )

       April Scalisi, being duly sworn, deposes and says:

       I am the plaintiff in the within action.  I have read the foregoing complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
April Scalisi

Sworn to before me this
14th day of December, 2004

_____
Notary Public

PETER  RAVO
Notary Public, State of New York
No.01RA6116523
Qualified in Suffork County
COMMISSION EXPIRES: 10/04/2008

## VERIFICATION

I, Scott McDonough am the plaintiff in the within action   I affirm under perjury under the laws of the United States of America that I have read the allegations of the foregoing Complaint. The same is true to my own knowledge except as to those matters therein stated to be alleged upon information and belief and as to those matters I believe them to be true

Dated: December _7_, 2004

Scott McDonough



**U.S. Securities and Exchange Commission**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States
Securities and Exchange Commission,

Plaintiff,

v.

MERRILL LYNCH & CO., INC.,
DANIEL H. BAYLY,
THOMAS W. DAVIS,
ROBERT S. FURST,
SCHUYLER M. TILNEY

Defendants.

Civil Action No. H-03-0946 (Hoyt)
**COMPLAINT**
JURY DEMANDED

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

## SUMMARY

1. Merrill Lynch and its senior executives Robert S. Furst, Schuyler M. Tilney, Daniel H. Bayly, and Thomas W. Davis, helped their client, Enron Corp., commit securities fraud. In December 1999, at Enron's request, Merrill Lynch entered into two fraudulent year-end transactions that Merrill Lynch knew were designed to improve Enron's financial picture. As a result of these transactions, Enron fraudulently added $60 million to its fourth quarter 1999 income, a 30% improvement in net income. This allowed Enron to meet analysts' expectations about its performance, increase its earnings per share, improve its stock price, and boost its bonus pool for senior executives. For aiding Enron, Merrill Lynch earned millions of dollars in fees and believed Enron would continue to award it lucrative business in the future.

2. Merrill Lynch and Enron completed the two fraudulent transactions in the last days of December, 1999. In the first, an asset parking arrangement, Enron purportedly "sold" an interest in Nigerian energy barges to Merrill Lynch. In fact, the risk of ownership never passed to Merrill Lynch. Instead, this was in effect a short term loan and Merrill Lynch earned a specified rate of return. Pursuant to a side deal between Enron and Merrill Lynch, Enron took Merrill Lynch out of the transaction in June 2000. Enron reported, as

Merrill Lynch knew it would, $12 million in income from this sham "sale." In the second fraudulent transaction, Enron and Merrill Lynch entered into two energy option contracts that were designed to substantially cancel each other out. Enron agreed to pay Merrill Lynch a $17 million dollar fee for participating in what was essentially a risk-free transaction. Enron reported, as Merrill Lynch knew it would, $50 million in income from this sham energy trade.

3. Based on their substantial assistance to Enron, defendants aided and abetted Enron's violations of the federal securities laws. The Commission requests that this Court permanently enjoin defendants from violating the federal securities laws cited herein, bar defendants Bayly, Davis, Furst, and Tilney from acting as officers or directors of any public company, order Merrill Lynch to disgorge all ill-gotten gains, order all defendants to pay civil penalties, and order such other and further relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act.

5. Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. ' 78aa] because certain acts or transactions constituting the violations occurred in this District.

6. In connection with the acts, practices, and courses of business alleged herein, defendants, directly or indirectly, made use of the means and instruments of transportation and communication in interstate commerce, and of the mails and of the facilities of a national securities exchange.

7. Defendants, unless restrained and enjoined by this Court, will continue to engage in transactions, acts, practices, and courses of business as set forth in this Complaint or in similar illegal acts and practices.

## DEFENDANTS

8. Merrill Lynch & Co., Inc., is a Delaware corporation with headquarters in New York, New York and offices serving corporate and institutional clients nationwide, including Houston, Texas. At all relevant times, Merrill Lynch's common stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act and was listed for trading on the New York Stock Exchange (MER).

9. Thomas W. Davis, 49, resides in Scarsdale, New York. Davis was an Executive Vice President and the Global Head of Merrill Lynch's Corporate and Institutional Client Group from 1998 until October 2001, when he became Vice Chairman of Private Equity and Research. Davis was a member of Merrill Lynch's senior executive management committees from 1997 until 2002. Davis was terminated by Merrill Lynch on September 18, 2002, after he asserted his Fifth Amendment rights in Commission testimony on September 10, 2002.

10. Daniel H. Bayly, 55, resides in Darien, Connecticut. Bayly was Global

Head of Merrill Lynch's Investment Banking division from 1999 until 2001, when he became Chairman of Investment Banking. Bayly retired from Merrill Lynch in the Fall of 2002. Bayly initially testified before the Commission on July 10, 2002 but later declined to provide additional testimony requested by the Commission.

11. Schuyler M. Tilney, 47, resides in Houston, Texas. Tilney was head of the Houston, Texas office of Merrill Lynch's Global Energy & Power division within Investment Banking until 2001, when he was promoted to Global Head of the Energy and Power Group. Tilney was placed on administrative leave by Merrill Lynch in July 2002, and terminated on September 18, 2002. He asserted his Fifth Amendment rights in Commission testimony on July 31, 2002.

12. Robert S. Furst, 41, resides in Dallas, Texas. Furst was a Managing Director of Merrill Lynch and, during the relevant period in 1999 and 2000, was the Enron relationship manager for the investment bank. Furst resigned from Merrill Lynch in 2001. Furst asserted his Fifth Amendment rights in Commission testimony on August 21, 2002.

## OTHER ENTITIES INVOLVED

13. Enron Corp. is an Oregon corporation with its principal place of business in Houston, Texas. During the relevant time period, the common stock of Enron was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange. In 2000, Enron raised millions in the public debt and equity markets. Among other operations, Enron was the nation's largest natural gas and electric marketer with reported annual revenue of more than $150 billion. Enron rose to number seven on the *Fortune 500* list of companies. By December 2, 2001, when it filed for bankruptcy, Enron's stock price had dropped in less than a year from more than $80 per share to less than $1.

## FACTUAL ALLEGATIONS

### Earnings Pressure At Enron, Year-End 1999

14. In late 1999, Enron faced shortfalls in earnings. Failure to meet earnings targets for year end 1999 might have had a negative impact on Enron's stock price and the compensation of Enron's senior management. Enron sought to make up the earnings shortfalls. As part of this effort, Enron devised two transactions that had the purpose and effect of fraudulently inflating Enron's reported financial performance. Seeking a partner to assist it in this endeavor, Enron approached Merrill Lynch in December 1999 with the two fraudulent earnings schemes.

### The Nigerian Barge Transaction B Asset Parking

15. In December 1999, defendants knowingly rendered substantial assistance to Enron in a fraudulent asset parking arrangement. This involved a "sale" of an interest in Nigerian barges that, as defendants knew, would allow Enron to record $12 million in earnings in the fourth quarter of 1999. The sale was a sham. The risks and rewards of ownership in the barges never passed to Merrill Lynch because Enron's CFO Andrew

Fastow guaranteed Merrill Lynch that it would not lose money and that it would be taken out of the deal within six months.

**Enron Approaches Defendants With Barge Transaction**

16. In mid-December 1999, Enron's treasurer contacted Furst about buying an interest in the Nigerian barge project. In the transaction, a Merrill Lynch special purpose entity ("SPE") would purchase stock in an Enron subsidiary called Enron Nigeria Barge Limited for $28 million. Ownership of the stock purportedly would entitle Merrill Lynch to receive certain future revenues from sales of power to Nigeria under a Power Purchase Agreement. Enron would provide $21 million of the purchase price to the Merrill Lynch SPE in the form of a loan that was non-recourse to Merrill Lynch. Thus, Merrill Lynch was asked to provide only $7 million in cash for the deal.

17. At the time Enron presented the transaction to defendants, there were significant questions about the value of the barge investment. The barges were still under construction and not yet operational in Nigeria. Various Nigerian government approvals had not been obtained, and Nigeria had not yet secured a $30 million Letter of Credit that was to serve as a guarantee for the government's performance under the Power Purchase Agreement. Further, given the short notice to defendants, they were unable to perform due diligence on the barge transaction. The transaction was unusual for the group at Merrill Lynch that would handle the transaction because, among other things, the group generally worked with domestic assets and structured lease transactions, and had no experience in dealing with Nigeria or Africa.

18. After discussing the transaction with Fastow and Enron's treasurer, Furst memorialized Enron's request in a memorandum dated December 21, 1999 to Bayly, Tilney, and others at Merrill Lynch. The memorandum stated that the transaction would allow Enron to book $10 million in earnings [later corrected to $12 million], and had to close by December 31, 1999. The memorandum also stated that Enron believed Merrill Lynch's "hold" would be for less than six months and the investment would have a 22.5% return (these terms were deliberately omitted from the operative transaction documents because they would have revealed the true nature of the transaction). The memorandum also noted that the transaction would permit Enron to record $28 million in cash flow. Furst strongly recommended that Merrill Lynch take part in the transaction because Enron was an important client.

19. In addition to the December 21, 1999 Furst memorandum, a document entitled "Appropriation Request" relating to the barge transaction was circulated within Merrill Lynch. This document also made clear that Enron and Merrill Lynch contemplated a side deal in which Merrill Lynch would be taken out of the transaction within six months at a specified rate of return. The document noted that the transaction (a) would allow Enron to book $12 million in earnings; (b) had to close by December 31, 1999; (c) would generate a return of $250,000 plus 15% per annum or a flat 22.5% per annum; and (d) required a $7 million financial commitment by Merrill Lynch. The document stated that Enron had "assured us that we will be taken out of our investment within six months" and that Enron would "facilitate" Merrill Lynch's "exit from the transaction with third party investors." The document added that Bayly would call senior management

at Enron "confirming this commitment to guaranty [sic] the ML takeout within six months." Finally, the document stated that Enron had "strongly requested ML to enter into this transaction," that Enron had paid Merrill Lynch approximately $40 million in fees in 1999, and was expected to do so again in 2000.

20. After the transaction documents circulated, various Merrill Lynch executives met and conferred regarding the transaction. Contemporaneous notes of individuals at Merrill Lynch with knowledge of the transaction referred to it as a $7 million "handshake" loan to Enron that would be repaid within six months.

**Merrill Lynch Reviews and Approves Barge Deal**

21. Furst and Tilney also began the process of getting approval within Merrill Lynch by talking to an executive who was the head of Merrill Lynch's structured leasing group. The Merrill Lynch executive told Furst he was not interested in the transaction because it was not a lease, it did not involve domestic assets, and his group had no experience in dealing with Nigeria or Africa. Tilney asked the Merrill Lynch executive to reconsider because Enron was an important client of Merrill Lynch and the transaction was very important to Enron. The Merrill Lynch executive agreed to run the transaction further up the chain of command at Merrill Lynch.

22. As part of this process, Merrill Lynch's "Debt Markets Commitment Committee" (DMCC) reviewed the transaction. In preparation for a meeting of the DMCC, an interoffice memorandum, dated December 22, 1999, was prepared and addressed to the committee. The document stated in part, "Enron will facilitate our exit from the transaction with third party investors. Dan Bayly will have a conference call with senior management of Enron confirming this commitment."

23. Prior to the DMCC meeting, Tilney and Furst called Bayly to discuss further the terms of the proposed transaction, as described above. The parties also discussed the fact that the transaction was very important to Enron.

24. At the same time, there was some dissension within Merrill Lynch about the transaction, including an internal document expressing concern that Merrill Lynch could be viewed as aiding and abetting Enron's fraudulent manipulation of its income statement.

25. The DMCC met on or about December 22, 1999. Furst presented the terms of the transaction, as outlined above, and emphasized the transaction was for an important Merrill Lynch client. Again, concerns were raised by certain individuals at Merrill Lynch about the propriety of the transaction, including whether Enron could properly treat the transaction as a sale, and whether Merrill Lynch could be viewed as aiding and abetting Enron's fraudulent manipulation of its income statement. The DMCC discussed the fact that Bayly was expected to call Fastow to make sure Enron appreciated Merrill Lynch's assistance, to confirm Enron's take-out, and to receive assurances of future business from Enron. The DMCC concluded it did not have authority to approve the transaction and that such approval would have to be given by higher authority, specifically Bayly or Davis.

26. Following the DMCC meeting, Bayly, Davis and Merrill Lynch executives who attended the DMCC meeting met to consider the transaction. The parties discussed, and Davis was fully aware, of the terms of the transaction, including that: (a) Merrill Lynch would purchase its interest in the Nigerian barges for $28 million; of this amount, $21 million would be provided by Enron to Merrill Lynch in the form of a loan, and Merrill Lynch would pay only $7 million in cash; (b) the transaction would allow Enron to book $12 million in year-end earnings, and for this reason had to close by December 31, 1999; and (c) Enron agreed to take out Merrill Lynch from the transaction within six months at a specified rate of return, 22.5%. Davis, Bayly, and others also discussed the fact that the transaction was very important to Enron. Davis knew that Enron was an important client of Merrill Lynch and that Enron had paid Merrill Lynch millions in fees in 1999 and was expected to do so again in 2000. Davis was also made aware by Bayly and others that there were concerns within Merrill Lynch about the propriety of the transaction, including the concerns raised before the DMCC. Davis was also informed by Bayly and others that the DMCC had not resolved these issues, had not approved the transaction, and that his approval would be necessary to enter into the transaction. Bayly, Davis, and others discussed the fact that Bayly was going to contact Fastow to confirm Enron's commitment to take Merrill out of the transaction. Davis instructed Bayly to make this call. After considering all of these facts, and knowing the transaction was a sham sale designed to allow Enron to record earnings, Davis approved the transaction. Davis and Bayly understood that it would not be necessary for Bayly to consult with Davis again to close the transaction once Bayly confirmed Enron's take-out commitment with Fastow.

27. Bayly called Fastow on or about December 23, 1999 to confirm the agreed upon take-out. Tilney and Furst, among others, participated in the call. These defendants also wanted to make sure that Fastow understood that Merrill Lynch was doing the transaction as a favor to Enron, and that Merrill Lynch would not be participating in the transaction unless it were trying to improve its business relationship with Enron. Fastow assured Merrill Lynch that it would not lose money and would be taken out of the deal within six months. Fastow stated that this guarantee could not be in writing as it would defeat Enron's ability to recognize a gain on the sale. After this call, Bayly directed others at Merrill Lynch to close the transaction with Enron.

**Enron Records Fraudulent Earnings**

28. Merrill Lynch invested $7 million, and Enron financed the remainder of the deal with a $21 million loan that was non-recourse to Merrill Lynch. Merrill Lynch never paid any interest on the loan. Defendants did not actively monitor the investment.

29. Enron recorded approximately $12 million of fictitious earnings in the fourth quarter of 1999 from the sale of the barge interest.

**Course of Conduct Confirms Take-Out**

30. Six months later, consistent with the guarantee given by Enron to Merrill Lynch, Fastow arranged for Merrill Lynch to be bought out of its interest in the barges. Internal Enron and Merrill Lynch documents dated in

the May-June 2000 time period confirm that Enron was obligated to take out Merrill Lynch by June 2000.

31. For example, a May 2000 Enron e-mail between Enron executives knowledgeable about the barge transaction states: "As we have discussed, should a strategic buyer not materialize by June 30, 2000, [ENRON] will have to take out ML and the investment in the barges will be placed on balance sheet. This will not only have income implications but require a level of damage control with AA [Arthur Andersen]. As you know, ML's decision to purchase the equity was based solely on personal assurances by Enron senior management to ML's Vice Chairman [Dan Bayly] that the transaction would not go beyond June 30, 2000."

32. In a later e-mail in the same e-mail chain, another Enron executive wrote to reiterate Enron's obligation to Merrill Lynch: "[t]o be clear, ENE [Enron] is obligated to get Merrill Lynch out of the deal on or before June 30. We have no ability to roll structure." In response, another executive wrote: "We have always understood that is required."

33. Another internal Enron e-mail confirms the take-out: "[t] he deal with ML was to get them a total annualized return of roughly 20%" and that "ML is expecting to receive a minimum of $7.525 million when they sell there [sic] equity on June 30, 2000."

34. In mid-June 2000, Furst and others at Merrill Lynch prepared a draft letter to Enron in anticipation of the agreed upon take-out. The letter referred to the barge transaction and stated: "Enron has agreed to purchase the [Enron] shares from Ebarge [the Merrill Lynch SPE] by June 30, 2000, for a purchase price . . . of $7,510,976.55." The letter also provided Enron wiring instructions and indicated the amount should be paid "on or before June 30, 2000." Merrill Lynch did not have to send the letter because on or about June 14, 2000, an Enron executive contacted Merrill Lynch and said that Enron had found a buyer for Merrill Lynch's interest for the "agreed upon amount."

35. Enron arranged for LJM2, a partnership operated by Fastow, to buy Merrill Lynch's interest. On June 29, 2000, LJM2 bought Merrill Lynch's interest for $7,525,000. The price was not the product of negotiation. Rather, the price reflected a $525,000 premium over Merrill Lynch's original investment to account for the rate of return promised to Merrill Lynch. As agreed, Merrill Lynch earned approximately a 22% annualized return on its $7 million investment. LJM2 documents confirm that it made the purchase to fulfill Fastow's guarantee.

**The Energy Trade Transaction**

36. Merrill Lynch, Furst, and Tilney also assisted Enron in another fraudulent year-end transaction in December 1999. In this transaction, Enron agreed to pay Merrill Lynch a $17 million fee to enter into a virtually offsetting energy trade. Merrill Lynch, Furst, and Tilney knew, among other things, that the transaction: (a) was essentially risk free to Merrill Lynch, and (b) had the purpose and effect of inflating Enron's reported income by approximately $50 million in 1999, and that such earnings were necessary for Enron to meet earnings targets and award bonuses to senior management. Merrill Lynch, Furst, and Tilney also knew that Enron was

contemplating unwinding the transaction after obtaining its earnings benefit. Knowing these facts, and to accommodate an important client, Merrill Lynch, Furst, and Tilney knowingly rendered substantial assistance to Enron in carrying out the fraudulent transaction. After the transaction was completed and Enron reported its inflated earnings, Enron and Merrill Lynch unwound the transaction on June 30, 2000, and Enron received $8.5 million, half of its original fee.

## Enron Approaches Merrill Lynch With Proposed Energy Trade

37. In December 1999, the CEO of Enron North America contacted Merrill Lynch investment bankers to discuss a proposed electricity option transaction that Enron wanted to complete by year end. Furst and Tilney wanted to do the transaction to help Enron and sought approval within Merrill Lynch. Initially, a Merrill Lynch executive told Furst and Tilney that Merrill Lynch was unlikely to approve the deal because such transactions normally took weeks or months to analyze and complete. However, Merrill Lynch explored whether it could complete the transaction in the tight time frame based on Enron's importance as a client and the urgency of its request.

38. Enron supplied Merrill Lynch with summary documents for the proposed transaction. Enron designed a transaction structure using two "back to back" call options. Enron proposed to sell Merrill Lynch a physically settled call option. Simultaneously, Merrill Lynch would sell to Enron an offsetting financially-settled call option. The terms of the options were nearly identical.

39. Furst and Tilney helped draft a summary memorandum dated on or about December 29, 1999, describing the terms of the transaction. The memorandum stated that the transaction was one of Enron's highest priorities and would enable Enron to achieve "off-balance sheet" treatment for certain assets. The memorandum discussed the options to be sold by each party to the other, stating, "[t]he quantities, pricing points, market locations and term are `mirror image.'" In a portion addressing "risk," the memorandum stated, "[t]he proposed transaction is `back-to-back' and is therefore `delta-neutral.'" The memorandum also stated that Enron would pay a fee of $17 million based in part on "the benefits enjoyed by Enron as a result of the transaction," and the fee would be built into the option premiums paid by Enron. The memorandum closed with a recommendation to approve the transaction based on Enron's importance as a client, the millions in fees paid by Enron on other transactions, and the financial benefits to Merrill Lynch and Enron.

40. Merrill Lynch, Furst, and Tilney knew they could request a substantial fee from Enron because Enron was anxious to complete the transaction. Enron was initially surprised regarding the size of the fee because the transaction posed little risk to Merrill Lynch, but ultimately agreed to pay a $17 million fee given the importance of the transaction to its year end earnings.

## Merrill Lynch Reviews And Approves Energy Trade

41. On or about December 30, 1999, Merrill Lynch's Special Transactions Review Committee (STRC) met to review the transaction. Prior to the

meeting, the STRC received the summary memorandum (see & 39 infra) prepared by Furst, Tilney, and another Merrill Lynch executive. The STRC reviewed the details of the transaction as described in the summary memorandum. The STRC also was informed that the transaction had no market risk and that the options offset each other. The STRC questioned, among other things, how Enron could use the transaction to achieve off balance sheet treatment for certain assets. The meeting adjourned so that more information could be obtained from Furst and Tilney.

42. While the STRC meeting was adjourned, Furst and Tilney had conversations with others at Merrill Lynch about questions raised at the meeting. Furst and Tilney then revealed to others at Merrill Lynch, for the first time, that Enron's purpose for the transaction was to achieve year-end earnings, not off-balance sheet treatment of assets. Merrill Lynch executives were angry and embarrassed at this revelation because they had given different information to the STRC. Once Enron's true purpose was known, a Merrill Lynch employee expressed reservations about the transaction because it appeared to him to be a ploy by Enron to manipulate its earnings. In response, another high level Merrill Lynch executive stated that Merrill Lynch had "17 million reasons" for getting the transaction approved.

43. When the STRC reconvened on or about December 30, 1999, Furst and Tilney joined the meeting by telephone. Furst and Tilney revealed to the STRC Enron's true purpose for the transaction -- to achieve year end earnings. Merrill Lynch also knew that Enron was accounting for the transaction in a different manner than Merrill Lynch was planning. Merrill Lynch viewed the transactions as offsetting with the only gain being the $17 million fee owed to Merrill Lynch. The STRC discussed how it could be that Enron intended to record a gain on the transaction. Concerned, Merrill Lynch attempted to create a record that it thought would shield itself from liability or exposure. The STRC expressed a desire to speak directly to Enron and its auditors, purportedly to confirm that Enron's accounting for the sham transaction had been approved.

44. Furst and Tilney contacted Enron's chief accounting officer (CAO) and asked him to speak to the STRC. Enron's CAO joined the STRC meeting by phone, introduced by Furst. Enron's CAO told Merrill Lynch that he was aware of the transaction, that Enron intended to take $50-60 million in earnings on it, that this was a material amount for Enron, and that it would affect bonuses of senior management at Enron. Enron's CAO also claimed that Arthur Andersen, Enron's auditors, had been consulted and had approved Enron's accounting for the transaction. Merrill Lynch requested that Enron provide a "warranty letter" stating that Andersen approved the transaction, that Merrill Lynch had provided no accounting advice to Enron, and that Enron had not relied on Merrill Lynch to determine the market value of the transactions. Merrill Lynch prepared the letter and Enron's CAO faxed the signed letter back to Merrill Lynch on December 31, 1999.

45. Merrill Lynch, Furst, and Tilney never talked to Andersen, and had no engagement or retainer with Andersen. Andersen provided no analysis or anything else about the transaction orally or in writing to Merrill Lynch, Furst, and Tilney. Merrill Lynch, Furst, and Tilney did not know whether Enron had fully disclosed to Andersen all facts about the transaction. These defendants fully knew, regardless of the purported "warranty letter," that

the transaction was a sham transaction intended to create year-end earnings for Enron.

46. After Merrill Lynch received the purported "warranty letter" from Enron, the transaction closed. Enron recognized nearly $50 million in earnings for the year end 1999.

## The Parties Unwind The Energy Trade

47. In February 2000, less than two months after the transaction was agreed upon, Enron sought to unwind the transaction early. Furst sought guidance within Merrill Lynch on a fee for the early unwind (because the original fee of $17 million was not paid up-front but would be paid in the form of option premiums, beginning months later, in September 2000).

48. In May 2000, an Enron executive again asked Merrill Lynch to unwind the transaction, with no payment of the $17 million fee to Merrill Lynch. However, Furst and Tilney believed that Merrill Lynch should be compensated for the early unwind. An e-mail dated May 2000 written by Tilney and sent to Furst and others confirmed that the parties contemplated the unwind at the inception of the transaction, and that the purpose of the transaction was to help Enron make earnings:

> This is not a great surprise as [the ENA CEO] had indicated to Rob [Furst] and me at year-end when we did this trade that [Enron] thought they would want to unwind at some point. As you know, [the ENA CEO] has now moved on to a new position at Enron, and I for one am less concerned about the relationship issues as they knew what we were making at the time and we were clearly helping them make earnings for the quarter and year (which had great value in their stock price, not to mention personal compensation). What would you think was a fair number in the absence of relationship issues?

49. Furst and Tilney had conversations with a Merrill Lynch executive who wanted the full original $17 million fee to unwind the transaction. The Merrill Lynch executive, Furst, and Tilney met with Bayly on the issue. Bayly told the participants that Merrill Lynch should unwind the transaction early for a lower amount, because Enron was an important client and there were wider relationship considerations. Thereafter, Furst negotiated with Enron regarding the fee.

50. On June 30, 2000, the same time period at which Enron facilitated the take out of Merrill Lynch from the barge transaction, the energy trade was unwound. Merrill Lynch received $8.5 million for the unwind, half of its original fee for the transaction.

## Effect of the Sham Transactions on Enron's Earnings and Merrill Lynch's Fees

51. Enron's fraudulent scheme, aided and abetted by defendants, resulted in Enron's recognition of approximately $60 million in income for the fourth quarter 1999 (improving net income from $199 million to $259 million, a 30% increase). The fraudulent transactions also increased Enron's 1999

earnings per share from $1.09 to $1.17. The fraudulent earnings were publicly reported in Enron's 1999 Form 10-K and were reflected in Enron's 10-Q for the first quarter of 2000, the results of which were later distributed and published by Enron numerous times. Since the fraudulent earnings enabled Enron to meet its 1999 earnings targets, they had a favorable impact on Enron's stock price and the amount of bonuses for Enron's senior management, and enabled Enron to raise millions of dollars.

52. Merrill Lynch earned $9.275 million in fees from the barge and energy trade transactions. Defendants' substantial participation in Enron's fraud resulted in continued business and fees for Merrill Lynch on other Enron engagements.

53. Merrill Lynch handsomely compensated Bayly, Davis, Furst, and Tilney, and their efforts for Enron were a factor in determining the amount of this compensation.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

54. Paragraphs 1 through 53 are realleged and incorporated by reference herein.

55. As set forth more fully above, Enron, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by the use of the mails and of the facilities of a national securities exchange, in connection with the purchase or sale of securities; has employed devices, schemes, or artifices to defraud, has made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or has engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

56. As detailed above, defendants knowingly provided substantial assistance to Enron in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

57. Based on the foregoing, defendants aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, & 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13]

58. Paragraphs 1 through 57 are realleged and incorporated by reference

herein.

59. By engaging in the conduct described above, defendants knowingly and substantially assisted Enron to file with the Commission a false and misleading annual report on Form 10-K for 1999 and a false and misleading quarterly report on Form 10-Q for the first quarter of 2000.

60. By reason of the foregoing, defendants aided and abetted violations by Enron of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## THIRD CLAIM

### Aiding and Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

61. Paragraphs 1 through 60 are realleged and incorporated by reference herein.

62. By engaging in the conduct described above, defendants aided and abetted Enron's failures to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected Enron's transactions and dispositions of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act, and further aided and abetted failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Enron's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with generally accepted accounting principles in violation of Section 13(b)(2)(B) of the Exchange Act.

63. By engaging in the conduct described above, Enron, directly or indirectly, falsified or caused to be falsified, books, records, and accounts subject to section 13(b)(2)(A) of the Exchange Act, in violation of Exchange Act Rule 13b2-1 and defendants aided and abetted Enron's violation of this rule.

64. By reason of the foregoing, defendants aided and abetted violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1 thereunder.

## FOURTH CLAIM

### Aiding and Abetting Violations of Section 13(b)(5) of the Exchange Act
### [15 U.S.C. § 78m(b)(5)]

65. Paragraphs 1 through 64 are realleged and incorporated by reference herein.

66. By engaging in the conduct described above, defendants aided and abetted Enron's knowing circumvention or knowing failure to implement a system of internal financial controls at Enron.

67. By reason of the foregoing, defendants aided and abetted Enron's violations of Section 13(b)(5) of the Exchange Act.

## JURY DEMAND

69. The Commission demands a jury in this matter.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A. Grant a Permanent Injunction restraining and enjoining defendants from violating the statutory provisions set forth herein; prohibiting Bayly, Davis, Furst, and Tilney permanently and unconditionally from acting as officers or directors of any issuer of securities that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of such Act; ordering Merrill Lynch to pay disgorgement of illegal gains, and ordering all defendants to pay civil penalties;

B. Pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204 (2002), enter an order providing that the amount of civil penalties ordered against defendants be added to and become part of a disgorgement fund for the benefit of the victims of the violations alleged herein; and

C. Grant such other and additional relief as this Court may deem just and proper.

Dated: March ____, 2003

Respectfully submitted,

_____
Stephen M. Cutler
    Director, Enforcement Division
Linda Chatman Thomsen
    Deputy Director, Enforcement Divisio
Charles J. Clark
    Assistant Director, Enforcement Divis

_____
Luis R. Mejia
Assistant Chief Litigation Counsel
Attorney-in-Charge, Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549-0911
Phone: (202) 942-4744 (Mejia)
Fax: (202) 942-9569 (Mejia)

Of Counsel:

Alex Lipman
Kevin M. Loftus

*http://www.sec.gov/litigation/complaints/comp18038.htm*



## U.S. Securities and Exchange Commission

## U.S. Securities and Exchange Commission
## Washington, D.C.

**Litigation Release No. 18038 / March 17, 2003**

**Accounting and Auditing Enforcement Release No. 1742 / March 17, 2003**

*Securities and Exchange Commission v. Merrill Lynch & Co., Inc., Daniel H. Bayly, Thomas W. Davis, Robert S. Furst, Schuyler M. Tilney,* **Case No. H-03-0946 (Hoyt) (S.D. Tx)**

### SEC Charges Merrill Lynch, Four Merrill Lynch Executives with Aiding and Abetting Enron Accounting Fraud

### Merrill Lynch Simultaneously Settles Charges for Permanent Anti-Fraud Injunction and Payment of $80 Million in Disgorgement, Penalties and Interest

The Securities and Exchange Commission today charged Merrill Lynch & Co., Inc. and four of its former senior executives with aiding and abetting Enron Corp.'s securities fraud. The Commission's complaint, filed in U.S. District Court in Houston, alleges that Merrill Lynch and its former executives aided and abetted Enron Corp.'s earnings manipulation by engaging in two fraudulent year-end transactions in 1999. The transactions had the purpose and effect of overstating Enron's reported financial results. Specifically, Enron used these transactions to add approximately $60 million to its fourth quarter of 1999 income (improving net income from $199 million to $259 million or 33 percent) and to increase its full year 1999 earnings per share from $1.09 to $1.17.

Simultaneous with the filing of this action, the Commission has agreed to accept Merrill Lynch's offer to settle this matter. Merrill Lynch, without admitting or denying the allegations in the complaint, has agreed to pay $80 million dollars in disgorgement, penalties and interest and has agreed to the entry of a permanent anti-fraud injunction prohibiting future violations of the federal securities laws. The Commission intends to have these funds paid into a court account pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002 for ultimate distribution to victims of the fraud. The four former Merrill Lynch executives named in the complaint, Robert S. Furst, Schuyler M. Tilney, Daniel H. Bayly, and Thomas W. Davis, are contesting the matter.

The Commission's complaint alleges that, in late December 1999, senior Enron executives approached Merrill Lynch with the two transactions it had designed. As alleged, the first transaction was an asset-parking arrangement whereby on December 29, 1999, Merrill Lynch bought an

interest in certain Nigerian barges from Enron with an express understanding that Enron would arrange for the sale of this interest by Merrill Lynch within six months at a specified rate of return. In substance, this transaction was, at best, a bridge loan because the risks and rewards of ownership of the interest in the barges did not pass to Merrill Lynch.

As further alleged in the complaint, Merrill Lynch and the named executives knew that Enron would record $28 million in revenue and $12 million in pre-tax income in connection with this transaction. The Commission alleges that Merrill Lynch and the named executives entered into this transaction solely to accommodate Enron, despite express concerns that Merrill Lynch could appear to be aiding and abetting Enron's earnings manipulation. In 2000, Enron arranged to take Merrill Lynch out of the barge deal on the agreed time frame at the agreed rate of return.

In the second transaction, also closed in the last days of December 1999, Merrill Lynch and Enron entered into two energy options — one physical and one financial — that Merrill Lynch knew had the purpose and effect of inflating Enron's income by approximately $50 million. The complaint details that, at year-end 1999, the trading under these options was not scheduled to begin for approximately nine months. Before the transaction was closed, the complaint alleges, Enron told Merrill Lynch that, despite a nominal term of four years, it might want to unwind this transaction early.

Merrill Lynch believed that the two trades were essentially a wash and knew that the transaction would have a significant impact on Enron's reported results, bonuses, and stock price. Merrill Lynch demanded a multi-million dollar fee for entering into this transaction; Enron ultimately agreed to pay Merrill Lynch a structured fee to be paid over four years with a net present value of $17 million. In 2000, Enron approached Merrill Lynch seeking to unwind the transaction before trading under the energy options was scheduled to begin. The deal was unwound in June 2000 after Merrill Lynch agreed to reduce its fee to $8.5 million to terminate the transaction.

The complaint alleges that Merrill Lynch and the named executives aided and abetted Enron's violations of the anti-fraud, reporting, books and records, and internal controls provisions of the federal securities laws. For these violations, the Commission seeks in its complaint a permanent injunction, disgorgement, and civil penalties with respect to Merrill Lynch and, with respect to the individual defendants, permanent injunctions, civil penalties, and permanent officer and director bars.

Simultaneous with the filing of the complaint, Merrill Lynch agreed to file a consent and final judgment settling the Commission's action against it. In the consent, Merrill Lynch has agreed, without admitting or denying the allegations of the complaint, to the entry of a final judgment permanently enjoining it from future violations of Sections 10(b), 13(a), 13(b)(2), and 13(b)(5) and of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

Merrill Lynch also has agreed to pay disgorgement, penalties and interest in the amount of $80 million. Specifically, Merrill Lynch will pay $37.5 million in disgorgement, $5 million in prejudgment interest, and a civil penalty of $37.5 million. As noted above, the Commission intends to have these funds paid into a court account pursuant to the Fair Fund provisions of Section

308(a) of the Sarbanes-Oxley Act of 2002 for ultimate distribution to victims of the fraud.

In agreeing to resolve this matter on the terms described above, the Commission took into account certain affirmative conduct by Merrill Lynch. Merrill Lynch terminated Messrs. Davis and Tilney after they refused to testify before the staff and instead asserted their Fifth Amendment rights. In addition, Merrill Lynch brought the energy trade transaction to the staff's attention at a time when it believed the staff was unaware of its existence.

The Commission acknowledges the assistance provided by the staff of the Federal Energy Regulatory Commission in this investigation.

The Commission also acknowledges the continuing coordination among the Division of Enforcement, the Justice Department Enron Task Force and the Federal Bureau of Investigation in the Enron investigation.

The Commission's investigation is continuing. For additional information see

- SEC v. Andrew S. Fastow - Litigation Release 17762 (Oct. 2, 2002)

- SEC v. Michael J. Kopper — Litigation Release 17692 (Aug. 21, 2002)

- SEC v. Kevin A. Howard and Michael W. Krautz — Litigation Release 18030 (March 12, 2003)

➤ SEC Complaint in this matter


*http://www.sec.gov/litigation/litreleases/lr18038.htm*

Home | Previous Page                                    Modified: 03/17/2003

Exhibit B

Case 2:04-cv-05513-TCP-WDW   Document 1   Filed 12/17/04   Page 41 of 95

# Graphic: Deal Me In (extended)

# The Merrill 97

Who are the "Merrill 97"? Below is the complete list of current and former Merrill Lynch employees who invested in the partnership set up by former Enron CFO Andrew S. Fastow in 1999. Merrill's private equity sales team raised $265 m million committed to the partnership. Based on documents obtained by BusinessWeek, these individuals contributed a million:

| NAME | AMOUNT | NAME | AMOUNT |
|---|---|---|---|
| 1. Barry Friedberg | $500,000 | 50. Joseph Marion man. | 200,000 |
| 2. Brian Abdoo | 50,000 | 51. Frank Maturo | 100,000 |
| 3. Kevin Albert | 250,000 | 52. Mark McAndrews* | 50,000 |
| 4. Michael Anderson | 100,000 | 53. Robert McCann | 200,000 |
| 5. Gary Baker | 100,000 | 54. David McCarthy | 200,000 |
| 6. Daniel Bayly | 200,000 | 55. Thomas McCreary | 50,000 |
| 7. Alan Biloski* | 140,000 | 56. Louis Wolf McIntosh | 100,000 |
| 8. James Birle | 150,000 | 57. William McManus | 100,000 |
| 9. James Brown | 50,000 | 58. Peter Meyer* | 250,000 |
| 10. Eduardo Cabrera | 100,000 | 59. James Meyer* | 300,000 |
| 11. Daniel Campbell* | 300,000 | 60. Christopher Mize | 65,000 |
| 12. Robert Chandler | 400,000 | 61. William Montgomery* | 75,000 |
| 13. Louis Chiavacci | 1,000,000 | 62. Charles Murphy* | 750,000 |
| 14.. Martin Cicco | 100,000 | 63. Victor Nesi | 50,000 |
| 15. Francis Corcoran Jr. | 150,000 | 64. Brian O'Gara | 250,000 |
| 16. Emmett Daly | 75,000 | 65. Keith Overlander | 75,000 |
| 17. Munir Dauhajre | 200,000 | 66. Michael Pavelec | 50,000 |
| 18. Thomas Davis | 150,000 | 67. Paul Pepe | 150,000 |
| 19. Samuel Dodson III | 300,000 | 68. John Pratt | 150,000 |
| 20. Helen Doyle* | 50,000 | 69. Harish Raghavan | 100,000 |
| 21. Marisa Drew | 75,000 | 70. Leo Ressa | 75,000 |
| 22. Kevin Dunleavy | 75,000 | 71. Richard Reubenstone | 50,000 |
| 23. Richard Dunn | 500,000 | 72. Daniel Richards* | 100,000 |
| | | 73. William Howard | 600,000 |

| | | | |
|---|---|---|---|
| 24. Frederick Fiddle | 75,000 | Riddle | |
| 25. James Flaherty | 50,000 | 74. John Roberts | 50,000 |
| 26. Robert Furst* | 200,000 | 75. Douglas Robinson | 200,000 |
| 27. Michael Geitz | 100,000 | 76. Ronald Rosenberg | 100,000 |
| 28. William Genco | 250,000 | | |
| 29. Mark Godvin | 65,000 | 77. Purna Saggurti | 50,000 |
| 30. Kenneth Goldberg | 50,000 | 78. Clare Schiedermayer | 50,000 |
| 31. Richard Gordon | 500,000 | 79. Mark Schulte | 100,000 |
| 32. Scott Haberman | 50,000 | 80. Gregg Seibert | 150,000 |
| 33. Michael Hammond | 100,000 | 81. Michael Senft* | 75,000 |
| | | 82. John Shaffer | 100,000 |
| 34. Michele Harrington | 50,000 | 83. Kurt Simon | 150,000 |
| 35. Alan Hartman | 50,000 | 84. Douglas Squires | 50,000 |
| 36. Brian Hehir | 150,000 | 85. Brian Sterling | 100,000 |
| 37. Peter Hoffman | 150,000 | 86. Benjamin Sullivan | 150,000 |
| 38. Keith Horn | 100,000 | 87. Todd Sycoff | 100,000 |
| 39. Michael Hughes | 450,000 | 88. James Tammaro | 150,000 |
| 40. Christopher Johnson | 50,000 | 89. M Tayabji | 100,000 |
| | | 90. Schuyler Tilney | 750,000 |
| 41. Rob Jones | 100,000 | 91. Thomas Troy | 200,000 |
| 42. Gerald Knorr | 200,000 | 92. Daniel Tully | 200,000 |
| 43. Jerry Labowitz | 250,000 | 93. Donald Ullmann | 200,000 |
| 44. Mark Lane* | 50,000 | 94. Robert Vaughan* | 50,000 |
| 45. Alain Lebec | 1,000,000 | 95. Raymond Wong | 500,000 |
| 46. David Lund | 100,000 | 96. Thomas Wright | 100,000 |
| 47. Herb Lurie* | 100,000 | 97. Stephen Zimmerman* | 250,000 |
| 48. Thomas Lynett* | 200,000 | | |
| 49. Edward Malmstrom | 100,000 | * No longer employed by Merrill Lynch | |

▲
BACK TO TOP

Case 2:04-cv-05513-TCP-WDW    Document 1    Filed 12/17/04    Page 43 of 95

Copyright 2002, by The McGraw-Hill Companies Inc. All rights reserved.
Terms of Use | Privacy Policy

Media Kit | Special Sections | MarketPlace | Knowledge Centers

The **McGraw·Hill** Companies

Exhibit C

Case 2:04-cv-05513-TCP-WDW    Document 1    Filed 12/17/04    Page 45 of 95

*Nov. 4, 2004, 3:48PM*

# 5 guilty in Enron barge scheme

## One former exec and 4 bankers are convicted of fraud; accountant cleared

**By MARY FLOOD and TOM FOWLER**
**Copyright 2004 Houston Chronicle**

A former Enron finance executive and four ex-Merrill Lynch bankers were found guilty of conspiracy and fraud Wednesday while a co-defendant, an ex-Enron accountant, walked onto the sunlit sidewalk in front of the federal courthouse a free woman.

The jury in the first Enron criminal trial acquitted a grateful Sheila Kahanek while convicting the five others in a 1999 deal in which Enron padded its earnings by pretending to sell an interest in Nigerian barges to Merrill Lynch.

Though 14 former Enron employees have pleaded guilty to various crimes, this verdict marks the first jury finding against an ex-Enron executive and four ex-Wall Street bankers for aiding and abetting the Enron scheme.

The case was a test of Enron Task Force prosecutors' accusations of earnings manipulations, alleged repeatedly in the bigger upcoming case against ex-Enron Chairman Ken Lay and ex-CEO Jeff Skilling. Prosecutors were also very pleased that jurors found two defendants guilty for lying to or obstructing authorities.

But the government was not invincible, and legal experts think the case has many lessons for the 11 people awaiting trial on Enron-related criminal charges.

"This may be a shot across the bow for the government in its upcoming multiple-defendant cases. Juries like to let somebody go; they understand how important these charges are, and they feel better when they find someone to let go," said Houston lawyer David Berg.

Prosecutors had contended that all six defendants in this case conspired to pump up Enron's profits by temporarily "selling" the barges to Merrill Lynch in a 1999 deal. The part of the deal in question: an oral guarantee that someone would buy back the barges from Merrill Lynch within six months at a locked-in profit for the banking firm.

Enron recorded $12 million in earnings from the deal and met its profit goals, but if Merrill Lynch never took on any risk when it took over the barges, then Enron was cooking its books.

Defense attorneys tried to convince jurors their clients believed Merrill

## RESOURCES



The Nigerian barges that prosecutors say Enron needed to sell to shore up profits.

◀ **AUDIO: Prosecutor Matt Friedrich's statement.**



◀ Former Enron accountant Sheila Kahanek talks about:
• **How she felt as her acquittal was read.**
• **How she connected with the jury.**
• **The effects of being on trial.**
• **Whether she regrets working at Enron.**
• Attorney Dan Cogdell on **Kahanek's prosecution.**

### THE ACCUSATIONS
• **Q&A:** What the trial was all about and what barges off the coast of Nigeria have to do with Enron
• **Indictment:** Six former executives charged with conspiracy to commit wire fraud and falsify books and records. Additional charges against three.
• **Picturing it:** Enron's questionable barge deal explained.
• **Trial evidence:** E-mail and other documents prosecutors said supported their case and defense attorneys said showed the opposite.

Case 2:04-cv-05513-TCP-WDW    Document 1    Filed 12/17/04    Page 46 of 95

Lynch was taking a real risk by buying Enron's stake in three Nigerian barges, making the deal a true sale, not a thinly disguised loan. They noted their clients ran the deal past lawyers and freely distributed documents, which would not have made sense if they knew it was fraud.

Each of the six defendants faced at least three charges — one of conspiracy and two each of wire fraud. Most of them now face 15 to 30 years in prison.

## The defendants

Dan Boyle, 48, of Clear Lake, the former vice president at Enron's global finance group, was convicted of all three charges as well as a charge of lying to a congressional investigator about the deal. Though he contradicted himself in testimony, at one point Boyle said he knew the deal was wrong even as he continued working on it.

James A. Brown, 52, of Connecticut, the former managing director of Merrill's strategic asset lease and finance group, was convicted of all three charges and of lying to and obstructing the Enron grand jury. He told grand jurors he didn't know about an oral side deal, though he referred to the secret deal clearly in an e-mail.

Daniel Bayly, 57, also of Connecticut, the former head of global investment banking at Merrill who made a $10 million salary in 1999, was convicted of all three charges for his part in a phone call obtaining the oral side deal. William Fuhs, 36, of Colorado, a former vice president in Merrill's lease finance group, was convicted of the three charges, as was Robert Furst, 43, of Dallas, a former Merrill managing director.

The six-woman, six-man jury listened to six weeks of testimony and deliberated more than 20 hours over five days to reach this verdict. They are due back in court this morning to hear testimony about how much damage the sham deal caused. The government will allege it cost more than $40 million, while the defense will say it caused no financial damage.

The jury will act as an adviser to U.S. District Judge Ewing Werlein, who is holding this second phase of the trial because the U.S. Supreme Court has not yet said whether it has found the federal sentencing guidelines to be unconstitutional. Makeshift hearings like this, trying to second-guess an upcoming high court ruling, are held occasionally in other cases around the country, lawyers said.

## Appeals planned

But the judge also ordered the probation department to do the usual pre-sentencing report on the five men.

Richard Schaeffer, lawyer for Bayly, and Ira Sorkin, lawyer for Furst, said they plan to appeal the guilty verdicts. The attorneys said the issues on appeal will include rulings about what evidence the jury saw, including Brown's damaging

e-mail against other defendants.

• **Kahanek' defense:** How the acquitted defendant's case differed from the others'.

**Trial highlights** 

**THE ACCUSED**
Enron
• **Dan Boyle:** Guilty
• **Sheila Kahanek:** Not guilty

Merrill Lynch
• **James A. Brown:** Guilty
• **Daniel Bayly:** Guilty
• **William Fuhs:** Guilty
• **Robert Furst:** Guilty

**ENRON UPDATES**
• **Prosecution scorecard:** Who's been charged, convicted and cleared.
• **Gallery of key players:** Click through updates on Enron's familiar faces.
• **Enron timeline**
• **Take a quiz:** Are you an Enron junkie or merely well-informed?

**MORE**
• **Archives of Chronicle's Enron coverage** with additional resources
• **Legal documents on Enron compiled by FindLaw** (PDF files require Acrobat Reader)

Case 2:04-cv-05513-TCP-WDW   Document 1   Filed 12/17/04   Page 47 of 95

Lawyers for Fuhs and Boyle refused to comment, as did Enron Task Force Director Andrew Weissmann.

Kahanek's attorney, Dan Cogdell, called the jury's verdict courageous, given the way Enron affected many people personally in Houston.

"There's a lot of Enron venom in the water and for them to get through this, to put that aside and to judge Sheila for who she is as opposed to how she was painted, is a courageous thing," he said.

Kahanek said she was greatly relieved by the verdict and thankful to the jury and to the friends and family who stood by her. She said that despite the turmoil, she didn't regret her time at Enron.

"I worked with a lot of fine people at Enron," she said. "The things I learned about, the things I've seen throughout this trial, have been just as surprising to me as a lot of other people who sat in that courtroom. But I would definitely like for Enron to be behind me."

Jacob Frenkel, a former federal prosecutor in the Washington, D.C.-area who has been following the case, sees this as a big win for the prosecution despite the acquittal of Kahanek.

"Guilty pleas don't test the government. This was a preview to how this kind of evidence will play in the bigger cases," he said. "Plus, if the right verdict was that Ms. Kahanek go free, and that's where the evidence seemed to point, it's not a loss for the government if it's justice."

Frenkel suggested that the acquittal will impede other defendants in the claim that excessive publicity has tainted the Houston jury pool against all Enron-related defendants.

Mike Ramsey, attorney for Lay, said he thinks this trial has little to do with his client.

"Lay is high-profile, an identifiable name," Ramsey said. "It's one thing to acquit her and another to acquit the chairman of the board."

Daniel Petrocelli, lead trial attorney for Skilling, said he would not comment on the barge verdict.

Dan Hedges, a Houston lawyer and former U.S. Attorney for the region, said Kahanek's successful defense — that she opposed a side deal and did not know one existed — could be good news for Lay and others.

"It's important to note a jury was willing to listen and go along with someone saying, 'I didn't know,' " Hedges said.

## Signal on corporate fraud

The Justice Department said it was pleased with the outcome.

"Today's verdict signals that executives committing corporate fraud will be vigorously investigated and prosecuted. Those who aid such fraud will meet the same fate," said Christopher A. Wray, assistant attorney general the Justice Department's criminal division, in a statement.

He said the prosecution of these individuals "goes hand in hand" with the government's deferred prosecution agreement with Merrill Lynch that set up measures meant to deter this kind of income

manipulation in the future.

Bill Halldin, spokesman for Merrill Lynch, which paid for the defense attorneys for its former employees, said "it would be inappropriate for us to comment on their trial."

Halldin said the company "put this case behind it more than a year ago" when it settled with the Justice Department. He said Merrill Lynch believes this verdict will have "little or no impact" on the Enron-related civil litigation pending against it because the barge transaction did not cause significant shareholder losses and did not precipitate the bankruptcy.

mary.flood@chron.com and tom.fowler@chron.com

ADVERTISEMENT








Exhibit D

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated                    Page 1 of 25



## U.S. Securities and Exchange Commission

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| 450 Fifth Street, N. W. | : |
| Washington, DC 20549, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| -against- | : |
|  | : |
| MERRILL LYNCH, PIERCE, FENNER | : |
| & SMITH INCORPORATED | : |
| 4 World Financial Center | : |
| New York, NY 10080 | : |
|  | : |
| Defendant. | : |

Civil Action No.

COMPLAINT

---

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## NATURE OF THE ACTION

1. The Commission brings this action against defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated to redress its violations of the federal securities laws and several rules of conduct of NASD, Inc. ("NASD") and the New York Stock Exchange, Inc. ("NYSE").

2. During the period January 1, 1999 to December 31, 2001 (the "relevant period"), as enumerated below, Merrill Lynch published research reports on two Internet companies that violated antifraud provisions of the federal securities laws, and published research reports on five other Internet companies that expressed views inconsistent with the analysts' privately expressed negative views in violation of NASD's and NYSE's advertising rules. Those rules require that, among other things, published research reports have a reasonable basis, present a fair picture of the investment risks and benefits, and not make exaggerated or unwarranted claims.

3. On various occasions during the relevant period, Merrill Lynch allowed its investment banking function to exercise undue influence over research analysts, thereby resulting in conflicts of interest for its research analysts, and it failed to manage these conflicts in an adequate or appropriate manner. These circumstances arose from a combination of forces, including the following: (i) Merrill Lynch's investment banking division unduly

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

influenced the analysts' decisions regarding whether to provide research coverage for a particular stock and how to rate that stock; (ii) Merrill Lynch encouraged research analysts to participate regularly in investment banking's marketing activities prior to the publication of research, and coordinated their research coverage with investment banking; (iii) in certain instances, Merrill Lynch investment bankers and actual and prospective investment banking clients reviewed draft research reports and ratings before publication, and Merrill Lynch used research in conjunction with investment banking to generate banking business; and (iv) Merrill Lynch's compensation of research analysts was influenced by the analysts' contributions to investment banking revenue.

4. Merrill Lynch's policies and procedures that were intended to maintain the independence of research analysts from investment banking were inadequate to ensure its research analysts issued objective research and were not compromised by the conflicts of interest described above. As a result, Merrill Lynch failed to adequately supervise the activities and conduct of its research analysts.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to Sections 21(d)(1), 21(e), 21(f), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u(f), and 78aa].

6. Merrill Lynch, directly or indirectly, used the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein.

7. Venue is appropriate in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendant is found, has its headquarters and principal executive offices, and transacts business in this District.

## DEFENDANT

8. Merrill Lynch, a registered broker-dealer, is a member of NASD and NYSE. Its principal offices are located in New York City. Merrill Lynch engages in a full-service securities business, including retail and institutional sales, investment banking services, trading, and research.

## FACTUAL ALLEGATIONS

## I. OVERVIEW OF INTERNET RESEARCH AT MERRILL LYNCH

9. During the relevant period, Merrill Lynch divided its research analysts into sectors that each covered a discrete industry, and published written research reports on selected companies within each sector. The three basic types of research reports issued by Merrill Lynch -- bulletins, comments, and in-depth reports -- differed in length and level of detail. Bulletins did not include models, charts, or other exhibits that would typically be included in a comment or in-depth report.

10. From February 1999 through December 2001, Merrill Lynch employed Henry Blodget as a senior research analyst to cover the Internet sector and to head a group of analysts who issued, and who assisted him in issuing, research reports and ratings on Internet companies. The Internet research group covered Internet and similar technology stocks during this period. Blodget was First Vice-President and Managing Director for Merrill Lynch and the senior research analyst for the Internet sector. The analyst principally responsible for each research report published by Merrill Lynch on covered Internet companies was usually listed first on the report.

11. Merrill Lynch divided the Internet sector into the following three subsectors: (i) consumer Internet, e-commerce and new media; (ii) Internet infrastructure services; and (iii) business to business Internet companies. Blodget wrote, reviewed and/or consulted with other analysts regarding research generated by the Internet sector, and was the senior research analyst on all but a handful of the research reports discussed below.

12. Each Merrill Lynch research report included an investment rating that was intended to reflect the analyst's opinion on how the stock would perform. During 1999 to May 2001, Merrill Lynch stated that it used the following five-point rating system:

   1 - Buy

   2 - Accumulate

   3 - Neutral

   4 - Reduce

   5 - Sell

13. Merrill Lynch, however, did not rate any Internet stock a 5, and rated only one Internet stock a 4, during the relevant period. With respect to each of the research reports discussed below, the descriptive word(s) (e.g., "Buy", "Accumulate", etc.) representing the analyst's intermediate and long-term ratings appeared in the upper right corner of the research report in bold, capital letters, and in a font larger than in the text of the research report.

14. The descriptive words were to reflect the analyst's opinion of the stock's price appreciation potential over the intermediate term (0 to 12 months from the date of rating) and long term (more than 12 months from the date of rating): 1 - Buy (more than 20% appreciation), 2 - Accumulate (10-20% appreciation), 3 - Neutral (between 10% depreciation and 10% appreciation), 4 - Reduce (10-20% depreciation), and 5 - Sell (more than 20% depreciation). Although some of Merrill Lynch's research reports disclosed the stock appreciation percentages associated with the intermediate and long-term ratings, none of the research reports discussed below contained such disclosure.

15. During the relevant period, Merrill Lynch's published ratings had four elements: (i) a risk rating from "A" (low risk) through "D" (high risk); (ii) a

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

rating for the intermediate term; (iii) a rating for the long term; and (iv) a dividend rating. With respect to each of the research reports discussed below, Merrill Lynch rated each company "D" (high risk).

16. Some of Merrill Lynch's research reports also assigned to the stock a price target, which was intended to reflect the price at which the analyst believed the stock would trade within the next twelve months or, on occasion, within a longer period of time.

## II. RESEARCH ANALYSTS WERE SUBJECTED TO CONFLICTS OF INTEREST

17. In the manner described below, Merrill Lynch investment bankers unduly influenced research analysts, thereby creating conflicts of interest for the research analysts. Merrill Lynch failed to manage these conflicts in an adequate or appropriate manner.

### A. Merrill Lynch Research Analysts Assisted Investment Banking

18. Merrill Lynch's research department provided a service function within the firm and was not an independent profit center. Merrill Lynch funded its research department through firm revenues received from a number of businesses at the firm, including investment banking. Merrill Lynch's investment banking department generated substantial revenues for Merrill Lynch. Merrill Lynch encouraged its research analysts to assist investment banking activities. Merrill Lynch expected research analysts to vet initial public offerings, review and opine on other prospective investment banking deals, attend "pitch" sessions with investment bankers in which the bankers competed for the issuer's investment banking business, and talk with institutional investors about those issuers. When the Internet research group could not support favorable research ratings, it vetoed the investment banking deals.

19. Merrill Lynch's investment banking group used the Internet research group's ratings and coverage to support its business.

20. In March 1999, within weeks of joining Merrill Lynch, Blodget circulated to research management and senior investment bankers an e-mail entitled "Managing the Banking Calendar for Internet Research." In that e-mail, Blodget stated,

> [w]e are now up to 11-12 Internet banking transactions in the pipeline . . . . The current schedule for this week . . . is 85% banking, 15% research . . . .

Blodget estimated that his team would devote the majority of its time that week to assisting in investment banking efforts, and cautioned that if he failed "to allocate at least 50% of [his] time and the overall research team's time" to performing research and institutional marketing, then his, and his team's, reputation among institutional investors might suffer.

21. If Merrill Lynch secured the mandate, the Internet sector analysts sometimes helped market investment banking deals to institutional

investors by attending "roadshows." During roadshows, the issuer's management and Merrill Lynch investment bankers solicited interest in the offering from institutional investors. Internet sector analysts also attended "non-deal roadshows" for existing clients to promote interest in their company's stock. As a senior intermediate Internet group analyst stated to Blodget, among others, in a May 17, 2000 e-mail:

> We are taking InfoSpace . . . on a non-deal roadshow to introduce the new CEO. This company is very important to us from a banking perspective, in addition to our institutional franchise. . . . These non-deal roadshows are very important in my view in that they . . . have tremendous halo effect on our banking efforts.

22. During the relevant period, Merrill Lynch's Internet research group assigned consistently positive intermediate and long-term ratings on the Internet stocks it covered. During the relevant period, the overwhelming majority of stocks covered by Merrill Lynch's Internet research group had a "1" (buy) or a "2" (accumulate) rating. Merrill Lynch infrequently used a "3" (neutral) rating. As a junior analyst explained to the management of an investment banking client in September 2000, Merrill Lynch's ratings "range from 1-5, but we don't cover anything below a 3."

23. In a June 2000 e-mail, a senior intermediate analyst wrote to Blodget in connection with a company on which Merrill Lynch was then planning to but ultimately did not initiate coverage: "I am personally afraid of the impact we will have on the stock if we do a 3-1 so am leaning towards a 2-2 which is still our lowest rating."

**B. The Existing or Potential Investment Banking Relationship Factored Into the Decision to Initiate Research Coverage**

24. Whether Merrill Lynch had or wanted investment banking business from a company was a factor in the decision to initiate research coverage on that company, and in the instance described below, an important factor. While Blodget headed the Internet group, Merrill Lynch initiated coverage predominantly on existing or prospective investment banking clients. Blodget noted that the selection of a company for research coverage was "based on the company's status in the industry, the number of shareholders, the long term prognosis, and/or a banking relationship."

25. In an April 2000 e-mail, a Merrill Lynch investment banker asked, "Do you think we should aggressively link coverage with banking - that is what we did with Go2Net (Henry [Blodget] was involved) . . . ."

26. In a July 2000 e-mail, a junior analyst in the Internet group observed:

> We listened to gotonet call last night - investors didn't like weakish traffic and ad growth. I don't understand what makes biz model tick. They beat estimates in part due to decreased share count, increased interest income and a low tax rate . . . . i imagine we will pick it up if there is some banking

revenue attached.

(Merrill Lynch did not in fact initiate research coverage on Go2Net. In October 2000, Go2Net was sold to InfoSpace, a company on which Merrill Lynch provided research coverage, and Merrill Lynch provided advisory services to Go2Net between July and October 2000 in connection with the sale.)

## C. Certain Prospective Ratings and Research Reports With Ratings Were Shared With Investment Bankers and Issuers

27. Merrill Lynch did not prohibit all interaction between research and investment banking. Rather, its internal policies prohibited the dissemination of ratings and research reports with ratings to investment bankers and to issuers prior to publication. The Merrill Lynch Policies and Procedures Manual in effect during 1999 to 2001 imposed the following restrictions on pending research:

> Pending initial opinions, estimate or opinion changes, and decisions to issue research reports or comments may not be disclosed by any means to anyone, either inside or outside the Firm, until the information is disseminated in the appropriately prescribed manner. Exceptions are limited to [certain Merrill Lynch personnel] and, under limited circumstances, management of the subject company. This prohibition is intended to avoid the misuse of market-sensitive information and the appearance of impropriety.

(Certain of the exceptions referenced in the quotation above allowed investment bankers and company management to review unpublished research reports to verify factual accuracy, or after the market closed but before publication of the research. None of the instances cited herein, however, qualified for any of the exceptions listed in Merrill Lynch's Policies and Procedures Manual.)

28. In the instances described below, Merrill Lynch's research analysts violated such policies by disseminating research reports with ratings to investment bankers and issuers prior to their publication. Merrill Lynch did not adequately monitor research analysts' communications to detect and prevent such dissemination.

## 1. Sharing Unpublished Ratings With Investment Bankers

29. In August 2000, a junior analyst in the Internet group sent the following e-mail to a Merrill Lynch research manager and Blodget:

> The following chart lays out Henry's [Henry Blodget's] universe and the ratings we would like to change. I have spoken to the [Merrill Lynch investment] banker . . . on this . . . as these are all B2C names-and he is fine with it.

30. In an e-mail dated November 12, 2000, Blodget gave the following advance notice to a Merrill Lynch investment banker:

> based on what I'm hearing, we will probably be taking CMGI to at least a 2-2 after they report guidance Monday night.

Two days later, on November 14, 2000, Merrill Lynch, through Blodget, in fact downgraded CMGI from a 2-1 to a 3-2.

## 2. Sharing Unpublished Reports and Ratings with Covered Companies

31. Prior to initiating research coverage on GoTo.com, Inc. ("GoTo") (discussed in greater detail below), a research analyst shared the prospective rating with both investment bankers and the company. On November 21, prior to initiating coverage of GoTo, a junior Internet research analyst e-mailed Blodget to report,

> GoTo has gotten back to me and says they are 'comfortable' with the discussions we had with them, and with coming out with a 3-1 [rating], etc. given that we would be downgrading LOOK at the same time so the ratings are the same.

32. In an e-mail dated July 28, 2001 from Blodget to the junior analyst, Blodget stated: "Some of the communication with the GoTo people and the bankers prior to the initiation may have been a technical violation of the firm's written policies and procedures (which, I have now learned, say the company/bankers should not be told what the proposed rating is or will be, even if the company isn't currently under coverage) . . . ."

33. As the date for initiating coverage of GoTo drew closer, the same junior analyst e-mailed the investment bankers, "Research mgmnt [ ] wants to go with a 3-2 on GoTo."

34. Another Merrill Lynch analyst who was not in the Internet group also shared unpublished research reports with his covered company - Tyco International Ltd. ("Tyco"). In a February 23, 2001 e-mail from the analyst to the Tyco CFO, the analyst attached an unpublished research report and stated: "PLEASE REVIEW ASAP. I WILL NOT SEND IT OUT UNTIL I HEAR FROM YOU FIRST! LOYAL TYCO EMPLOYEE!" That same day, the analyst sent an e-mail to another Tyco investor relations employee attaching the same draft research report and stated: "I WANTED TO GET THIS OUT ASAP . . . ! PLEASE REVIEW AND COMMENT."

## D. Research Analysts' Contributions to Investment Banking Factored Into Their Performance Evaluations and Compensation

35. Investment banking revenues generated in an analyst's sector were a factor in evaluating that analyst's performance and, consequently, in determining that analyst's compensation. In November 2000, Merrill Lynch's research management requested that all equity analysts submit a report detailing their contributions to investment banking during the year

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

and highlighting instances where their research coverage played a role in originating and securing an underwriting mandate or advisory work on mergers and acquisitions. Blodget's e-mail response highlighted his Internet group's involvement in over 52 completed or potential investment banking transactions and included among his team's activities: pitching the client, marketing the offering, and providing research "coverage for future banking." Blodget estimated that from December 1999 to November 2000, the Internet research group was involved in activities relating to investment banking deals that produced approximately $115 million of revenue for Merrill Lynch.

## E. Research Analysts Were Subjected to Pressure From Investment Bankers

36. Merrill Lynch research management acknowledged the problem of investment banking influence over research analysts in the following October 2000 e-mail to Blodget:

> Wireless Internet Ratings. Major issue. . . . I would like to discuss this topic with you directly to gather facts about this issue over the last year. I then need to have a philosophical discussion with [other research managers] about this. I think we are off base on how we rate stocks and how much we bend backwards to accommodate banking, etc. Breaking the link between writing and rating is a partial solution but I think the issue is much deeper.

37. In November 2000, the Merrill Lynch senior analyst who covered Aether, a wireless Internet company, with Blodget circulated an e-mail to a research manager, copied to other research managers and Blodget entitled, "Mobile Internet: Reducing Intermediate Term Rating to Accumulate, Maintaining Long Term Buy." In that e-mail, the analyst attached a draft note that announced the simultaneous downgrade of Aether, InfoSpace and OpenWave from 1-1 to 2-1, and outlined the following four choices:

> First, we can downgrade to 2-1, and go out with the [draft report] below . . . . Second, we can keep Aether at a 1-1 . . . and downgrade [OpenWave] and [InfoSpace] for the reasons cited. (People would invariably ask the question why aren't we downgrading Aether.) Third, we can downgrade [OpenWave] and [InfoSpace] and say nothing about Aether. Fourth, we can keep them all at 1-1s . . . (I sound flip but I am not being so - If banking is our top concern I'd just like us all to agree on it.)

38. This e-mail prompted research management to conduct a meeting among research management, the analyst who wrote the e-mail, the Merrill Lynch investment bankers who managed the Aether relationship, and Blodget. During that call, investment bankers argued against the proposed downgrade, and urged the analyst to meet with Aether management. Shortly thereafter, research management, the senior analyst and Blodget met with Aether management, who argued against the downgrade. Instead of downgrading Aether, in December 2000, Merrill Lynch published separate

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated   Page 9 of 25

research reports maintaining a 1-1 rating on Aether, and downgrading OpenWave and InfoSpace.

39. Shortly thereafter, Blodget e-mailed the investment bankers who managed the Aether relationship, and copied the senior analyst for Aether and another Internet group analyst,

> The more I read of these, the less willing I am to cut companies any slack, regardless of the predictable temper-tantrums, threats, and/or relationship damage that are likely to follow. . . . If there is no new email forthcoming from [research management on how to apply ratings to] sensitive banking clients/situations, we are going to just start calling the stocks (stocks, not companies) including [Aether], like we see them, no matter what the ancillary business consequences are.

## III. MERRILL LYNCH PUBLISHED RESEARCH ON GOTO AND INFOSPACE THAT VIOLATED ANTI-FRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS

40. As described below, certain of Merrill Lynch's research reports for GoTo and InfoSpace, Inc. ("InfoSpace") expressed views that were contrary to the analysts' privately expressed negative views of the stocks and did not disclose those negative views, thereby making those reports fraudulent.

### A. GoTo

41. GoTo, now known as Overture Services Inc., is an Internet advertising services company that introduces consumers and businesses that search the Internet to advertisers who provide products, services, and information. In September 2000, Merrill Lynch pursued and secured a mandate for a private placement of GoTo's European subsidiary. In connection with that mandate, Merrill Lynch initiated research coverage on GoTo.

### 1. Initiation of Coverage on GoTo

42. The initial research report on GoTo was published in January 2001 and expressed views contrary to the privately expressed negative views of Blodget and his fellow analysts during the period November 2000 to January 2001. On November 15, 2000, a junior analyst e-mailed Blodget and stated, "[another firm] initiated on GoTo.com with a buy . . . I guess they are angling for the M&A [mergers and acquisitions] business too!"

43. The next day, while working on the initiation of coverage report, Blodget e-mailed a junior analyst and queried,

> What is your honest take on the stock? No reason to own it . . . or going a lot lower[?] [In my humble opinion], I think the first [rating] should be a 2[-] 2 . . . the second a 3...

Later that day, the junior analyst responded:

> . . . I think both - no reason to own now. . . . totally
> could go lower, who are we trying to please by
> doing a 2-2 ? I don't want to be a whore for f-ing
> mgmnt. if 2-2 means that we are putting half of
> merrill retail into this stock because they are out
> accumulating it, then I don't think that's the right
> thing to do. we are losing people money and I don't
> like it. [hypothetical retail clients] john and mary
> smith are losing their retirement because we don't
> want [GoTo's CFO] to be mad at us. [Merrill Lynch's
> investment banking relationship manager for GoTo]
> said he is fine with a 3-2 (I said to him the whole
> idea that we are independent from banking is a big
> lie - without banking this would be a 3-2 and he
> said "no-you guys are independent you can do what
> you want - I'm fine with that["] -I would put it back
> to the company to convince you that there is a
> reason you should own this at 54x [year 2002
> earnings per share]. . . so that's my feeling. . . .

44. On January 4, 2001 the junior analyst e-mailed the investment
bankers, "Research mgmnt [] wants to go with a 3-2 on GoTo." (Ratings on
initiation of coverage were approved by Research Management and
Research Compliance). One of the bankers responded to Blodget and the
junior analyst:

> Briefly, in talking to [Research Compliance]
> yesterday, I thought the strategy was to go out
> with the 3-1 as soon as the stock hit $10; if it
> doesn't, I don't think anybody has an interest in
> seeing initiation at a 3-2.

Blodget replied to the bankers: "my concern is that waiting for $10 is
waiting for godot . . ." (The reference here was to the Samuel Beckett play
*Waiting for Godot*. In that play, the central story line involves two
characters who continuously wait for the arrival of an individual named
Godot. He never comes.)

45. During the following week, GoTo traded intraday above $10 and, on
January 11, 2001, Merrill Lynch initiated coverage on Goto at a 3-1
(neutral-buy), the same rating reflected in the e-mail from investment
banking. Merrill Lynch's initiation piece reported that

> GoTo has a pay-for-performance model, which
> should help it gain share in the current
> environment. . . . It is growing quickly and probably
> has enough cash to make it to break-even
> (estimated in 1Q02) . . . . Given the current weak
> environment for online advertising, we do not see
> any near term catalysts. We expect the market to
> improve in 2H 2001, however, and we believe that
> GoTo will be a survivor.

46. On the same day Merrill Lynch initiated coverage, an institutional client
e-mailed Blodget to ask, "What's so interesting about Goto except banking

fees????" Blodget replied, "nothin."

47. The initial research report on GoTo expressed views contrary to the research analysts' privately expressed negative views as described above, and did not disclose those contrary views, including Blodget's belief that GoTo was "interesting" only for the banking fees it could generate. As a result, the January 11 research report was fraudulent.

## 2. Subsequent Research on GoTo

48. On April 25, 2001, Merrill Lynch upgraded GoTo from 3-1 to 2-1 (accumulate-buy), based on GoTo's very strong first quarter results and Merrill Lynch's observation that GoTo had "execut[ed] extremely well in a tough environment." The upgrade set a price objective of $18-19 from GoTo's then current trading price of $11.57.

49. On May 4, 2001, GoTo closed at $21.92. In a May 6, 2001 e-mail, an institutional client asked Blodget for buy recommendations that were "compelling currently"; Blodget responded: "I would have said GoTo and HOMS but both have had very strong runs and are overdone, in my opinion."

50. On May 22 and 23, 2001, when GoTo closed at $23.90 and $23.43, respectively, Merrill Lynch issued additional research reports that reiterated GoTo's 2-1 rating and stated, "We believe a few stocks are attractive. . . . we are recommending . . . GoTo. . . ." These research reports expressed views contrary to the views privately expressed by Blodget in his May 6 e-mail, and did not disclose Blodget's view that the stock price was overdone.

51. In mid-May 2001, Merrill Lynch's investment bankers pitched to GoTo the idea of doing a secondary equity offering, underwritten by Merrill Lynch, and set a May 31 meeting date to discuss this possibility. However, on May 25, GoTo's CEO and CFO advised a Merrill Lynch investment banker that GoTo was leaning toward selecting a firm other than Merrill Lynch to do the underwriting work. That same day, in an internal e-mail, a Merrill Lynch investment banker remarked:

> I was very dismayed to learn that [GoTo was] leaning toward [another firm] as the lead bookrunning manager, particularly given the tremendous effort we have put forth on the Company's behalf. Not only did Henry Blodget initiate on the stock when it was flirting with penny stock status but he recently upgraded it and sponsored a set of meetings for management in New York which dramatically moved the stock price. . . . we have the #1 ranked Internet research analyst in Henry Blodget . . . .

52. A few hours later, a research analyst e-mailed to Blodget draft downgrade bullets for GoTo:

> H, I don't think I've downgraded a stock on valuation since the mid-90's. Anyway, I threw

together these bullets in a note on my hard drive so
that we are ready to pull the trigger quickly. Do you
think we need more than bullets? I didn't think so
since this downgrade would be based solely on
valuation? Let me know.

53. The downgrade bullets explained that,

GoTo has doubled since our upgrade about a month
ago. We are downgrading the stock due to
valuation . . . . we believe it is prudent to take
some money off the table.

54. Blodget's immediate e-mail response was, "beautiful fuk *[sic]* em."

55. While Merrill Lynch's May 22 and May 23 research reports maintained
GoTo's 2-1 rating and recommended GoTo as "attractive", the research
analysts' May 25 e-mail stated an intention to downgrade GoTo based on
valuation concerns - meaning that they viewed the stock as expensive.
GoTo's stock price, however, remained relatively constant from May 21 to
May 31, 2001. In fact, on May 22 and May 23, when Merrill Lynch issued
research reports recommending the stock, GoTo closed at $23.90 and
$23.43, respectively, and on May 25, the date of the e-mail, GoTo closed at
$22.75. Accordingly, the May 22 and May 23 research reports also
expressed views that were contrary to the views privately expressed in the
May 25 e-mail, and did not disclose those contrary views. As a result, the
May 22 and 23 research reports were fraudulent.

56. Merrill Lynch did not publish the GoTo downgrade on May 25. On the
morning of June 6, GoTo issued a press release announcing its follow-on
offering and naming its underwriters, which did not include Merrill Lynch.
Blodget and his fellow analyst believed that news of GoTo's secondary
offering would have a near term negative impact on GoTo's stock price.
That same morning, Merrill Lynch issued its report downgrading GoTo from
2-1 to 3-1 in substantially the same form as the draft bullets in the May 25
e-mail. (From May 25 to June 6, GoTo's stock price closed at $22.75 [May
25], $22.96 [May 29], $21.05 [May 30], $22.36 [May 31], $23.43 [June 1],
$25.99 [June 4], $26.64 [June 5] and $23.78 [June 6]). The June 6
research report did not disclose the analysts' belief that news of GoTo's
secondary offering would have a near term negative impact on GoTo's stock
price.

**B. InfoSpace**

57. InfoSpace is an Internet information infrastructure services company
that provides technologies to Web sites, merchants, and wireless devices.
Merrill Lynch maintained a 1-1 (buy-buy) rating on InfoSpace from January
through December 2000, when it was downgraded to a 2-1 (accumulate-
buy). From March 2000 to December 2000, Merrill Lynch included
InfoSpace on its monthly "Favored 15" list. The Favored 15 list is a list of
15 stocks covered by Merrill Lynch that are each rated 1-1 and that satisfy
certain other technical and quantitative criteria. InfoSpace's stock price
declined throughout 2000 and into early 2001, from $140 on January 27,
2000, to $40.56 on September 15, 2000, to $21.94 on October 9, 2000, to
$13.81 on December 11, 2000 and to $8.59 on January 9, 2001.

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

58. On June 15, 2000, while Merrill Lynch maintained a 1-1 rating on InfoSpace, Merrill Lynch's Internet research analysts raised questions about the stock. Specifically, an analyst e-mailed Blodget and a second senior intermediate analyst an article entitled, "Why One Short-Seller is Attracted to InfoSpace." The second analyst replied,

> thanks . . . a lot of people have been calling me on inside selling . . . i checked it out - its not that bad . . . [InfoSpace's Chairman] owns 29% of company and has sold three times over past year . . . i don't think that's a big deal . . . i would sell.

59. That same day, Blodget responded to the second analyst as follows:

> . . . enormous skepticism about this one now. . . . got questions yesterday about the exact extent of svces/content that [InfoSpace] provides to "50% of global and 80% of US carriers." AT&T apparently saying "they give us maps and directories, not a `platform' - whooptedo. In three yrs, the $1/sub will be $0.10/sub." stock obviously caught in backlash of [the InfoSpace Chairman's] hyperbole, unfortunately. just like ICGE . . . .

60. On July 10, 2000, Go2Net asked Merrill Lynch to serve as its financial advisor in connection with a proposed sale of Go2Net to InfoSpace, and Merrill Lynch agreed. On July 11, 2000, Merrill Lynch issued an "update report" on InfoSpace, reiterating the 1-1 buy rating, but not disclosing the questions raised in the June 15 e-mail.

61. That same day, apparently in response to the newly issued report, a Merrill Lynch financial consultant sent Blodget the following e-mail:

> it seems that InfoSpace is your favorite stock. Should we worry that the chairman has sold over 1MM shares before their quarterly earnings? Are we planning a secondary for the stock?

62. Later that day, Blodget forwarded the e-mail to a senior intermediate analyst complaining, "ugh. i'm getting killed on this thing." Two days later, on July 13, 2000, Blodget e-mailed the same research analyst and stated:

> I don't mean to be a pain on this one, but this stock is a powder keg, given how aggressive we were on it earlier this year and given the "bad smell" comments that so many institutions are bringing up. . . .

Later that day, the analyst replied,

> Fair point. But here's how I look at it. I still believe in the story long-term and secondly, we addressed the issues without crushing the stock which we would have done and angered everyone. Also, it is

> not as smelly as the hedgies say - they're just
> looking for a short.

63. The following day, July 14, 2000, InfoSpace's Chairman e-mailed the same research analyst to confide that InfoSpace was contemplating an investment in the company "U.S. Search." The research analyst advised him as follows,

> We need to talk about this. . . . I am concerned the
> market will not react favorably to any news that
> [InfoSpace] funds US Search. My BEST advice to
> you is to let [your competitors] win this one - there
> will be plenty of deals for you to do and [InfoSpace]
> cannot afford this kind of scrutiny right now - the
> stock is under a lot of pressure.

64. On or about October 2000, another senior analyst assumed coverage of InfoSpace, but Blodget continued to participate in the research process and his name continued to appear on the research reports beneath the name of the senior analyst. On the morning of October 20, 2000, Blodget received an e-mail from a Merrill Lynch financial consultant asking about the buy rating and a $100 price target on InfoSpace (at a time it was trading in the $20 price range), and a Dow Jones News Service article stating that InfoSpace had published a handwritten annual report in a "high school exam format." Blodget immediately forwarded the e-mail to the senior analyst for InfoSpace and said,

> I am so tired of getting these. Can we please reset
> this [InfoSpace] stupid price target and rip this
> piece of junk off whatever list it's on. If you have to
> downgrade it, downgrade it.

65. That same morning, the financial consultant sent another e-mail to Blodget explaining that he had read InfoSpace's 1999 annual report and that he believed it was not as bad as the newspaper article had indicated. Again, that same morning, Blodget forwarded the e-mail to the senior analyst for InfoSpace and remarked, "Phew. Still would love to reset the price target to $30 or something. . ." At the time of the October 20 e-mail exchanges, InfoSpace was still rated 1-1.

66. On December 5, 2000, the senior analyst advised him, "happy day -- insp off the favored 15," to which Blodget replied, "oh my god. I can't believe it took until now."

67. On December 11, 2000, Merrill Lynch downgraded InfoSpace to 2-1 (accumulate-buy).

68. On December 19, 2000, the senior analyst forwarded to Blodget a news article entitled, "InfoSpace VP Sues Chairman Over Stock Option Promise," and added, "not that this is any news . . . but thank god we downgraded while in the doubledigits [sic].

69. Blodget responded, "My god. What a sleazebag." Seven minutes later, Blodget sent the following e-mail:

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

> I think you can go ahead and downgrade on this [if]
> you feel like taking to neutral. I've seen enough of
> [the InfoSpace Chairman's] alleged sleazery [sic]
> that I'm officially not comfortable with him still
> involved with co. . . . I would actually forward this
> to [Merrill Lynch research management] - they may
> insist that you cut it.

70. Merrill Lynch's research reports on InfoSpace dated July 11, August 7, September 15, October 9, October 23, October 25, October 26, October 31, November 6, November 7, and December 20, 2000, and January 8 and January 9, 2001, were contrary to the analysts' privately expressed negative views as described above, and did not disclose those contrary views, including Blodget's concerns about the InfoSpace Chairman's conduct and continuing management of the company. Nor did these reports disclose that a Merrill Lynch analyst had expressed concern that the market would not react favorably to a proposed InfoSpace transaction and had advised InfoSpace against entering into that transaction. As a result, these research reports were fraudulent.

## IV. MERRILL LYNCH PUBLISHED RESEARCH THAT VIOLATED NASD AND NYSE ADVERTISING RULES

71. Under NASD's and NYSE's advertising rules, Merrill Lynch must have a reasonable basis for its recommendations, and its communications must present a fair and balanced picture of the risks and benefits of investing in the covered companies, and must not make exaggerated or unwarranted claims. As discussed below, Merrill Lynch published research reports on 24/7 Media, Inc.; Lifeminders, Inc.; Homestore.com, Inc.; Excite@Home; and Internet Capital Group, Inc. that violated NASD's and NYSE's advertising rules, as well as the NASD and NYSE rules that require members to observe high standards of commercial honor and just and equitable principles of trade.

## A. 24/7 Media, Inc.

72. 24/7 Media, Inc. ("24/7") is an Internet company that provides marketing services to Internet advertisers. After closing a secondary offering for 24/7 on May 3, 1999, Merrill Lynch published a May 12, 1999 research report rating 24/7 a 2-1, when 24/7 traded at $45.00. On August 12, 1999, Merrill Lynch upgraded the stock to 1-1. As of December 31, 1999, 24/7 was trading at $56.25. On January 26 2000, 24/7 reached a high of $64.62. During the course of 2000, 24/7's stock price plummeted. On August 7, 2000, Blodget downgraded the rating to a 2-2 "accumulate," and on November 9, he changed the rating to a "neutral" 3-3. On December 29, 2000, the stock closed at $0.53.

73. On March 6, 2000, a junior analyst e-mailed Blodget a draft research report on 24/7 that, among other things, referred to the launch of 24/7's "Connect" proprietary advertising software. The analyst stated,

> Try these on for size - trying to be oblique to help
> stock in anticipation of downgrade on wed - so we
> can say we were expecting great Q4 - w/ 20 mm
> names they should be making tons on email - we'd

> take opportunity to lighten position until co. brings
> all of assets onto one platform, go to accumulate.
> also would be surprised if EPS comes in much better
> than $0.46 . . . . if worse, another excuse to
> downgrade.

74. The following day, March 7, 2000, Blodget issued the report in substantially identical form as the previous day's e-mail draft and maintained a 1-1 on 24/7. The March 7 report was inconsistent with the privately expressed negative view in the above-noted March 6 e-mail and did not disclose the junior analyst's appraisal that 24/7 would report lower than expected fourth quarter results, that the analyst expected to downgrade 24/7 on that news, or that the analyst then believed that investors should "lighten position" or sell the stock. Two days later, 24/7 reported its fourth quarter results, which exceeded the Internet group's expectations. Merrill Lynch maintained its 1-1 rating on 24/7 until August 7, 2000, when it downgraded 24/7 to 2-2.

75. On October 10, 2000, Blodget privately expressed a negative view about 24/7's key product -- its "Connect" proprietary advertising software. That day, another analyst e-mailed to Blodget a news article entitled "24/7 Media working to repair technology glitch." The article highlighted glitches in 24/7's "Connect" advertising software, resulting in the reporting of inaccurate results to 24/7's clients. The analyst remarked,

> Don't know if you saw this, nothing revolutionary -
> but it probably confirms what you and [another
> fellow analyst] have talked about for some time.

76. That same day, Blodget responded, "That it's a pos [piece of shit]? yes."

77. On August 11, 2000, Merrill Lynch published a research report rating 24/7 a 2-2. In that report, Blodget's only mention of Connect was to explain that 24/7 had yet to complete its full rollout, but that 24/7 was then serving over 80 percent of its U.S. network ads through Connect. Merrill Lynch's November 8, 2000 report maintained the 2-2 rating and noted,

> We hope to hear more about traction at Connect,
> including any new business from competitors based
> on Connect's capabilities as opposed to those won
> on price.

78. Merrill Lynch's August 11 and November 8, 2000 research reports were inconsistent with Blodget's privately expressed negative view of the company's key product in his October 10, 2000 e-mail.

## B. LifeMinders, Inc.

79. LifeMinders, Inc. ("LFMN") is an online direct marketing company specializing in outbound messaging, both e-mail and wireless. Merrill Lynch initiated coverage of LFMN on September 28, 2000 with a 2-1, when LFMN traded at $22.69. At that time, Merrill Lynch was pursuing an investment banking relationship with LFMN. Blodget described his team's contribution

to the investment banking effort on LFMN as "coverage for future banking."

80. After Merrill Lynch initiated research coverage, LFMN's price declined to the $10 range in October and the $3-5 range in December. On December 4, 2000, Blodget e-mailed a fellow analyst,

> LFMN at $4. I can't believe what a POS [piece of shit] that thing is. Shame on me/us for giving them any benefit of doubt.

81. Merrill Lynch's research report on LFMN dated December 21, 2000, which reiterated a 2-1 rating, was inconsistent with Blodget's privately expressed negative view of LFMN in his December 4 e-mail.

## C. Homestore.com, Inc.

82. Homestore.com, Inc. ("HOMS") is a collection of Internet websites that focus on the home and real estate-related information and advertising products and services. Shortly after closing a follow-on offering for HOMS, Merrill Lynch initiated coverage on HOMS on September 8, 1999 with a 2-1 rating, when HOMS traded at $47.50. By February 1, 2000, the date Merrill Lynch closed a second equity offering for HOMS, the stock price had risen to $97. On March 6, 2000, Merrill Lynch upgraded HOMS to 1-1, when the stock price had fallen to $67. Merrill Lynch maintained its 1-1 rating until July 9, 2001 when it downgraded HOMS to 2-1 and the stock price was $35.29.

83. On April 26, 2001, Merrill Lynch issued a research report reiterating the 1-1 rating on HOMS and setting a price objective of $35 (from its current price of $28.73). On May 4, 2001, HOMS closed at $34.70. On May 6, 2001, when an institutional client asked Blodget for recommendations that were "compelling currently", Blodget responded: "I would have said GoTo and HOMS but both have had very strong runs and are overdone, in my opinion."

84. On May 10, 2001 Merrill Lynch issued a research report reiterating the 1-1 rating on HOMS, then trading at $32.56. Both the April 26 and May 10 reports were inconsistent with the views expressed in Blodget's May 6, 2001 e-mail.

## D. Excite@Home

85. Excite@Home ("ATHM") is a broadband network services company that provides high-speed Internet, data and content services to consumers. In June 1999, At Home Corporation acquired Excite and became ATHM. Blodget assumed coverage of ATHM from another analyst in April 1999 with a 2-1 rating, and continued coverage after At Home's acquisition of Excite in June 1999, when the stock price was $97. Merrill Lynch acted as a financial advisor to At Home in connection with the acquisition of Excite. On July 20, 2000, when the stock price was $29, Merrill Lynch downgraded ATHM to 2-2.

86. By December 21, 2000, ATHM's stock price had fallen to $4. On January 29, 2001, while Merrill Lynch still had a 2-2 rating on ATHM, Blodget

expressed a view to a financial consultant that he did not think there was any reason to buy more shares of ATHM. Specifically, when a Merrill Lynch financial consultant e-mailed Blodget and asked if he would recommend buying more shares of ATHM at its then-current level (approximately $8), Blodget responded,

> I don't think it goes much lower, but I also don't think there's any reason to buy more of it... as a standalone business, it's falling apart.

87. On January 26, 2001, Merrill Lynch published a research report on ATHM that maintained a 2-2 rating and noted

> [ATHM] 3Q had a weak quarter, as expected, and gave a dismal outlook for 2001. However, the company believes it can hit double digit EBITDA margins in 2H .... [ATHM] might be on the right track, but never-ending state of flux makes forecasting (and investing) difficult. Pieces of the company remain attractive for acquisition, but we believe the value as a consolidated operating business continues to decline. If indeed the company is able to turn EBITDA positive and hit the double-digit margin targets in the back half of the year, the stock should act favorably. However, at this point, we have neither the visibility nor confidence in this happening, and maintain our "wait and see stance."

88. On March 8, 2001, Merrill Lynch published a research report on ATHM that reiterated the 2-2 rating and noted that the "[t]one was very upbeat" at ATHM's latest conference. Both the January 26 and March 8 reports were inconsistent with Blodget's privately expressed negative views in his January 29, 2001 e-mail.

## E. Internet Capital Group, Inc.

89. Internet Capital Group, Inc. ("ICG") is a holding company, an "incubator" with owner positions in numerous partner companies, most of which are focused on Business to Business ("B2B") e-commerce. ICG allocates capital to promising B2B opportunities, then provides partner companies with strategic and operational guidance with the aim of building market leaders. ICG was designed to facilitate strategic relationships and share best practices, advantages not enjoyed by stand-alone B2B start-ups.

90. Merrill Lynch initiated coverage of ICG on August 30, 1999 with a 2-1 rating, when ICG traded at $53.50. By the end of 1999, ICG was trading at $164. In early 2000, ICG reached a high of $212, but then fell sharply to $23.13 on September 25, 2000 and $11 on November 10, 2000. Merrill Lynch maintained a 2-1 rating on ICG during that time period.

91. On October 5, 2000, when ICG was trading in the $12 -15 range, Blodget made the following statement about the direction of ICG's stock price in an internal e-mail to the research analyst covering ICG with

Blodget: "Going to 5." During that same e-mail exchange, Blodget also remarked, "Sure hope [the co-founders of ICG] taking some dough off table."

92. The next day, on October 6, 2000, a Merrill Lynch financial consultant e-mailed Blodget for advice on ICG. Blodget replied,

> No hopeful news to relate, I'm afraid. This has been a disaster... There really are no `operations' here to fall back on, so there really is no `floor' to the stock... We see nothing that will turn this around near-term. The company needs to restructure its operations and raise additional cash, and until it does that, there is nothing positive to say.

93. Merrill Lynch's September 25, 2000 research report reiterated a 2-1 rating and expressed concern that current market conditions, the need for financing, ICG's vertical market maker focus and potential year-end tax-loss selling could keep pressure on the stock. Although this report stated that ICG needed cash and that its then current investments were not optimal, it also expressed strong approval of ICG's new CFO and stated that a successful financing and the sale of non-strategic assets could be potential positive catalysts for the stock.

94. On November 9, 2000, Merrill Lynch downgraded ICG from 2-1 to 2-2, following ICG's announcement of its third quarter results and its plans to downsize its operations, reduce cash burn, and intensify its focus on the execution of a core set of 15 "developed" partner companies. On November 10, 2000, Merrill Lynch issued a report reiterating the 2-2 rating. Although Blodget's October 6, 2000 e-mail expressed concerns about ICG in the "near term" and Blodget's November 10 report stated that ICG could remain under pressure "over the intermediate term," the November 9, 2000 downgrade did not adjust the intermediate term rating, but only the long-term rating for ICG.

95. Merrill Lynch's September 25, November 9 and November 10 research reports on ICG were inconsistent with Blodget's privately expressed negative views in his October 5 and 6 e-mails.

## V. MERRILL LYNCH FAILED TO SUPERVISE ITS RESEARCH ANALYSTS

96. In the instances cited herein, Merrill Lynch's supervisory systems proved inadequate to prevent violations of the federal securities laws and NASD rules. Merrill Lynch failed reasonably to establish and maintain adequate procedures to detect and prevent undue investment banking influence on research analysts, and to ensure compliance with its internal policies regarding analyst independence. Merrill Lynch failed to supervise adequately the participation of research analysts in investment banking activities, and failed to manage the conflicts of interest created thereby in an adequate or appropriate manner. Merrill Lynch's supervisory systems were also inadequate and not reasonably designed to achieve compliance with the federal securities laws, NASD rules, and Merrill Lynch policies cited herein that prohibit misleading statements or material omissions in published research reports.

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

97. In addition, although Merrill Lynch's policies and procedures prohibited the dissemination of material non-public information as well as dissemination of other market sensitive information such as unpublished research reports and ratings, Merrill Lynch did not maintain a supervisory system sufficient to enforce those policies and procedures because Merrill Lynch's supervisory systems were not reasonably designed to monitor the external communications of its research analysts so as to detect and prevent the improper dissemination of ratings, or reports with ratings, as described above or in the instances described below.

98. A Merrill Lynch analyst who was not in the Internet group improperly gave advance notice of his stock ratings on Tyco and SPX Corporation ("SPX") to three institutional clients prior to the publication of those ratings. In an e-mail dated September 7, 1999 to an institutional client, the analyst stated, "I will be launching coverage on Thursday morning. I will rate Tyco and SPX 1-1." In another e-mail dated September 8, 1999 to a different institutional client, the analyst stated: "Also FYI, we will be initiating coverage with a 1-1 buy rating tomorrow!" A third e-mail to another institutional client conveyed the same advance notice of the analyst's stock ratings.

99. The same analyst also improperly disseminated material, nonpublic information concerning the acquisition of a Siemens business unit by Tyco. The analyst heard a rumor sometime prior to September 1999 (from hedge fund clients) that Tyco intended to purchase a Siemens business unit. The analyst followed-up on this rumor on September 25, 1999, when he sent an e-mail to Tyco Investor Relations, attaching a draft Merrill Lynch research report dated for release on September 28, 1999 and asking, "Please help fill in the blanks on the Siemens unit!" The stated reason for the report was "Accretion Could Be $0.07 in Year 1" - meaning that Tyco's acquisition of the Siemens unit could add 7 cents per share in the first year of ownership. As a result of this e-mail and his subsequent communications with Tyco, by September 25, 1999, the analyst possessed material, non-public information from Tyco.

100. The analyst selectively disseminated this information to certain institutional clients. On September 27, 1999, the analyst e-mailed an institutional client and stated: "FYI. It is likely that Tyco will announce the purchase of the Siemens connector operation early Tuesday morning for about $1.2 billion for $900 million in sales . . . Accretion could be about $0.05 - $0.07 in the first 12 months." This e-mail was materially accurate in terms of the purchase price, expected sales revenue from the purchase, and expected accretion to Tyco's EPS. On September 27, 1999 at 4:00 p.m., the analyst e-mailed an updated research bulletin to Tyco Investor Relations, wherein some of the missing information regarding the acquisition had been supplied. This research was also dated for release on September 28, 1999.

101. On September 27, 1999, a Tyco Investor Relations employee e-mailed the analyst a "grid", apparently prepared by Tyco, detailing the advantages of this acquisition. Later that day, the analyst received an e-mail from Tyco Investor Relations, which stated: "The attached information makes you an insider until the [Siemens] deal is announced. The information sheet at this stage is preliminary." Shortly thereafter, the analyst e-mailed the "grid" to an institutional client and wrote, "... You can't use until after

announcement!"

102. On September 28, 1999 at 1:45 am, a Tyco Investor Relations employee e-mailed the analyst stating: "Here is the revised information sheet [on the Siemens acquisition] . . . . DO NOT PUT OUT ANY INFORMATION UNTIL THE STORY CROSSES THE WIRE-I WILL CALL YOU WHEN IT DOES. THERE HAS BEEN A DELAY, SO THE EARLIEST IT WILL BE RELEASED IS AT 7 AM EST." On September 28, 1999, Tyco officially announced its acquisition of the Siemens unit under terms materially consistent with the analyst's prior communications to individuals outside of Merrill Lynch. On September 28, 1999, the analyst issued his research report on Tyco, announcing the "all cash" acquisition of the Siemens unit.

## FIRST CLAIM FOR RELIEF

**[Violation of Section 15(c)(1), Rule 15c1-2 Thereunder, and Section 15(c)(2) of the Exchange Act, and NASD and NYSE Rules by Issuing Fraudulent Research on GoTo.Com and InfoSpace]**

103. Paragraphs 1-102 are realleged and incorporated by reference.

104. Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)] provides, in relevant part, that

> [n]o broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . otherwise than on a national securities exchange of which it is a member by means of any manipulative, deceptive, or other fraudulent device or contrivance.

105. Rule 15c1-2 [17 C.F.R. § 240.15c1-2] provides, in relevant part, that the term, "manipulative, deceptive, or other fraudulent device," as used in Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)] shall include (a) "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" and (b) "any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement is made with knowledge or reasonable grounds to believe that is us untrue or misleading."

106. Section 15(c)(2)(A) of the Exchange Act [15 U.S.C. § 78o(c)(2)] provides, in relevant part, that

> [n]o broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . otherwise than on a national securities exchange of which it is a member, in connection with which such broker or dealer engages in any

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

> fraudulent, deceptive, or manipulative act or
> practice, or makes any fictitious quotation.

107. NASD Conduct Rule 2110 requires members to observe high standards of commercial honor and just and equitable principles of trade.

108. NASD Conduct Rule 2210(d)(1)(A) states:

> All member communications with the public shall be
> based on principles of fair dealing and good faith
> and should provide a sound basis for evaluating the
> facts in regard to any particular security or
> securities or type of security, industry discussed, or
> service offered. No material fact or qualification
> may be omitted if the omission, in the light of the
> context of the material presented, would cause the
> communications to be misleading.

109. NASD Conduct Rule 2210(d)(1)(B) prohibits members from making "[e]xaggerated, unwarranted or misleading statements or claims" in all public communications and states that "no member shall, directly or indirectly, publish, circulate or distribute any public communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading."

110. NASD Conduct Rule 2210(d)(2)(B) requires, among other things, that members have a reasonable basis for all recommendations made in advertisements and sales literature.

111. NASD Conduct Rule 2210(d)(2)(C) prohibits members from making, among other things, "promises of specific results, exaggerated or unwarranted claims or unwarranted superlatives, opinions for which there is no reasonable basis, or forecasts of future events which are unwarranted" in communications with the public.

112. NYSE Rule 401 requires that member organizations adhere at all times to the principles of good business practice in the conduct of their business affairs.

113. NYSE Rule 476(a)(6) prohibits members from engaging in conduct or proceeding in a manner inconsistent with just and equitable principles of trade.

114. NYSE Rule 472 provides, among other things, that

> [n]o member or member organization shall utilize
> any communication which contains (i) any untrue
> statement or omission of a material fact or is
> otherwise false or misleading; or (ii) promises of
> specific results, exaggerated or unwarranted
> claims; or (iii) opinions for which there is no
> reasonable basis; or (iv) projections or forecasts of
> future events which are not clearly labeled as
> forecasts.

115. As alleged above, Merrill Lynch issued research reports on GoTo and InfoSpace that were materially misleading because they were contrary to Merrill Lynch research analysts' privately-expressed negative views.

116. By reason of the foregoing, Merrill Lynch violated Section 15(c)(1), Rule 15c1-2 thereunder and 15(c)(2) of the Exchange Act, NASD Conduct Rules 2110, 2210(d)(1), and 2210(d)(2), and NYSE Rules 401, 472, and 476(a)(6).

## SECOND CLAIM FOR RELIEF

### [Violations of NASD and NYSE Rules by Publishing Misleading, Exaggerated, Unbalanced or Unwarranted Research and Making Statements Without a Reasonable Basis]

117. Paragraphs 1-102 and 107-114 are realleged and incorporated by reference.

118. As alleged above, Merrill Lynch issued research reports on 24/7 Media, Inc.; LifeMinders, Inc.; Homestore.com, Inc.; Excite@Home; and Internet Capital Group, Inc. that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about these companies, and/or contained opinions for which there was no reasonable basis.

119. By reason of the foregoing, Merrill Lynch violated NASD Conduct Rules 2110, 2210(d)(1), and 2210(d)(2), and NYSE Rules 401, 472, and 476(a)(6).

## THIRD CLAIM FOR RELIEF

### [Violation of NASD and NYSE Rules Due to Conflicts of Interest Resulting From Investment Banking Influence Over Research Analysts]

120. Paragraphs 1-102, 107, and 112-113 are realleged and incorporated by reference.

121. During the relevant period, Merrill Lynch engaged in the acts and practices described above that created or maintained inappropriate influence by investment banking over research analysts and therefore imposed conflicts of interest on its research analysts. Merrill Lynch failed to manage these conflicts in an adequate or appropriate manner.

122. By reason of the foregoing, Merrill Lynch violated NASD Conduct Rule 2110 and NYSE Rules 401 and 476(a)(6).

## FOURTH CLAIM FOR RELIEF

### [Violations of NASD and NYSE Rules by Failing to Supervise]

123. Paragraphs 1-102 are realleged and incorporated by reference.

124. NASD Conduct Rule 3010(a) requires members, among other things, to "establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with" NASD's own Rules.

125. NYSE Rule 342(a) requires members, among other things, to maintain "appropriate supervisory control" over all business activities to ensure compliance with securities laws and regulations, including establishing "a separate system of follow-up and review to determine that the delegated authority and responsibility is being properly exercised."

126. As alleged above, Merrill Lynch failed to manage the conflicts of interest for research analysts and to protect research analysts from undue influence by investment banking. Also, Merrill Lynch's supervisory systems were not reasonably designed or implemented to monitor research analysts' external e-mails to detect and prevent the occurrence of the violations described herein.

127. By reason of the foregoing, Merrill Lynch violated NASD Conduct Rule 3010(a) and NYSE Rule 342(a).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter final judgment:

### I.

Permanently restraining and enjoining defendant from violating Section 15 (c)(1), Rule 15c1-2 thereunder, and 15(c)(2) of the Exchange Act, NASD Conduct Rules 2110, 2210(d)(1), 2210(d)(2), and 3010(a), and NYSE Rules 342(a), 401, 472, and 476.

### II.

Ordering defendant to account for and disgorge all proceeds it has obtained as a result of its illegal conduct, plus prejudgment interest thereon.

### III.

Ordering defendant to pay civil money penalties.

### IV.

Ordering such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

_____

Of Counsel:               Kenneth L. Miller (KM 5614)
Yuri B. Zelinsky          Antonia Chion (AC 9522)

Complaint: SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated

Kara Novaco Brockmeyer    James A. Meyers (JM 5231)
                          SECURITIES AND EXCHANGE COMMISSION
Michael S. Fuchs
                          450 Fifth Street, N.W.
                          Washington, D.C. 20549-0911
                          (202) 942-4567 (Chion)
                          (202) 942-9636 (Chion fax)

Date: April 28, 2003      <u>Attorneys for Plaintiff</u>

*http://www.sec.gov/litigation/complaints/comp18115.htm*

Home | Previous Page

**U.S. Securities and Exchange Commission**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION, :

                                 Plaintiff, :

                                          :

             -against- :                     :

                                        : Civil Action No.

MERRILL LYNCH, PIERCE, FENNER : :
& SMITH INCORPORATED : :
4 World Financial Center : :
New York, NY 10281 : :

         Defendant. :

_____

### FINAL JUDGMENT AS TO DEFENDANT
### MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

Plaintiff Securities and Exchange Commission ("Commission") having filed a Complaint in this action ("Complaint") and Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Defendant") having (a) entered a general appearance, (b) consented to the Court's jurisdiction over Defendant and the subject matter of this action, (c) consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction), (d) waived findings of fact and conclusions of law, and (e) waived any right to appeal from this Final Judgment; and the Commission having agreed that, on the basis of this Final Judgment, it will not institute a proceeding against Defendant pursuant to Sections 15(b), 15B, 15C, or 19(h) of the Securities Exchange Act of 1934 (the "Exchange Act"):

### I.

### Injunctive Relief

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

A. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 15(c) of the

Exchange Act and Rule 15c1-2 promulgated thereunder [15 U.S.C. §_78o (c) and 17 C.F.R. § 240.15c1-2] by making use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security by means of any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

B. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Rule 2110 of the Conduct Rules of NASD Inc. ("NASD") and Rules 401 and 476 of the New York Stock Exchange, Inc. ("NYSE"), by (1) engaging in acts or practices that create or maintain inappropriate influence by investment banking over research analysts and therefore impose conflicts of interest on research analysts, and by failing to manage these conflicts in an adequate or appropriate manner; and (2) publishing research reports that are contrary to the beliefs of its research analysts and fail to disclose that fact, do not provide a sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis.

C. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 2210 and NYSE Rule 472 by issuing communications to the public that are contrary to the beliefs of its research analysts and fail to disclose that fact, do not provide a sound basis for evaluating facts, are not properly balanced, and/or contain exaggerated or unwarranted claims and/or opinions for which there is no reasonable basis.

D. Defendant, Defendant's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating NASD Rule 3010 and NYSE Rule 342 by failing to maintain appropriate supervisory procedures regarding or controls over the following that are reasonably designed to ensure compliance with securities laws and regulations: (1) influence by investment banking over research analysts; (2) compensation and evaluation of research analysts; (3) use of research or research analysts in connection with the solicitation or marketing of investment banking business; and (4) publication of research regarding a securities issuer with which Defendant has, has solicited, or is soliciting an investment banking relationship.

## II.

### Monetary Sanctions

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that:

A. As a result of the violations alleged in the Complaint, Defendant shall pay a total amount of $200,000,000. This amount includes:

1. $100,000,000, as a penalty;

2. $75,000,000, to be used for the procurement of Independent Research, as described in Section III below and the undertakings set forth in Addendum A hereto; and

3. $25,000,000, to be used for investor education, as described in Section IV below.

No portion of the payments for Independent Research or investor education shall be considered disgorgement or restitution, and/or used for compensatory purposes.

B. The payment of the penalty of $100,000,000 is deemed satisfied by Defendant's prior payment of $100,000,000 pursuant to its agreements with state securities regulators.

## III.

### Financial Obligation Regarding Independent Research

A. As referenced in Section II.A.2 above, Defendant shall pay a total of $75,000,000 for its Independent Consultant to procure Independent Research from the Independent Research Providers over the five-year period set forth in Section III.1 of Addendum A hereto. As used herein, the terms "Independent Consultant," "Independent Research," and "Independent Research Providers" shall have the meanings set forth in Addendum A hereto. Defendant will not be required to spend more than the amount set forth in this Section VIII.A in order to procure Independent Research and will have no obligation to procure additional Independent Research if the Independent Consultant has spent the entire amount of Defendant's financial obligation with regard to Independent Research. Any money that is not spent after the five-year period set forth in Section III.1 of Addendum A hereto will not revert to Defendant and will be paid one-half to NASD and one-half to NYSE for use in their regulation and enforcement programs.

B. Defendant shall also escrow $1,250,000 within thirty (30) days after entry of this Final Judgment to cover the fees and costs of the Independent Consultant. This obligation is not contingent or dependent in any way or part upon acceptance by any state securities regulator(s) of the State Settlement Offer. In the event that such escrowed amount exceeds the fees and costs of the Independent Consultant, the excess will be returned to Defendant at the conclusion of the five-year period set forth in Section III.1 of Addendum A hereto.

## IV.

### Investor Education

A. Payments to the Investor Education Fund.

1. As referenced in Section II.A.3 above, Defendant shall pay a total amount of $25,000,000 to be used for investor education. Defendant

shall pay this amount in five equal installments on an annual basis.

2. Defendant shall make the first such installment payment within ninety (90) days after the entry of this Final Judgment by the Court. This payment shall be made by wire transfer to the Clerk of this Court, together with a cover letter identifying Merrill Lynch, Pierce, Fenner & Smith Incorporated as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made to the CRIS Investor Education Fund Account pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of its payment and letter to the Clerk of the Court to the SEC's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. The Clerk shall deposit the funds into an interest bearing account with the CRIS, to be designated the "Investor Education Fund Account." Any interest and income earned on funds in the Investor Education Fund Account shall be added to and become part of the Investor Education Fund Account. The Investor Education Fund Account shall be held by the CRIS until further order of the Court. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Investor Education Fund Account a fee equal to ten (10) percent of the income earned on the Investor Education Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States. The Investor Education Fund Account shall be administered in accordance with the terms of the Investor Education Plan to be approved by this Court as provided for in this Final Judgment.

3. Defendant shall make subsequent installment payments annually on or before the month and day of the entry of this Final Judgment. Such payments shall be made into the Investor Education Fund by the means to be specified in the Investor Education Plan or in a further order of this Court.

B. Purpose of and Limitations on the Use of the Investor Education Fund.

1. The Investor Education Fund (including all installment payments) shall be used to support programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions, according to the terms of this Final Judgment and the Investor Education Plan described below.

2. The Investor Education Fund, and any grants awarded from the Investor Education Fund, shall not be used:

    (a) to benefit, directly or indirectly:

        (i) beyond the payment of his fees and expenses, the Investor Education Fund Administrator (described below) or any person involved in the review or approval of applications for grants from the Investor Education Fund; any entity that employs such a person; any entity that

has contributed to the Investor Education Fund; or any entity affiliated with any such contributor;

(ii) Defendant, its predecessors, successors, or their subsidiaries, affiliates, present or former officers, directors, or their employees, agents, assigns, members of their immediate households, or those persons in active concert or participation with them, through subrogation or otherwise;

(iii) any person who has been convicted of a crime substantially related to any act or practice, or the types of acts or practices, identified in the Complaint;

(iv) any person who has been enjoined by a court or sanctioned by the Commission or any other regulatory authority for any act or practice, or the types of acts or practices, identified in the Complaint; or

(v) any person named as a defendant in a pending federal criminal or civil enforcement action for any act or practice, or the types of acts or practices, identified in the Complaint;

(b) to promote, directly or indirectly, the products or services of any single firm or entity;

(c) for any unlawful or unethical purpose; or

(d) for any non-educational purpose.

3. Monies in the Investor Education Fund may also be used to pay any taxes on income earned by such Fund. The Investor Education Fund is intended to be a "qualified settlement fund" pursuant to Section 468B (g) of the Internal Revenue Code and regulations thereunder. The Investor Education Fund Administrator (described below) is designated the administrator of such Fund as defined in and for the purpose of Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2 by, e.g., (1) obtaining a taxpayer identification number; (2) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon; and (3) satisfying any information reporting or withholding requirements imposed on distributions from such Fund. Defendant shall provide the Investor Education Fund Administrator with relevant information and otherwise cooperate with the Investor Education Fund Administrator in fulfilling such Fund's obligations under Treas. Reg. § 1.468B-2.

C. Appointment and Payment of the Investor Education Fund Administrator.

1. As soon as is practicable, the Court shall appoint an Investor Education Fund Administrator, whom the Commission shall recommend. Subject to the Court's approval, there shall be a single Investor Education Fund Administrator with respect to this action and

the Related Actions. However, the Investor Education Fund in this action shall be separate from the Investor Education Funds established in those other actions.

2. All fees, costs, and expenses incurred by the Investor Education Fund Administrator and approved by the Court in connection with and incidental to the performance of his duties under the Final Judgment, including the fees, costs, and expenses of any persons engaged to assist him and all administrative fees, costs, and expenses related to the Investor Education Plan described below, shall be paid out of the Investor Education Fund in this Action and/or the Related Actions.

D. Responsibilities, Powers and Rights of the Investor Education Fund Administrator.

1. The Investor Education Fund Administrator shall:

(a) propose and administer the Investor Education Plan described below in accordance with and subject to the conditions and limitations imposed by the terms of this Final Judgment;

(b) distribute monies from the Investor Education Fund pursuant to the Investor Education Plan;

(c) file all required tax returns on behalf of the Investor Education Fund;

(d) commencing one year after entry of this Final Judgment and continuing through the life of the Investment Education Fund, submit written annual reports to the Court and the Commission providing detailed information on the progress of the implementation of the Investor Education Fund (including a description of all grant applications received and all grants approved), fees and expenses incurred, and other matters relevant to the status of the Investor Education Fund; and

(e) file with the Court on a quarterly basis, with copies to the Commission staff, applications for payment of his fees and expenses (including the fees and expenses of others retained by him as authorized by this Final Judgment) incurred during the quarterly period. At least thirty (30) days before making each such application to the Court, the Investor Education Fund Administrator shall submit the application to the Commission staff, and the Commission may advise the Court whether it has any objection. Upon approval of any such application by the Court, the Clerk of the Court shall pay the approved amounts to the Investment Education Fund Administrator and to those employed by him from the CRIS Investment Education Fund Account or, if applicable, the Investor Education Fund Administrator may pay the approved amounts to himself and to those employed by him from the Investor Education Fund.

2. The Investment Education Fund Administrator shall have all

appropriate powers and authority to perform his duties as set forth in this Final Judgment including, without limitation, the following powers:

> (a) to retain and engage such personnel as he deems necessary, including, without limitation, legal counsel, relevant experts, and other personnel to assist in the preparation and administration of the Investor Education Plan; and

> (b) to delegate to such persons such duties as he deems appropriate.

3. The Investor Education Fund Administrator, his agents, attorneys and all persons acting on his behalf shall be held harmless against all liabilities, claims and demands, whether civil, criminal, administrative, or investigative arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that it is found that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

4. Defendant shall indemnify, defend, and hold harmless the Investment Education Fund Administrator, his agents, and his attorneys from and against all liabilities, claims, and demands, whether civil, criminal, administrative, or investigative, judgments, fines, and amounts paid in settlement, and costs and expenses (including attorneys' fees), arising from or relating to any act or omission to act in the course of performing his duties, except and to the extent that the Court finds that such person acted in bad faith, gross negligence, reckless disregard of his duties, or in a manner that he knew was contrary to the terms of this Final Judgment.

5. The Court may remove the Investor Education Fund Administrator *sua sponte* or, for good cause shown, upon application of the Commission. If the Investor Education Fund Administrator decides to resign, he shall first give sixty (60) days written notice to the Commission and the Court of his intention. Such resignation shall not become effective until the Court has appointed a successor. If the Investor Education Fund Administrator is removed by the Court, becomes incapacitated due to illness or death, is otherwise unable to serve, or resigns, the Court shall appoint a successor recommended by the Commission.

6. The Investor Education Fund Administrator is entitled to rely on all rules of law and court orders, and shall not be liable to anyone for his own good faith compliance with any order, rule, law, judgment, or decree. Nor shall he be liable for complying with the orders of this Court. In no event shall he be liable to Defendant for his good faith compliance with his duties and responsibilities under this Final Judgment.

7. The Investor Education Fund Administrator shall not enter into any employment, consulting, or attorney-client relationship with Defendant, or any of its present or former parents, subsidiaries, directors, officers, employees, or agents acting in their capacity as

such for the period of the engagement and for a period of three years from the completion of his engagement. Any firm with which the Investor Education Fund Administrator is affiliated or of which he is a member and any person engaged to assist the Investor Education Fund Administrator in the performance of his duties under this Final Judgment shall not, without the Commission's prior written consent, enter into any employment, consulting or other professional relationship with Defendant, or any of its present or former directors, officers, employees, or agents in their capacity as such for the period of the engagement and for three years after the completion of the engagement.

E. The Investor Education Plan.

1. As soon as is practicable, but in no event more than sixty (60) days after being appointed by the Court, the Investor Education Fund Administrator shall provide the Commission staff for its review and comment an Investor Education Plan.

2. The Investor Education Plan shall establish and describe a non-profit grant administration program to fund worthy and cost-efficient programs designed to equip investors with the knowledge and skills necessary to make informed investment decisions. The Investor Education Plan shall state the means by which Defendant shall make all remaining installment payments required by this Final Judgment; may authorize the transfer of the funds in the CRIS Investor Education Fund accounts in this action and in the Related Actions to one or more interest-bearing accounts opened and maintained by the Investor Education Fund Administrator; shall include all provisions necessary to implement the Investor Education Plan; and shall be consistent in all respects with the terms of this Final Judgment.

3. Thirty (30) days after the Investor Education Plan has been submitted to the Commission staff, the Investor Education Fund Administrator shall present such Plan, with any revisions that he deems appropriate, to the Court for its approval. The Investor Education Fund Administrator shall promptly begin to implement such Plan after it has been approved by the Court.

F. Stay of Proceedings. For the purposes of implementing and effectuating the Final Judgment, and upon a finding hereby made that a stay of any proceedings against the Investor Education Fund Administrator and the Investor Education Fund during the pendency or the existence of such Fund is necessary to effectuate the Final Judgment, all creditors or claimants of Defendant, and other persons acting on behalf of such creditors, claimants, or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, and attorneys, be and the same hereby are restrained and enjoined during the pendency or the existence of the Investor Education Fund from: (1) commencing, prosecuting, continuing, or enforcing any suit or proceeding against the Investor Education Fund Administrator or the Investor Education Fund; (2) using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property owned by or in the

possession of or to be transferred to the Investor Education Fund or the Investor Education Fund Administrator pursuant to the Final Judgment, wheresoever situated; and/or (3) doing any act or thing whatsoever to interfere with the taking control, possession, or management by the Investor Education Fund Administrator, of the monies that are or may be transferred to the Investor Education Fund, or in any way to interfere with or harass said Investor Education Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Investor Education Fund.

## V.

### Standing

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, notwithstanding any rule or provision of law, nothing herein, including in the Addenda hereto, shall be deemed to confer standing or right of intervention upon any persons other than the Commission and Defendant.

## VI.

### Record Retention and Non-Destruction Requirement

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for a period of five years from the effective date of this Final Judgment or such shorter or longer period as the Court may order, Defendant, its officers, directors, agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, are hereby enjoined from destroying, mutilating, concealing, altering, or disposing of (a) any research distributed by Defendant during the relevant period identified in the Complaint; (b) documents sufficient to identify all customers who bought or sold equity securities of the issuers as to which Defendant issued research during the relevant period identified in the Complaint (the "Transactions"), including but not limited to documents sufficient to identify the dates, amounts, and prices of the Transactions; (c) documents sufficient to identify which customers received which research distributed by Defendant during the relevant period identified in the Complaint; (d) order entry information sufficient to identify whether the Transactions were solicited by Defendant; (e) documents sufficient to identify the publicly-traded companies for which Defendant sought to provide, was engaged to provide, or did provide investment banking services during the relevant period identified in the Complaint; and (f) any and all written (including electronic) communication, including communications to and from customers and intra-firm communications, relating to Defendant's investment banking and equity research operations during the relevant period identified in the Complaint; *provided, however,* that Defendant need not retain duplicate identical copies of public documents filed with the Commission or any other regulatory authority.

## VII.

### Defendant's Consent Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and Defendant shall comply with all of the undertakings and agreements set forth therein.

## VIII.

### Attached Undertakings Incorporated by Reference

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall comply with the undertakings set forth in Addendum A hereto. Such undertakings and Addendum A are incorporated herein with the same force and effect as if fully set forth herein.

## IX.

### Definition of Defendant

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that with respect to all injunctive relief and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions, the terms "Defendant" and "Defendant's" as used herein shall include Defendant's successors and assigns (which, for these purposes, shall include a successor or assign to Defendant's investment banking and research operations, and in the case of an affiliate of Defendant, a successor or assign to Defendant's investment banking *or* research operations).

## X.

### Court to Retain Jurisdiction

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## XI.

### Entry of Judgment Forthwith

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, there being no just cause for delay, the Clerk of the Court shall, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, enter this Judgment forthwith and without further notice.

Dated: New York, New York
_____, 2003


_____
UNITED STATES DISTRICT JUDGE

*http://www.sec.gov/litigation/litreleases/judge18115.htm*

Exhibit E

# GARWIN, BRONZAFT, GERSTEIN & FISHER, L.L.P.

Bruce E. Gerstein
Scott W. Fisher
Barry S. Taus
Noah H. Silverman
Brett Cebulash
Joseph Opper
Kevin S. Landau

Counselors at Law
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055
Telecopier No. (212) 764-6620
E-Mail: lawoffices@gbgf-law.com

Sidney L. Garwin (1908-1980)
—————
Jon R. Bartelli
Adam M. Steinfeld
Archana Tamoshunas
Anne K. Fornecker
Kimberly M. Hennings

August 31, 2004

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Board of Directors
Merrill Lynch Focus
 Twenty Fund, Inc.
P.O. Box 9211
Princeton, New Jersey 08543-9011

      **Re:**    **In re Merrill Lynch Focus Twenty Fund:**
                    **Conflict of Interest and Waste of Assets**

Dear Sir/Madam:

        We represent April Scalisi and Felix Amsler, who own and have owned shares in Merrill Lynch Focus Twenty Fund, Inc. (the "Fund') for many years.

        Consistent with the Second Circuit Court of Appeals' recent decision in <u>Scalisi v. Fund Asset Mgmt., L.P.</u>, Docket No. 03-9233, and without conceding the independence or disinterestedness of the board, we write to demand that you remedy the damage sustained by the Fund as described below.

        As you know, Fund Asset Management, L.P. ("FAM"), the adviser to the Fund and a wholly-owned subsidiary of Merrill Lynch & Co. ("Merrill Lynch") is responsible for, <u>inter alia</u>, selecting investments, consistent with a publically represented policy (<u>i.e.</u>, "long-term goals in mind, such as retirement or funding a child's education"), for the Fund's portfolio.

        During a time when FAM caused the Fund to commit approximately 4% of shareholder monies to purchase approximately 610,000 shares of common stock in Enron Corporation ("Enron"), other Merrill Lynch subsidiaries, affiliates and executives were actively and admittedly engaged in and profited from assisting Enron in committing fraud. The nature and scope of these fraudulent transactions with Enron is specified in detail in the accompanying complaints annexed hereto as Exhibits A and B.

**Board of Directors**
**Merrill Lynch Focus**
   **Twenty Fund, Inc.**
**August 31, 2004**
**Page 2**

There are undeniable entanglements between Merrill Lynch, FAM, Merrill Lynch's brokerage arm which sold and/or otherwise provided research to FAM, Merrill Lynch's investment banking arm and Merrill Lynch's executives many of whom were either implicated in the fraud or profited from investments in private Enron off-balance sheet partnerships. Indeed, the lack of any meaningful policies and procedures to obviate conflicts between Merrill Lynch and its affiliates during, at least, the time of the Fund's investment in Enron, has been the subject of additional public criticism and regulatory proceedings (see e.g., Exhibit C hereto.)

While the Second Circuit affirmed the dismissal of the Scalisi action solely for failure to make a presuit demand, the merits of the underlying lawsuit have not been addressed.

As "watch dogs" overseeing FAM and its management, we hereby demand that you take action against FAM and any other Merrill Lynch entity or executive, to recover for the benefit of the Fund, what is believed to be in excess of $30 million of Fund monies, lost as a result of the purchase Enron of common stock, which purchase aided and abetted the private pecuniary gain and fraud of Merrill Lynch and its executives.

Please confirm receipt of this letter and the steps that you plan to take to remedy this abhorrent situation.

Yours very truly,

WECHSLER HARWOOD LLP

By: _____
   Joel C. Feffer

GARWIN, BRONZAFT, GERSTEIN & FISHER, L.L.P.

By: _____
   Scott W. Fisher

SWF:jcs
Enclosures

cc:   Marvin E. Barkin, Esq. (Via Federal Express)

Exhibit F

**B ASS , B ERRY & S IMS PLC**

A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

JAMES H. CHEEK, III
TEL: (615) 742-6223
FAX: (615) 742-2723
jcheek@bassberry.com

AMSOUTH CENTER
315 DEADERICK STREET, SUITE 2700
NASHVILLE, TN 37238-3001
(615) 742-6200

www.bassberry.com

OTHER OFFICES:

NASHVILLE MUSIC ROW
KNOXVILLE
MEMPHIS

September 8, 2004

Joel C. Feffer, Esq.
Wechsler Harwood LLP
488 Madison Avenue
New York, NY 10022

Scott W. Fisher, Esq.
Garwin, Bronzaft, Gerstein & Fisher, L.L.P.
1501 Broadway
Suite 1416
New York, NY 10036

Re:     **August 31, 2004 Letter**

Dear Messrs. Feffer and Fisher:

On behalf of the directors for the Merrill Lynch Focus Twenty Fund, Inc. (the "Fund"), I am writing to acknowledge receipt of your letter, dated August 31, 2004.

Please be advised that the Fund's Board of Directors will consider your letter at its next regularly scheduled meeting.  Please let us know whether there are any additional facts, not already contained in your August 31 letter, that you would like presented to the Fund's Board at its next meeting.

Very truly yours,

James H. Cheek, III

cc:     Independent Directors of the Fund
        Terry Glenn, President of the Fund

Exhibit G

TELEPHONE: (212) 935·7400
TELECOPIER: (212) 753·3630

September 20, 2004

By Telecopier and First Class Mail

James H. Cheek, III, Esq.
Bass, Berry & Sims PLC
AmSouth Center
315 Deaderick Street
Suite 2700
Nashville, Tennessee 37238-3001

Re:  Merrill Lynch Focus Twenty Fund, Inc.

Dear Mr. Cheek:

Thank you for your prompt response to our demand letter of August 31, 2004.

So that there is no misunderstanding, our clients, shareholders of the Merrill Lynch Focus Twenty Fund, Inc. (the "Fund"), assume that the Board of the Fund already would have familiarized itself fully with the facts alleged in the extensive public record of the sordid relationship between Merrill Lynch and its affiliates, and Enron Corporation ("Enron"), including the facts and circumstances surrounding Fund Asset Management, L.P.'s determination to commit substantial Fund public monies to Enron, while Merrill Lynch and its executives were profiting wrongfully from private intercourse with Enron. Our clients' assumption is based, in part, on the fact that the public record indicates that there has been very little change in the composition of the Board over the past few years.

Accordingly, given the extensive body of public information, including without limitation the record in the Scalisi action and the wealth of non-public information available to the Board concerning the relationships between Merrill Lynch and its

James H. Cheek, III, Esq.
September 20, 2004
Page 2

affiliates and Enron, there are no "additional facts" we can provide over and above what the Board already knows or should know, whether referred to in our August 31, 2004 letter or otherwise.

Please advise us as to the date the Board is expected to consider this matter and the steps the Board has taken or intends to take to address our clients' allegations.

Very truly yours,

Wechsler Harwood LLP

By: _____
    Joel C. Feffer

Garwin, Bronzaft, Gerstein
& Fisher, L.L.P.

By: _____
    Scott W. Fisher

JCF:jrg



|  |  |
| --- | --- |
| Two Hopkins Plaza, Suite 1800 | Telephone 410-244-7400   www.venable.com |
| Baltimore, Maryland 21201-2978 | Facsimile 410-244-7742 |

November 24, 2004

Joel C. Feffer, Esquire
Wechsler Harwood LLP
488 Madison Avenue
New York, NY 10022

Scott W. Fisher, Esquire
Garwin, Bronzaft, Gerstein & Fisher, L.L.P.
1501 Broadway
Suite 1416
New York, NY 10036

    Re:  Merrill Lynch Focus Twenty Fund, Inc.

Gentlemen:

    Your letter of August 31, 2004 to James H. Cheek, III has been referred to us for our response.  The Board of Directors of Merrill Lynch Focus Twenty Fund, Inc. has appointed directors Stephen B. Swensrud, Joe Grills and Robert S. Salomon, Jr., as the Independent Investigation Committee to review and investigate the matters set forth in the Letter; delegated to the Committee all such powers as are necessary or appropriate to carry out such review and investigation; authorized the Committee to retain counsel and other experts to advise and assist the Committee in its review and investigation; and instructed the Committee to report its findings and recommendations to the Board upon the completion of its review and investigation.

    The Committee has retained our firm to help it perform a thorough and complete investigation and advise it.  If there are any facts or other matters that you wish to bring to our attention to assist the Committee in its investigation, we invite you to do so at your earliest convenience.

MARYLAND    VIRGINIA    WASHINGTON, DC

11-29-04

# VENABLE®LLP

Joel C. Feffer, Esquire
Scott W. Fisher, Esquire
November 24, 2004
Page 2

      Please communicate with me or my partner James J. Hanks, Jr. (410-244-7500) should you have any questions or comments.  Thank you.

      Sincerely,

Benjamin R. Civiletti

cc:    Mr. Robert S. Salomon, Jr.
       Mr. Joe Grills
       Mr. Stephen B. Swensrud
       James J. Hanks, Jr., Esquire

BA0DOSCS1/143787v2