UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————x

APRIL SCALISI, as custodian for her
minor children, and SCOTT
McDONOUGH,

               Plaintiffs,

        v.

JOE GRILLS, STEPHEN B. SWENSRUD,
ROBERT S. SALOMON, JR, and FUND
ASSET MANAGEMENT, L.P.,

            Defendants,

        - and -

MERRILL LYNCH FOCUS TWENTY
FUND, INC.,

          Nominal Defendant.

———————————————————x

Case No. CV 04 5513 (TCP)

**VERIFIED FIRST AMENDED
AND SUPPLEMENTAL
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiffs allege the following upon personal knowledge as to themselves and their own

acts, and as to all other matters upon information and belief, based upon the investigation made

by and through their attorneys, which investigation includes, inter alia, review of Securities and

Exchange Commission filings, press releases, news articles, and other publicly available

materials.

### NATURE OF THE ACTION

    1.    Plaintiffs are investors in nominal defendant the Merrill Lynch Focus Twenty

Fund, Inc. (the "Fund"), a mutual fund promoted by Merrill Lynch & Co. ("Merrill Lynch") as

being appropriate for investors with, inter alia, "long-term goals in mind such as retirement or

funding a child's education." Plaintiffs bring this action derivatively on behalf of the Fund

against Merrill Lynch's wholly-owned subsidiary, Fund Asset Management, L.P. ("FAM"), the

Fund's investment adviser, and against individual defendants Joe Grills, Stephen B. Swensrud,

and Robert S. Salomon, Jr., for their efforts to cover up FAM's wrongdoing, for breach of

fiduciary duty in violation of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 - 80a-43

(the "ICA"), as well as common law breaches of fiduciary duties, negligence, gross negligence,

and negligent misrepresentation.

2.      FAM served the interests of its parent Merrill Lynch at the expense of the Fund

and its shareholders by purchasing the common stock of Enron Corporation ("Enron") while

Merrill Lynch and its affiliates were helping to engineer fraudulent financial transactions to

artificially boost Enron's publicly reported earnings, thereby wasting tens of millions of dollars

in public Fund monies.[1] Exacerbating the conflicts and entanglements, Merrill Lynch, its

---

[1] See the complaint filed by the United States Securities and Exchange Commission (the "SEC") against Merrill Lynch and several senior executives (annexed hereto as Exhibit A), outlining in more detail the fraudulent Nigerian barge and energy trade transactions. As summarized by the SEC:

> Merrill Lynch and its senior executives . . . helped their client, Enron Corp., commit securities fraud.
>
> *      *      *
>
> Merrill Lynch and Enron completed the two fraudulent transactions in the last days of December, 1999. In the first, an asset parking arrangement, Enron purportedly "sold" an interest in Nigerian energy barges to Merrill Lynch. In fact, the risk of ownership never passed to Merrill Lynch. Instead, this was in effect a short term loan and Merrill Lynch earned a specified rate of return. Pursuant to a side deal between Enron and Merrill Lynch, Enron took Merrill Lynch out of the transaction in June 2000. Enron reported, as Merrill Lynch knew it would, $12 million in income from this sham "sale." In the second fraudulent transaction, Enron and Merrill Lynch entered into two energy option contracts that were designed to substantially cancel each other out. Enron agreed to pay Merrill Lynch a $17 million dollar fee for participating in what was essentially a risk-free transaction. Enron reported, as Merrill Lynch knew it would, $50 million in income from this sham energy trade.

affiliates, and its executives, including executives at FAM, were generating millions of dollars in fees and other consideration for themselves through private intercourse with Enron and its affiliates. This conduct artificially increased the price investors had to pay for Enron stock and ultimately resulted in civil and criminal investigations directed against Merrill Lynch and certain of its senior executives. The investigations resulted in criminal convictions of former Merrill Lynch executives and a "settlement" agreement by Merrill Lynch itself in order to avoid criminal charges being filed against it. Indicative of these patent entanglements and conflicts of interest, at least 97 of Merrill Lynch's most senior executives, including Stephen Zimmerman ("Zimmerman"), the Co-Chief Operating Officer of Merrill Lynch Investment Managers, L.P. ("MLIM") and its affiliate FAM (who invested $250,000), three of the four Merrill Lynch executives convicted of crimes in Texas Federal court and Senior Executive Management members Robert J. McCann, the Head of Global Securities Research and Barry S. Friedberg, the Chairman of Global Markets and Investment Banking, invested millions of dollars and profited from the notorious Enron off-balance sheet private partnership, known as LJM2 Co-Investment, L.P. ("LJM2").[2] Merrill Lynch prepared the Private Placement Memorandum ("PPM") and acted as the sole placement agent for LJM2.

3.      LJM2 and other Enron private partnerships were created to disguise Enron's true financial condition and generate huge returns to favored inside investors, including the Merrill Lynch "97." Merrill Lynch executives who received the PPM, all skilled financial professionals,

---

Merrill Lynch paid $80 million to settle the SEC's charges.

[2] A list of the 97 Merrill Lynch executives who invested a total of $17.6 million in the LJM2 Enron off-balance sheet private partnership is annexed hereto as Exhibit B.

reviewed the Merrill Lynch prepared PPM and understood that LJM2 was designed to *inter alia*: (a) hide billions of dollars in Enron debt; (b) create illusionary cash flow for Enron; and (c) richly reward partnership investors at the expense of public investors in Enron common stock.

4.    (a)    FAM is the adviser to dozens of Merrill Lynch mutual funds, and thereby has access to a vast reservoir of private information known to Merrill Lynch and its executives. Such information included admittedly, without limitation, the contents of the Merrill Lynch prepared  LJM2 partnership private placement documents which partnership was also underwritten, sponsored, financed, and/or promoted heavily by Merrill Lynch.  Therefore, FAM was in a privileged position and  knew that there was a substantial, fraudulent disconnect between Enron's actual financial condition and that reported to the investment community. Indeed, MLIM and its affiliate FAM's Co-Chief Operating Officer Stephen Zimmerman as a direct investor in LJM2, and Jeffrey Peek ("Peek") and Carol Galley ("Galley") the other most senior officers of MLIM and its affiliate FAM, received copies of the PPM and had an opportunity to invest and had access to material inside information regarding LJM2.  FAM and its executives also knew because it used Fund assets to purchase "research" from its affiliate, another wholly-owned subsidiary of Merrill Lynch, which was actively engaged in assisting Enron in creating its fraudulent financial statements;

(b)    Defendant FAM's own written "policies and procedures" concerning the erection of an "Ethical Wall," which "are required by law" (emphasis in original), explicitly impute all knowledge by any FAM employee, including Messrs. Zimmerman and Peek, as well as Ms. Galley, to FAM itself.  Specifically, these "policies and procedures" state, in relevant part, as follows (emphasis in original):

> [I]nformation possessed by a single individual associated with an
> entity is generally attributed to all individuals associated with the
> entity. Thus, a communication of inside information from any
> Merrill Lynch-affiliated company to any [FAM] employee could be
> deemed to have been communicated to [FAM] **and all its
> employees**. Such a communication of inside information could
> therefore cause a violation of law even if the [FAM] employee who
> receives the information does not trade on it, if a [FAM] portfolio
> manager, who did not actually know about the communication,
> traded in the security. It is therefore crucial to prevent
> communications of inside information from one company to
> another, even if the communications are innocently intended.

Merrill Lynch prepared the PPM for Enron. The PPM contained inside information concerning Enron. Thus, circulating the PPM to employees of FAM was a brazen breach of Merrill Lynch's own written "policies and procedures" and effectively destroyed whatever "Ethical Wall" would have otherwise been in place.

5.      With little regard for the Fund and its shareholders, and in order to advance the pecuniary interests of its parent, its affiliates, and Merrill Lynch senior executives, FAM abetted the Enron fraud and breached its fiduciary duties of loyalty, good faith, and due care by causing the Fund to invest and lose nearly 5% of its entire portfolio, wasting tens of millions of dollars of Fund assets.

6.      As described herein, individual defendants Joe Grills, Robert S. Salomon, Jr., and Stephen B. Swensrud (each paid several hundred thousand dollars per year by Merrill Lynch affiliates) purported to conduct an "investigation" of FAM's wrongdoing. Instead of a good faith, diligent investigation, these individuals attempted to conceal the wrongdoing by white washing FAM's activities with respect to Enron.

7.      Messrs. Grills, Salomon, Jr., and Swensrud presided over an "investigation" that provided virtually nothing germane to the factual wrongdoing alleged in this action.  Because of criminal conduct and the continuing investigation into Merrill Lynch's unholy relationship with Enron, the individual defendants with strong ties to Merrill Lynch could not have pursued a far reaching and  penetrating investigation.  Even after meeting with plaintiffs' counsel which provided them with a written road map of wrongful and illegal entanglements between Enron and Merrill Lynch (see Exhibit C hereto), the individual defendants still continued to avoid taking any sworn testimony and instead relied upon informal telephone interviews as the investigatory tool which formed the flawed foundation of the "investigation."  As plainly porous as this foundation is, even worse, the individual committee members ostensibly did not bother to read exhibits to the report which specify that the conflicted conduct alleged herein violated Merrill Lynch's own policies.

8.      Finally, when plaintiffs' counsel requested that the individual defendants comply with basic principles of procedural fairness by demonstrating to this Court that committee members are independent, acted in good faith, and conducted a diligent investigation, the individual defendants closed rank and refused to provide any discovery believing themselves and their efforts untouchable by judicial process.

9.      In loyally serving the interests of their paymaster Merrill Lynch, rather than the Fund and its shareholders, these individual defendants breached fiduciary duties of loyalty, good faith, and due care and are directly liable to the Fund for the damage alleged herein.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to ICA Section 36(a), 15 U.S.C. § 80a-35(a), and

the common law.  Subject matter jurisdiction exists under 15 U.S.C. § 80a-43, 28 U.S.C. § 1331,

and U.S.C. § 1367.

11.     Venue is proper in this District because defendants transact business in this

District.

12.     In connection with the acts, conduct, and other wrongs alleged herein, defendants,

directly and indirectly, used the means and instrumentalities of interstate commerce, including

the mails and telephone communications.

## PARTIES

13.     Plaintiffs April Scalisi and Scott McDonough have been, and continue to be,

shareholders of the Fund.

14.     Defendant FAM serves as investment adviser to the Fund.  It is a Delaware

limited partnership with principal offices located in Plainsboro, New Jersey.  MLIM and its

affiliate FAM's most senior executives including Zimmerman (Co-Chief Operating Officer);

Peek (Chief Executive Officer) and Galley (Co-Chief Operating Officer), had access to private

LJM2 and other Enron partnership documents and received information concerning the ongoing

performance of LJM2.

15.     Defendant Joe Grills, is a member of the committee (the "Committee) formed in

or about November 2004 to "investigate" claims raised in this action.  During the period 2001

through 2004, Grills was paid $259,500, $266,097, $182,219 and $250,000, respectively, to act

as an in-house director to Merrill Lynch sponsored mutual funds and currently purports to be a

board member of dozens of Merrill Lynch sponsored funds, overseeing a myriad of Merrill Lynch sponsored fund portfolios.

16.     Defendant Robert S. Salomon, Jr., is a member of the Committee.  During the period 2001 through 2004, Salomon was paid $222,000, $255,647, $163,219 and $225,000, respectively, to act as an in-house director to Merrill Lynch sponsored mutual funds and currently purports to be a board member of dozens of Merrill Lynch sponsored funds, overseeing a myriad of Merrill Lynch sponsored fund portfolios.

17.     Defendant Stephen B. Swensrud is a member of the Committee.  During the period 2001 through 2004, Swensrud was paid $406,083, $315,564, $168,219 and $231,000, respectively, to act as an in-house director to Merrill Lynch sponsored mutual funds and currently purports to be a board member of dozens of Merrill Lynch sponsored funds, overseeing a myriad of Merrill Lynch sponsored fund portfolios.

18.     In addition to purporting to oversee, at last count over 3 dozen Merrill Lynch mutual funds and 55 Merrill Lynch mutual fund portfolios, these individual defendants have substantial responsibilities as executives and/or board members of other organizations which consume a significant amount of time and effort and leave little time to exercise appropriate fiduciary responsibilities as directors of Merrill Lynch funds and as Committee members in this action.

19.     While each of the individual defendants received several hundred thousands of dollars per year in direct compensation from Merrill Lynch funds, the amount of additional remuneration including, without limitation, Merrill Lynch stock opportunities and ownership, Merrill Lynch related investments, other Merrill Lynch fees and compensation, interlocking

relationships with Merrill Lynch personnel and entanglements with Enron related partnerships, is currently unknown.  Plaintiffs have requested such information to allow the Court a full record upon which to determine whether the Committee members are independent in connection with the "investigation" of FAM's wrongdoing.  To date, these requests have been refused.

20.     Nominal defendant, the Fund, is a Maryland corporation.  Its principal offices are located at defendant's offices in New Jersey.  The Fund is a non-diversified, open-end investment company, registered under the ICA.  No claims are asserted against the Fund and any recovery from this action will belong to the Fund.

## STATEMENT OF FACTS

### A.     Merrill Lynch Acts To Curry Favor With Enron

21.     In 1997, John Olson, Merrill Lynch's well respected Houston-based energy analyst, a Wharton University of Pennsylvania MBA graduate, with over twenty-five years of experience in the energy industry, downgraded his estimate of Enron to "neutral." Enron responded by threatening to cut Merrill Lynch out of a $750 million stock offering.  In an April 1998 e-mail, Merrill Lynch investment bankers Schuyler Tilney, head of energy investment banking, and Richard Gordon asked Merrill Lynch's senior management to intervene, in order to win back that lucrative business.  The e-mail, in part, indicated that Enron's decision to deny Merrill Lynch participation in the offering was:

> based solely on the research issue and was intended to send a
> strong message as to how "viscerally" Enron's senior management
> felt about [the Merrill Lynch] research effort!

22.     Recognizing that the huge fees to be earned by Merrill Lynch through its relationship with Enron were in jeopardy as a result of honest research, senior management acted

-9-

quickly to force out John Olson. By August 1998, John Olson "resigned" and was replaced by Donato Eassey, a Merrill Lynch generalist analyst more inclined to see things as Enron desired. By November 1998, Donato Eassey had upgraded Enron's rating to "Accumulate."

23.     An e-mail dated on or about January 18, 1999 from Merrill Lynch investment banker Schuyler Tilney to Herb Alison, then Merrill Lynch's president, stated:

> It is clear that your response message was appreciated by [Enron] and any animosity in that regard seems to have dissipated.

24.     By January 1999, Merrill Lynch's analyst had upgraded its Enron rating to "Long-Term Buy," and continued, in at least quarterly research reports and newspaper interviews, to be unabashedly bullish on Enron until at least August 2001.[3]

25.     During 1999 alone, investment banking fees and underwriting fees realized by Merrill Lynch as a result of its relationship with Enron exceeded $40 million.

26.     In October 1999, LJM2, the notorious Enron off-balance sheet partnership, was formed with Merrill Lynch and its affiliates providing structuring, financing, and underwriting

_____

[3]Following the forced dismissal of John Olson, Donato Eassey and/or Merrill Lynch issued unrestrained bullish analyst reports on Enron, rating the stock a "Long-Term Buy" or "Buy" on at least the following dates 1/20/99; 3/31/99; 4/15/99; 7/14/99; 10/12/99; 1/18/00; 1/4/00; 4/12/00; 7/24/00; 10/17/00; 4/18/01. In addition, Eassey heavily promoted Enron's prospects in various interviews. For example, in the January 1, 2000 edition of the Economist, Eassey is quoted as stating "Enron is uniquely positioned to be the General Electric of the new economy." In the December 2000 Business Week Online edition, Eassey was quoted as describing Enron's broadband concept as follows: "What's the difference between measuring the gas pumped through a pipeline or data transmitted through a voice line." In the June 11, 2001 edition of the Houston Business Journal, and in the face of mounting evidence of fraud, Eassey continued to promote Enron as a buying opportunity: "we think that seasoned investors that step up and take advantage of the weakness should be handsomely rewarded over the next twelve months". In the July 13, 2001 edition of The Street.com, Eassey is quoted as stating "We believe Enron at current prices offers investors a free call option on the future of broadband, and the ultimate turnaround in the telecom market once it occurs."

assistance. In fact, Merrill Lynch was engaged as the exclusive financial adviser and private

placement agent for LJM2. Merrill Lynch helped to prepare the private placement documents

(which were not public documents) and at least 97 Merrill Lynch senior executives representing

virtually every strategic area within Merrill Lynch participated as investors, including without

limitation, executives from FAM, Executive Management, investment banking, research, equity

and bond sales.[4] In addition to its executives, as a Merrill Lynch sponsored product, LJM2 was

peddled throughout the Merrill Lynch organization, to officers and directors, and to its private

client network. Merrill Lynch secured approximately $390 million in capital commitments for

LJM2.

      27.     The "Investment Strategy" section of the Merrill Lynch prepared PPM (a copy of

which is annexed hereto as Exhibit D), made it perfectly clear that the purpose of LJM2 was to

create a vehicle for Enron to hide its assets and corresponding liabilities through "off-balance

sheet" arrangements with LJM2:

> Enron has been making investments over the past
> seven years. It is notable that, as of June 30, 1999,
> Enron had $34 billion of assets on its balance sheet,
> but was the owner or manager of assets in excess of
> $51 billion (the difference between those two
> numbers represents the amount of assets financed

---

[4]Examples of Merrill Lynch executives and their respective investment in LJM2 include, Stephen Zimmerman Co-Chief Operating Officer of FAM, $250,000;   Barry S. Friedberg, member Executive Management, Chairman of Global Market and Investment Banking, $500,000; Daniel M. Bayly, Head of Investment Banking, $200,000; Robert T. McCann, the Head of Global Securities Research Group, $200,000; Schuyler Tilney, Head of Energy Investment Banking Houston, $750,000; Munir Dauhajre, Head of U.S. Government Bond Sales, $200,000; Louis Chiavacci, Senior VP, Private Client Group, $1,000,000; Gary Baker, Director of Research, $100,000; and Ronald Ullman, Chief Operating Officer Global Research, $200,000; Thomas Davis, President of Corporate and Institutional Client Group, $150,000. See Exhibit B for the complete list.

> off-balance sheet, often through co-investment
> partnerships or joint ventures).

PPM at p. 5.

28.     The PPM also highlighted the inside Enron information, which was to be used to

generate superior returns for partners, explaining that "[t]he Partnership expects that Enron will

be the Partnership's primary source of investment opportunities" and that it "expects to benefit

from having the opportunity to invest in Enron-generated investment opportunities that would

not be available otherwise to outside investors." The PPM specifically noted that Fastow's

"access to Enron's information pertaining to potential investments will contribute to superior

returns. PPM at pp. 5, 8.

29.     The investment opportunity to make outsized returns was shopped very

aggressively within Merrill Lynch itself[5] and at least 97 senior executives invested in LJM2

(believed to have subscribed in April 2000).[6]  Merrill Lynch managed the initial October 1999

private placement for LJM2 through April 2000 using its vast marketing capabilities to raise

nearly $400 million.

      1.      <u>Executive Management Investors Included:</u>

|   |   |   |
|---|---|---|
| a. | Barry S. Friedberg - Executive VP and Chairman of Global  Markets & Investment Banking | $500,000 |
| b. | Daniel Bayly - Head of Investment Banking (Criminally convicted ( Nov. 2004) for role in Nigerian barge fraud) | $200,000 |

---

[5]The opportunity to invest in LJM2 was provided to Merrill Lynch managing directors or more senior executives believed to number in the hundreds.

[6]In addition, MLIBK (a Merrill Lynch private entity) committed $5 million to LJM2 in December 1999.

These two individuals comprised 2 of the 4 members of the Office of the Chairman in 2000 and 2 of 5 members in fiscal 2001 (others were Merrill's Chairman David Komansky and Jacob A. Frenkel).

| | | |
|---|---|---|
| c. | Thomas W. Davis - Executive VP President Corporate & Institutional Client Group (SEC Defendant) | $150,000 |
| d. | Richard A. Dunn - Senior VP Provident and CEO ML Securities Services Division | $500,000 |
| e. | Stephen A. Zimmerman - Senior VP, Joint COO of FAM | $250,000 |

2.  Criminally convicted Merrill Lynch Executive/Investors in LJM2 in addition to Daniel Bayly Included:

| | | |
|---|---|---|
| a. | Robert Furst - Managing Director | $200,000 |
| b. | James A. Brown - Managing Director Strategic Assets & Finance Group | $50,000 |

3.  Other ML Personnel of Note

| | | |
|---|---|---|
| a. | Schuyler Tilney - John Olson incident; Head of ML Houston Office Global Energy (SEC Defendant) | $750,000 |
| b. | Richard Gordon - John Olson incident, Managing Director | $500,000 |

30.    All Merrill Lynch executives who either invested in (like MLIM and FAM's Co-Chief Operating Officer Zimmerman) or received the PPM and had an opportunity to invest in (like MLIM and FAM's CEO Peek and Co-Chief Operating Officer Galley), knew that LJM2 was designed to disguise Enron's true financial condition.

B.     **Merrill Lynch Further Helps Its Client To Commit Fraud**

31.     Inextricably linked to Enron and its senior executives through LJM2, Merrill Lynch and its executives, in late 1999, participated directly in assisting its client Enron commit additional frauds.

1.     **The December 1999 Nigerian Barge Fraud**

32.     In order to continue its efforts to deceive the investment community regarding its actual revenue and profit generating ability, and maintain an artificially high price for its stock, Enron executives approached Merrill Lynch to "purchase" three partially completed power plants mounted on barges off the coast of Nigeria at a profit to Enron with assurances that Enron would repurchase Merrill Lynch's "interest" in the project at a substantial profit by mid-year 2000. Enron could not book profits from these power plants because they were incomplete, not operating, and therefor not generating any revenue.

33.     In mid-December 1999  Enron's Treasurer, Jeff McMahon, contacted Robert Furst, a Merrill Lynch investment banker, about buying an interest in the Nigerian barge project. By December 21, 1999, a Merrill Lynch document makes clear that as a result of the transaction: (a) Enron would be able to book $12 million in earnings; (b) the deal had to close by December 31, 1999; (c) Merrill Lynch was guaranteed a return of $250,000 plus 15% per annum, or a flat 22.5% per annum; and (d) a $7 million financial commitment by Merrill Lynch was required. Merrill Lynch and its executives, despite knowing the "sale" was a sham, approved the transaction because, as described in a Merrill Lynch Appropriation Request, Enron was a "top client" of Merrill Lynch and Merrill Lynch had earned "approximately $40 million in fees in

-14-

1999 [from Enron] and is expected to do so again in 2000." Merrill Lynch's senior executives signed off on the transaction and it closed in the waning days of 1999.

34.    In accordance with its side agreement, Enron bought back the Merrill Lynch "investment" at the agreed to profit on or about June 30, 2000.

35.    In or about March 2003, Merrill Lynch paid $80 million to settle SEC charges in connection with the Nigerian barge fraud, and most recently (on or about November 3, 2004), Merrill Lynch executives Robert Furst (Managing Director; Enron relationship manager), Daniel Bayly (Global Head of Investment Banking Division), James Brown (Head of Strategic Asset Lease and Finance Group), all investors in LJM2, and William Fuhs (Vice President), were convicted in Federal court for their role in the Nigerian barge fraud. (See Exhibit E).

### 2.    The December 1999 Fraudulent Power Swaps

36.    Similar to the incomplete Nigerian barge project, Enron had incomplete power plant construction projects in the United States.

37.    In connection with one such project, Midwest Continental, Enron approached Merrill Lynch and asked that it "purchase" contracts based on future revenues of the incomplete power plant. Enron secretly promised to ensure that the contracts would be repurchased or cancelled out after the close of Enron's fiscal year ended December 31, 1999. The Enron swap transaction created $60 million of phony profits and helped to maintain Enron's fraudulently inflated stock price by meeting market expectations for profit in 1999.

38.    At Enron's request, Merrill Lynch "purchased" future power swaps in a series of transactions on the eve of the close of Enron's fiscal year 1999. Four months into the new year,

the transactions were cancelled before Midwest Continental was built.  Merrill Lynch received an

$8 million fee for assisting Enron in connection with this fraud.

**C.      Merrill Lynch Continues To Support Enron's Stock's Artificially Inflated Price As The Result Of Its Subsidiary FAM Causing The Fund To Purchase Enron Common Stock**

**1.      The Merrill Lynch Focus Twenty Fund Is Created**

39.     In or about December 1999, when Merrill Lynch, its affiliates, and its executives

were actively aiding, abetting, and profiting from the massive fraud at Enron, the Fund was

created by Merrill Lynch and FAM.

40.     In order to distinguish itself from other investment companies and attract

investors, Merrill Lynch and its subsidiary FAM traded heavily on the then good Merrill Lynch

name, rigorously promoting the Fund and its investment policy as being particularly rigorous

based on access to a vast reservoir (i.e., Merrill Lynch) of "fundamental research and a bottom-

up approach to investing."

41.     In promoting itself to investors, Merrill Lynch and FAM repeatedly represented

that, as a result of investments limited to approximately 20 companies, FAM would carefully

evaluate the "quality of each company's earnings" and employ a "disciplined investment

process" to "construct a portfolio" with "strong growth prospects."  FAM represented that the

Fund was appropriate for investors with "long term goals in mind such as retirement or funding a

child's education."

42.     Prominently displaying and leveraging the blue-chip Merrill Lynch name gave

investors further assurance that based on its "own fundamental research" and "bottom-up

-16-

approach," each selection for this limited 20 company portfolio would be carefully scrutinized, free from any conflict, and satisfy fully the Fund's investment objective and policies.

**2.    The Assets of the Fund Are Wasted by FAM To
Serve Merrill Lynch and Its Executives' Interests**

43.    By the time the Fund began to sell its shares to the public, Merrill Lynch, its affiliates including FAM, and its executives, knew of the sham Nigerian barge transaction, the bogus power swaps, and the LJM2 transactions, falsely inflating Enron's publically reported profits to meet the investment community's expectations.  Merrill Lynch, its affiliates including FAM, and its executives, knew that if these targets had not been met, Enron's stock price would have plummeted, threatening Merrill Lynch's and its executives lucrative arrangements with Enron.

44.    In addition to the expectation of continued multi-million dollar benefits to be derived from its relationship with Enron, during 2000 and 2001 Merrill Lynch was earning millions of dollars by writing hundreds of millions of dollars of credit default puts on Enron's publically-traded debt securities.  As a result, Merrill Lynch was at risk for large losses should Enron not perform as well as the investment community had been led to believe.

45.    However, with the active assistance of a more compliant bullish Merrill Lynch analyst and the ability to have affiliates like FAM purchase Enron common stock to maintain an artificially high price, Merrill Lynch affiliates and its executives could continue to enjoy its lucrative private transactions with Enron.

46.    Accordingly, and contrary to representations concerning the methodology of selecting companies, FAM, in violation of, inter alia, its fiduciary duty of loyalty, in order to

benefit Merrill Lynch and its executives, caused the Fund to invest heavily in the common stock of Enron, a stock in which its parent, affiliates, and executives were actively abetting a fraud and had numerous undisclosed material, irreconcilable conflicts by virtue of its lucrative investment banking relationship and by directly investing in, lending money to, acting as a placement agent for, and promoting to its high net worth clients, LJM2.

47.     As a result of this undisclosed, incestuous, self-interested, conflicted position, with special access to a wealth of data and information including, without limitation, material information regarding off-balance sheet partnerships unavailable to the public, FAM knew that Enron's financial condition was far weaker than known to the investment community in general.

48.     At all relevant times, and as painfully evident as a result of investigations conducted by the SEC and the New York State Attorney General, there was no adequate "Chinese Wall" among Merrill Lynch and its affiliates, including FAM, so that information known to one affiliate was generally available to all affiliates.[7]

49.     While FAM was reaping millions of dollars in advisory, distribution, underwriting, and administrative fees from the Fund,[8] and its affiliates were engaged in undisclosed conflicted transactions earning themselves huge fees and returns on bogus investments with LJM2, FAM caused the Fund to acquire at least 610,000 shares of Enron

---

[7]See the complaint filed by the SEC against Merrill Lynch's research subsidiary for undue influence and conflict of interest between Merrill Lynch investment banking and research divisions, annexed hereto as Exhibit F.

[8]FAM and other Merrill Lynch subsidiaries earned tens of millions of dollars in advisory (.85% of average daily assets through December 18, 2001, .60% afterwards) distribution (.75% of average daily net assets) underwriting (.25% of average daily net assets) transfer agent and administrative (.25% of average daily net assets) fees from the Fund and its shareholders.

common stock representing at one point almost 5% of the Fund's portfolio. That investment of tens of millions of dollars is now worthless.

50.     As a result of its conflicted, wasteful, improvident investment in the securities of Enron, the Fund incurred a material loss, while FAM, its parent, and its affiliates have reaped huge profits.

## THE COMMITTEE DEFENDANTS TRY TO COVER UP MERRILL/FAM'S WRONGDOING

51.     The serious charges of conflict raised in this complaint were initially asserted in a complaint filed in this Court in October 2002.

52.     In connection with defendant FAM's and nominal defendant's motion to dismiss for, inter alia, failure to make a demand on the board, the Court In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig., 218 F.R.D. 377 (E.D.N.Y. 2003) found that:

> while the directors service on the Board of 49 Merrill Lynch funds combined with their large compensation package [$160,000-$250,000] does raise questions of good corporate governance...

The Court could not state:

> as a matter of law, that directors' service upon multiple boards, with significant remuneration is enough to demonstrate the futility of demand upon them.

Id. at 381.

53.     The Court stated that under Maryland law, a demand of the board is "not particularly onerous and any refusal of demand can subsequently be reviewed under the business judgment rule." (Id. at 381) The decision finding demand was not excused was affirmed by the Second Circuit in Scalisi v. Fund Asset Management, L.P., 380 F.3d 133, 141 (2d Cir. 2004),

-19-

which interpreted Maryland law as requiring demand "even [on] interested, non-independent directors."

54.     Accordingly, on August 31, 2004, counsel for plaintiffs sent, by certified mail, a letter to the Board of Directors demanding that action be taken against FAM for the wrong alleged herein.  A copy of the letter of August 31st, without exhibits, is annexed hereto as Exhibit G.

55.     By letter dated September 8, 2004, the third counsel to represent the Fund or the directors wrote to plaintiffs' counsel and requested that plaintiffs identify other information, if any, available to plaintiffs which the Board should consider.  A copy of the September 8th letter is annexed hereto as Exhibit H.

56.     In response thereto, and by letter dated September 20, 2004, plaintiffs' counsel further informed the Board of the misconduct and again demanded that the Board take appropriate legal action.  A copy of the September 20, 2004 letter is annexed hereto as Exhibit I.

57.     Rather than responding to plaintiffs' demand, the Fund's directors retained new counsel, the fourth firm to appear for the Fund or its directors with respect to plaintiffs' claims.

58.     By letter dated November 24, 2004, that fourth firm advised plaintiffs that the Fund's board appointed defendants Swensrud, Grills and Salomon, Jr., as the Committee to review and investigate" plaintiffs' claims.  No new directors were considered or added to board to undertake a fair investigation of Plaintiffs' long-standing claims.

59.     Defendants Swensrud, Grills and Salomon, Jr. have known about plaintiffs' claims for longer than the past two years.  Defendants Grills and Salomon, Jr., act as directors for 39 Merrill Lynch registered investment companies overseeing 56 separate portfolios.  Defendant

Swensrud acts as director for 40 Merrill Lynch registered investment companies overseeing 57 separate portfolios.  For years 2001-2004, defendants Swensrud, Grills and Salomon, Jr. earned aggregate compensation of $1,120,866, $913,657, and $706,0000, respectively, solely  from their positions as directors of Merrill Lynch mutual funds.  At December 31, 2003, defendants Salomon, and Swensrud had absolutely no investment in the Fund and defendant Grills had a nominal investment.

      60.     Ultimately the Committee produced a "report."  The report, however, can most charitably be characterized as a transparent travesty for the following reasons:

- Each of the three members of the Committee was a well-paid director of the Fund and many other Merrill Lynch funds.  In effect, each is a professional Merrill Lynch fund director.  Their presence on the Committee is all the more remarkable in view of Judge Platt already noting that this practice "does raise questions of good corporate governance."  In re Merrill Lynch Focus Twenty Investment Company Act Litig., 218 F.R.D. 377, 381 (E.D.N.Y. 2003), aff'd sub nom. Scalisi v. Fund Asset Mgm't L.P., 380 F.3d 133 (2d Cir. 2004).

- The sordid relationship between Merrill Lynch and Enron has been public knowledge for years yet, as far as plaintiffs are aware, the Committee members did nothing to investigate the appropriateness of the Fund's investment in Enron.  No one lifted a finger until the Fund was bludgeoned into acting by plaintiffs ' demand letter.  And because the Committee members were very reluctant investigators, the Committee's investigation was a charade.

- The three Committee members, during the course of prior litigation, took the position that there is no private right of action under Section 36(a) of the Investment Company Act of 1940, a position antithetical to the interests of investors, for whom the Committee members are supposed to act as watchdogs, not lapdogs.

- The Committee began its operations by engaging in lawyer-shopping, evidently choosing to replace Bass, Berry & Sims PLC with Venable LLP at the outset.

- An example of the superficiality of the Committee's work is its failure to elicit any sworn testimony.  In fact, and according to its report, many of the Committee's "interviews" were drive-by, telephone interviews.

- In fact, MLIM's and FAM's most senior executives who admittedly received the PPM and/or invested in LJM2, Jeffrey M. Peek, Carol Galley and Stephen Zimmerman, were all interviewed by telephone and, in all but one case, only after Plaintiffs' Counsel advised the Committee of the patent conflict directly related to the issues in this case. The overt bad faith of the Committee's investigating techniques, in not even seeking a face-to-face sworn interview with these critical executives, could not be more manifest.

- An example of the inadequacy of the report is the Committee's slavish adoption of Merrill Lynch's "Chinese Wall" defense notwithstanding the information uncovered by Attorney General Spitzer. Far worse, however, is the Committee's obliviousness to exhibits annexed to its own report. Merrill Lynch's Policies and Procedures flatly states (at the beginning of Section IV.A.): "All communications whether written, oral, electronic or otherwise between Adviser Personnel and Broker-Dealer Personnel involving the exchange of Confidential Information are prohibited." The reason given (in Section II, page 2) for this blanket prohibition is that "information possessed by a single individual associated with an entity is generally attributed to all individuals associated with the entity." The report is utterly silent as to how the wide circulation of the LJM2 PPMs can be consistent with either Merrill Lynch's policies or the law.

61.     The Committee has served a motion for summary judgment seeking to terminate the above-referenced action based upon its report. Recognizing the superficiality of its investigation, and the feebleness, if not absurdity, of the conclusions set forth in its report, the Committee has refused to consent to any discovery, notwithstanding such position is squarely at odds with the Federal Rules of Civil Procedure and judicial precedent. (See e.g., Plaintiffs' letter request dated November 7, 2005 and the Committee's response dated November 15, 2005, annexed as Exhibits J and K).

62.     In summary, the members of the Committee have breached their fiduciary duties of loyalty, good faith and due care to the Fund and its shareholders because their investigation was not conducted in good faith. Rather, in breach of their duty of loyalty to the Fund and its shareholders, the Committee's purpose was to create a pretext to whitewash FAM's misdeeds in

order to assist FAM, in continuing to resist demands that it reimburse the Fund for the $35 million in damages resulting from the Enron investment.

63.     By letter dated December 9, 2005, plaintiff demanded that the Fund's Board take action against the members of the Committee for engaging in a cover-up of FAM's wrongdoing. (A copy of such letter is annexed as Exhibit L.)

64.     By letter dated December 22, 2005, counsel for the Fund responded by stating that plaintiffs' demand would be considered at the Board's February 2006 meeting. (A copy of such letter is annexed as Exhibit M.)

65.     Almost three months after making the supplemental demand, the Board has continued to demonstrate open hostility to the Fund's long suffering shareholders by, in conclusory fashion, wrongfully refusing to prosecute plaintiffs' claim against FAM and the conflicted Committee members. (A copy of the Board's March 8, 2006 letter response is annexed as Exhibit N.)

66.     The March 8, 2006 letter notably admits that the Committee failed to provide the Board with plaintiffs' counsel's letter to the Hon. Thomas C. Platt of January 10, 2006 (a copy is annexed, without exhibits, as Exhibit O), in response to the Committee's gross attempt to avoid Court scrutiny of its faithless fiduciary conduct.

## DERIVATIVE ALLEGATIONS REGARDING DEMAND

67.     Plaintiffs bring this action as a derivative action on behalf of, and for the benefit of, the Fund to remedy FAM's wrongdoing alleged herein and the Committee's attempted cover-up of such wrongdoings.

68.     Plaintiffs will fairly and adequately represent the interests of the Fund and its shareholders in enforcing and prosecuting its rights.  This action is not a collusive one to confer jurisdiction on this Court which would not otherwise exist.

69.     The Fund's directors were fully aware of the matters raised in the August 2004 demand letter and subsequent correspondence at all relevant times and at least since the commencement of the Scalisi action in or about October 2002, and therefore have had sufficient time to respond to the wrongs identified in the demand letter but have failed to do so.  Whatever information was requested by the Fund's counsel was either provided to the directors by Plaintiffs' counsel or was readily available to directors or solely in their knowledge.

70.     Moreover, under the circumstances, the directors have manifested hostility to Fund shareholders for the following reasons:

a.      In the Scalisi derivative action the directors authorized the Fund to join in all of the litigation positions advanced by defendant FAM, including the argument by FAM that there is no private right of action under ICA Section 36(a), thereby seeking to eviscerate the only avenue of Federal redress available to investors to hold investment advisers accountable for breach of fiduciary duty under the ICA, other than in respect of fees.  The position joined in by the directors of the Fund is inimitable to Fund shareholder interests and demonstrates unequivocally the directors' hostility to bringing any claim against FAM;

b.      The directors are presently members of the Board, and they have for years been aware of the wrongs forming the basis for the claims alleged herein.

-24-

However, given repeated opportunities, they have chosen not to take action to protect the Fund or recover amounts due to it because any such action would require them to sue FAM, their benefactor, and Merrill Lynch, FAM's corporate parent.

c.      Instead, they have appointed existing directors to form a Committee in an effort to construct a record of ostensible diligent investigation to cover-up serious misconduct between Merrill Lynch, FAM and Enron and their respective executives.

71.    Demand on the Fund's shareholders is not feasible because the Fund is publicly-held.

## CLAIM I

### Breach Of Fiduciary Duty Against Defendant FAM
### Pursuant To ICA Section 36(a) And The Common Law

72.    Plaintiffs repeat and reallege all previous paragraphs, as if fully set forth herein.

73.    Plaintiffs bring this claim derivatively pursuant to Federal Rule of Civil Procedure 23.1 in the right of and for the benefit of the Fund to redress injuries suffered by the Fund as a direct result of the breaches of fiduciary duty complained of herein, which has resulted in a harm to the Fund as set forth above.

74.    Defendant FAM owes fiduciary duties of loyalty, good faith, and due care to the Fund and its shareholders. Defendant has breached its fiduciary duties of loyalty, good faith, and due care to the Fund and its shareholders. Specifically, defendant FAM breached its duty of loyalty and due care by serving the interests of its parent, Merrill Lynch, its affiliates and Merrill

Lynch senior executives by causing the Fund to invest in the securities of Enron notwithstanding that FAM knew, or in the exercise of due care should have know, that (a) affiliates of FAM were irreconcilably conflicted and directly profiting at the expense of Enron common stockholders; and (b) Enron's financial condition was far weaker than the public had been led to believe and that, therefore, FAM could not have formed a reasonable belief that Enron would, consistent with the Fund's publicly represented investment strategy, have strong earnings growth and capital appreciation potential.

75.     The breaches of fiduciary duty described above, including intentionally subordinating the interests of the Fund's investors to its own interests and those of its affiliates, and employees of its affiliates, involve personal misconduct within the meaning of ICA Section 36(a), 15 U.S.C. § 80a-35(a).

76.     As a result, the Fund has suffered damages under ICA Section 36(a), and the common law.

## CLAIM II

### Breach of Fiduciary Duty Against The Committee Members
### Pursuant to ICA Section 36(a) and the Common Law

77.     Plaintiffs repeat and reallege all previous paragraphs, as if fully set forth herein.

78.     Plaintiffs bring this claim derivatively pursuant to Federal Rule of Civil Procedure 23.1 in the right of and for the benefit of the Fund to redress injuries suffered by the Fund as a direct result of the breaches of fiduciary duty complained of herein, which has resulted in a harm to the Fund as set forth above.

79.     Defendants Grills, Swensrud, and Salomon, Jr., owe fiduciary duties of loyalty, good faith and due care to the Fund and its shareholders.   As described herein, these individual defendants breached their respective fiduciary duties by serving the interests of defendant FAM and its parent Merrill Lynch at the expense of the Fund and its shareholders.

80.     The breaches of fiduciary duty described above, including intentionally subordinating the interests of the Fund's investors to the interests of Merrill Lynch and its affiliates, involve personal misconduct within the meaning of ICA Section 36(a), 15 U.S.C. § 80a-35(a).

81.     As a result, the Fund has suffered damages under ICA Section 36(a), and the common law.

### CLAIM III

### Negligence, Gross Negligence, And Negligent Misrepresentation

82.     Plaintiffs repeat and reallege all previous paragraphs, as if fully set forth herein.

83.     FAM owed the Fund and its shareholders a duty to use such care in providing investment advisory services to the Fund as a reasonably prudent and careful person would use under the circumstances.

84.     In light of the overt conflicts between FAM, its parent, affiliates, and the Fund, FAM breached that duty by continually purchasing, and failing to sell, Enron stock under the circumstances where a reasonable and prudent person having the knowledge concerning Enron which FAM and its affiliates had, would have refrained from doing so.

85.     Moreover, pursuant to prospectuses, other public documents, and marketing brochures, defendant negligently misrepresented material facts and omitted to state material facts necessary in order to make the statements made concerning the selection of the Fund's portfolio

and the Fund's investment objective and policies, in light of the circumstances under which they were made, not misleading, all as more fully described above.

86.     Plaintiffs and nominal defendant relied to their detriment upon the misrepresentations and omissions and were damaged by the negligence, gross negligence, negligent misrepresentations, and omissions, and other action complained of in this complaint.

WHEREFORE, plaintiffs demand judgment as follows:

A.     awarding damages against FAM, and individual defendants Grills, Salomon, Jr., and Swensrud, and for the benefit of the Fund, equal to the Fund's losses as a result of its investment in the securities of Enron;

B.     awarding interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

C.     such other and further relief as may be just and proper.

Plaintiffs demand trial by jury.

Dated: March 15 2006

WECHSLER HARWOOD LLP

By: _____

Joel C. Feffer (JF 2608)
Daniella Quitt (DQ 1963)
488 Madison Avenue
New York, New York 10022
Ph:  (212) 935-7400
Fax: (212) 753-3630

-28-

GARWIN GERSTEIN & FISHER LLP

By: _____
     Scott W. Fisher (SF-8756)
     1501 Broadway, Suite 1416
     New York, NY  10036
     Ph: (212) 398-0055
     Fax: (212) 764-6620

PASKOWITZ & ASSOCIATES

By: _____
     Laurence D. Paskowitz (LP 7324)
     60 East 42nd Street - 46th Floor
     New York, NY 10165
     Ph:  (212) 685-0969
     Fax: (212) 685-2306

     *Attorneys for Plaintiffs*

## <u>VERIFICATION</u>

I, Scott McDonough am the plaintiff in the within action. I affirm under perjury under the laws of the United States of America that I have read the allegations of the foregoing First Amended and Supplemental Derivative Complaint. The same is true to my own knowledge except as to those matters therein stated to be alleged upon information and belief and as to those matters I believe them to be true.

_____
Scott McDonough

## **VERIFICATION**

I, April Scalisi am the plaintiff in the within action. I affirm under perjury under the laws of the United States of America that I have read the allegations of the foregoing First Amended and Supplemental Derivative Complaint. The same is true to my own knowledge except as to those matters therein stated to be alleged upon information and belief and as to those matters I believe them to be true.

April Scalisi

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 15, 2006, I served true and complete copies of the foregoing Verified Amended and Supplemental Derivative Complaint, by Federal Express to each of the following law firms at the addresses indicated:

Christopher E. Chang, Esq.
Law Offices of Christopher E. Chang
140 Broadway, 46th Floor
New York, New York 10005
Telephone:     (212) 208-1470
Facsimile:     (212) 208-1468

James A. Dunbar, Esq.
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
Telephone:     (410) 244-7400
Facsimile:     (410) 244-7742

*Attorneys for Committee Members Joe Grills,*
*Robert S. Salomon, Jr. And Stephen B. Swensrud*

James H. Cheek, III, Esq.
Bass, Berry & Sims PLC
AmSouth Center
315 Deaderick Street - Suite 2700
Nashville, Tennessee  37238-3001
Telephone:     (615) 742-6223
Facsimile:     (615) 742-2723

*Attorneys for Nominal Defendant Merrill*
*Lynch Focus Twenty Fund, Inc.*

Mark Holland, Esq.
Mary Dulka, Esq.
Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Telephone:     (212) 878-8000
Facsimile:     (212) 878-8375

*Attorneys for Defendant*
*Fund Asset Management, L.P.*