Christopher E. Chang
Law Offices of Christopher E. Chang
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 208-1470
Facsimile: (212) 208-1468
cechang@juno.com

Benjamin R. Civiletti
James J. Hanks, Jr.
James A. Dunbar
Geoffrey R. Garinther
Daniel P. Moylan
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


APRIL SCALISI as custodian for her minor
children, and SCOTT McDONOUGH

               Plaintiffs,

     - against -

FUND ASSET MANAGEMENT, L.P., *et al.*

              Defendants,

     - against -

MERRILL LYNCH FOCUS TWENTY
FUND, INC.

          Nominal Defendant.

Case No. CV 04-5513 (TCP) (WDW)

**NOTICE OF NOMINAL
DEFENDANT MERRILL LYNCH
FOCUS TWENTY FUND, INC'S
MEMORANDUM IN SUPPORT OF
ITS MOTION TO TERMINATE
DERIVATIVE LITIGATION.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    **PLEASE TAKE NOTICE**, that upon the annexed declaration by James A. Dunbar,

dated February 16, 2007, and the supporting memorandum of law submitted herewith, nominal

defendant Merrill Lynch Focus Twenty Fund, Inc. will move before United States District Judge

Thomas C. Platt at the United States Courthouse, 100 Federal Plaza, Central Islip, New York,

11722-4449, on a date and time to be scheduled by the Court, to terminate this derivative

lawsuit, with prejudice.

     Pursuant to Local Civil Rule 6.1(b), and the parties' agreed upon briefing schedule in this

matter, opposing papers, if any, must be served upon the undersigned on or before April 6, 2007.

<u>Date</u>:  Baltimore, Maryland

**February 16, 2007**

                                    /s/
        Christopher E. Chang
        Law Offices of Christopher E. Chang
        140 Broadway, 46th Floor
        New York, New York 10005
        Telephone: (212) 208-1470
        Facsimile: (212) 208-1468

                                      /s/
        Benjamin R. Civiletti
        James J. Hanks, Jr.
        James A. Dunbar
        Geoffrey R. Garinther
        Daniel P. Moylan
        Venable LLP
        1800 Mercantile Bank & Trust Bldg.
        2 Hopkins Plaza
        Baltimore, Maryland 21201
        Telephone: (410) 244-7400
        Facsimile: (410) 244-7742

        *Attorneys for Merrill Lynch Focus Twenty Fund,*
        *Inc., Joe Grills, Stephen B. Swensrud, and Robert S.*
        *Salomon, Jr.*

TO:    Harwood Feffer LLP
       488 Madison Avenue – 8th Floor
       New York, New York 10022
           -and-
       Garwin, Gerstein & Fisher LLP
       1501 Broadway, Suite 1416
       New York, New York 10036
       *Attorneys for Plaintiffs*

       Mark Holland, Esquire
       Mary Dulka, Esquire
       Clifford Chance US LLP
       31 West 52nd Street
       New York, New York 10019

       *Attorneys for Fund Asset Management, L.P.*

T01#239808v12

Christopher E. Chang, Esquire
Law Offices of Christopher E. Chang
140 Broadway, 46th Floor
New York, New York 10005
Telephone: (212) 208-1470
Facsimile: (212) 208-1468
cechang@juno.com

Benjamin R. Civiletti
James J. Hanks, Jr.
James A. Dunbar
Geoffrey R. Garinther
Daniel P. Moylan
Venable LLP
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
APRIL SCALISI as custodian for her minor
children, and SCOTT McDONOUGH

                        Plaintiffs,

        - against -                          Case No. CV 04-5513 (TCP) (WDW)

FUND ASSET MANAGEMENT, L.P., et al.

                        Defendant,

        - against -

MERRILL LYNCH FOCUS TWENTY
FUND, INC.

                Nominal Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## NOMINAL DEFENDANT MERRILL LYNCH FOCUS TWENTY FUND, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO TERMINATE DERIVATIVE LITIGATION

## TABLE OF CONTENTS

Page

INTRODUCTION............................................................................ 1

FACTS ........................................................................................... 3

    I.      The Fund's Transactions in Enron Stock.................................... 3

    II.     The Scalisi I Litigation.......................................................... 4

    III.    The Demand Letter............................................................... 4

    IV.    The Formation of the Committee............................................ 4

    V.     Plaintiffs' Theory of the Case................................................. 5

    VI.    The Committee's Investigation............................................... 6

           A. The Tolling Agreement.................................................. 7

           B. Document Review......................................................... 7

           C. Interviews.................................................................. 8

           D. Engagement of Experts................................................. 9

           E. Meeting with Plaintiffs' Counsel..................................... 10

    VII.   The Committee's Findings and Recommendations...................... 10

    VIII.  Procedural History of This Case............................................. 12

ARGUMENT................................................................................. 12

    I.      The Standard of Review....................................................... 12

    II.     This Court Should Defer to the Independent Directors' Decision
          That This Litigation Should Be Terminated................................ 14

           A. The Fund's Directors are Independent and Disinterested........... 14

           B. The Investigation was Thorough and Conducted in Good Faith.... 19

           C. Even if the Court Were To Exercise Its Own Business Judgment
              With Regard To The Independent Directors' Decision That
              This Case Should Be Terminated, The Independent Directors'

Decision Should Be Upheld............................................. 23

**CONCLUSION**................................................................. 23

# TABLE OF AUTHORITIES

## CASES

Allison on Behalf of General Motors Corp. v. General Motors Corp.,
    604 F.Supp. 1106 (D. Del 1985) ...................................................................19

Auerbach v. Bennett,
    47 N.Y.2d 619, 419 N.Y.S.2d 920 (1979)............................................................13, 14

Burks v. Lasker,
    441 U.S. 471 (1979)............................................................................12

Cutshall v. Barker,
    733 N.E.2d 973 (Ind. Ct. App. 2000)................................................................22

In re Evergreen Mutual Funds Fee Lit.,
    423 F.Supp.2d 249 (S.D.N.Y. 2006)................................................................17

Grossman v. Johnson,
    89 F.R.D. 656 (D. Mass. 1981)............................................................12, 14, 19, 20

Kamen v. Kemper Financial Services, Inc.,
    939 F.2d 458 (7th Cir. 1991)............................................................17, 18

Krantz v. Fidelity Management,
    98 F.Supp.2d 150 (D. Mass. 2000)................................................................16

Krantz v. Prudential Investment Fund Management, LLC,
    305 F.3d 140 (3d. Cir. 2002)................................................................17

In re Merrill Lynch Focus Twenty Fund Investment Company Act Lit.,
    218 F.R.D. 377 (E.D.N.Y. 2003)............................................................4, 13

Migdal v. Rowe Price-Fleming International, Inc.,
    248 F.3d 321 (4th Cir. 2001)............................................................15, 16, 17

NAACP v. Golding,
    342 Md. 663, 679 A.2d 554 (1996)................................................................13

O'Donnell v. Sardegna,
    336 Md. 18, 646 A.2d 398 (1994)................................................................12

Olesh v. Dreyfus Corp.,
    No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995)..........................16

Rosengarten v. Buckley,
        613 F.Supp. 1493 (D. Md. 1985)...............................................................14, 19, 20

Scalisi v. Fund Asset Management, L.P.,
        380 F.3d 133 (2d Cir. 2004).............................................................................4

Shapiro v. Greenfield,
        136 Md.App. 1, 764 A.2d 270 (2000)...........................................................17

Stoner v. Walsh,
        772 F.Supp. 790 (S.D.N.Y. 1991)................................................................17

Strougo v. Bassini,
        112 F.Supp.2d 355 (S.D.N.Y. 2000)............................................................20

Strougo v. Padegs,
        1 F.Supp.2d 276 (S.D.N.Y. 1998)................................................................20

Strougo v. Padegs,
        27 F.Supp.2d 442 (S.D.N.Y. 1998)..........................................12, 14, 19, 21

Verkouteren v. Blackrock Financial Management, Inc.,
        1999 WL 511411 (S.D.N.Y. July 20, 1999).................................................17

Werbowsky v. Collomb,
        362 Md. 581, 766 A.2d 123 (2001).....................................................17, 18, 19

Yost v. Early,
        87 Md.App. 364, 589 A.2d 1291 (1991)......................................................13

Zapata Corp. v. Maldonado,
        430 A.2d 779 (Del. 1981)..............................................................................14

## STATUTES

MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(a)..........................................13, 14, 21

MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(e)..........................................13, 14, 21

MD. CODE ANN., CORPS. & ASS'NS § 2-405.3(b)..................................................15

## OTHER AUTHORITY

James J. Hanks, Jr., MARYLAND CORPORATION LAW § 7.21[c]
(Aspen Publishers 2004)......................................................................................14

Nominal Defendant Merrill Lynch Focus Twenty Fund, Inc. (the "Fund"), by its undersigned counsel, submits this memorandum in support of its motion to terminate this derivative litigation.[1]

## INTRODUCTION

Plaintiffs have been pursuing this alleged shareholders' derivative suit since October 2002. Since June 2005, they have continued to pursue it despite a comprehensive Board investigation that determined that there was a complete absence of factual support for plaintiffs' claims. This waste of time and money is overdue for termination.

Plaintiffs' basic claim is that the Fund, a mutual fund organized under the Investment Company Act of 1940 ("ICA") and Maryland law, sustained losses resulting from its purchases of Enron Corporation ("Enron") stock in 2001. These losses are actionable, plaintiffs claim, because: (1) senior officials at Fund Asset Management, L.P. ("FAM"), the Fund's investment advisor, and/or FAM's parent company, Merrill Lynch & Co., Inc. ("Merrill Lynch"), allegedly caused the Fund to purchase Enron stock for the benefit of Merrill Lynch and its affiliates and employees in violation of FAM's duties to the Fund; or (2) FAM was negligent in causing the Fund to purchase Enron stock, because the persons at FAM responsible for the Fund's investments knew or should have known that Enron's financial condition was far weaker than its public filings disclosed.

In 2004 and 2005, a committee of three independent Fund directors (the "Committee") conducted an exhaustive investigation of plaintiffs' claims. That investigation included the review

---

[1] When a nominal defendant, such as the Fund, moves to terminate derivative litigation, the motion is neither a motion to dismiss nor a motion for summary judgment. Instead, it is a hybrid motion, "addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself." Strougo v. Padegs, 27 F.Supp.2d 442, 448 (S.D.N.Y. 1998) (applying Maryland law). Accord, Strougo v. Bassini, 112 F.Supp.2d 355, 361-362 (S.D.N.Y. 2000) (citations omitted) (applying Maryland law).

of over 350,000 pages of documents, interviews of more than 20 witnesses (some of them on more than one occasion), and the retention of two independent experts.

The Committee found: (1) <u>no evidence</u> that the Fund's purchases of Enron stock were the result of improper activity by FAM, Merrill Lynch, or anyone else; rather, they were the result of the standard investment selection process used by FAM's portfolio management team; and (2) <u>no evidence</u> that FAM's portfolio management team knew or should have known that Enron's financial statements were falsified or unreliable. Because there was no evidence to support plaintiffs' claims, the Committee recommended to the Fund's independent directors that this litigation should be terminated. In June 2005, the Fund's independent directors approved that recommendation.

Plaintiffs did not accept the Committee's recommendation or the Board's decision. Accordingly, in October of 2005, the Fund served its initial dispositive motion on plaintiffs' counsel. In April, 2006, this Court denied that motion without prejudice, in order to give plaintiffs an opportunity to conduct limited discovery.

Plaintiffs have now completed the discovery they sought. The Fund provided them with hundreds of thousands of pages of material the Committee reviewed in the course of its investigation, as well as copies of notes and typed memoranda of the Committee's interviews. Plaintiffs also conducted depositions of the three Committee members. Plaintiffs <u>still</u> have found no evidence to support their allegations.

Plaintiffs have now shifted strategies in an attempt to obscure the non-existence of evidence to support their claims. Instead, they are trying to create a misleading impression that the Committee's investigation was somehow incomplete. In the depositions, for example, plaintiffs focused on minutiae such as whether the Committee members could remember whether particular questions were asked by the Committee or its counsel during witness interviews; or whether they

conducted interviews over the telephone or in person; or whether the Committee members could read their counsel's notes of the interviews.

Despite these efforts to change the subject, plaintiffs cannot overcome the two key facts that require termination of the case:

- There is not a bit of evidence to support their allegations against FAM, and therefore it would be a waste of time and money for the Fund to pursue those allegations; and

- The Fund's Board, after an independent and thorough investigation, concluded that the case should not be pursued, and both plaintiffs and the court system must defer to that conclusion under Maryland law.

## FACTS

**I.    THE FUND'S TRANSACTIONS IN ENRON STOCK**

The Fund is an aggressive growth fund that invests in common stocks of approximately 20 companies that are believed to have strong potential for earnings growth and capital appreciation. (Committee Report at 33, a copy of which is annexed and incorporated as **Exhibit 1**).  As part of its investment process, the Fund evaluated companies using an "earnings momentum" computer model, which ranked the companies based on five factors contained in the model. (Committee Report at 39-40).  The Fund was "seen by the marketplace as an aggressive growth fund," and its risk level was high. (Committee Report Ex. H, Report of Robert Arnott at 6).

The Fund purchased shares of Enron in fourteen separate transactions beginning on February 23, 2001 and ending on July 21, 2001. (Committee Report at 44).  It sold those shares in seven transactions from September 20, 2001 through October 24, 2001.  It sustained a loss of approximately $33 million on the Enron investment. (Committee Report at 53).

## II.    THE SCALISI I LITIGATION

On October 18, 2002, plaintiff April Scalisi filed a derivative suit against FAM, purportedly on behalf of the Fund, seeking to recover losses allegedly sustained by the Fund resulting from its purchases of Enron stock ("Scalisi I").[2]  The Fund was named as a nominal defendant.

On October 30, 2003, this Court dismissed Scalisi I on the ground that plaintiff Scalisi was required to make demand on the Fund's Board prior to initiating her action, but had failed to do so. In re Merrill Lynch Focus Twenty Fund Investment Co. Act Litig., 218 F.R.D. 377 (E.D.N.Y. 2003).  The Second Circuit affirmed in August, 2004.  Scalisi v. Fund Asset Management, L.P., 380 F.3d 133 (2d Cir. 2004).

## III.    THE DEMAND LETTER

On August 31, 2004, two weeks after the Second Circuit affirmed this Court's dismissal of Scalisi I, plaintiffs' counsel sent a letter to the Board (the "Demand Letter") demanding that the Board "take action against FAM and any other Merrill Lynch entity or executive, to recover for the benefit of the Fund, what is believed to be in excess of $30 million of Fund monies, lost as a result of the purchase Enron of [sic] common stock, which purchase aided and abetted the private pecuniary gain and fraud of Merrill Lynch and its executives."

## IV.    THE FORMATION OF THE COMMITTEE

In response to the Demand Letter, on September 7, 2004, the Board appointed the Committee to investigate plaintiffs' claims.  (See annexed Declarations of Robert S. Salomon, Jr., Joe Grills, Stephen B. Swensrud, Roberta Cooper Ramo, Herbert I. London, and James H. Bodurtha, ¶ 3.)  The Committee consisted of three independent directors, Robert S. Salomon, Jr.,

---

[2] At the time of the investigation, FAM was a part of Merrill Lynch's investment management arm, Merrill Lynch Investment Managers, or "MLIM."  In its Report, the Committee generally made its findings about MLIM as a whole rather than FAM, and in accordance with that practice, this memorandum will generally address MLIM as a whole rather than just FAM.

Joe Grills, and Stephen B. Swensrud, each of whom was elected to the Board in early 2002, well after all of the Fund's transactions in of Enron stock. (See annexed Declarations of Messrs. Salomon, Jr., ¶ 9, Grills, ¶ 9, and Swensrud, ¶ 9.)[3]

## V.   PLAINTIFFS' THEORY OF THE CASE

Plaintiffs' claims rest largely on a private placement memorandum ("PPM") for LJM2 Co-Investment LP, a limited partnership created by Enron and marketed with the assistance of Merrill Lynch.[4]  Plaintiffs assert that Enron used LJM2 to manipulate its financial statements by permitting it to move certain investments off of its balance sheet.  Plaintiffs also contend that senior Merrill Lynch investment banking officials assisted Enron in falsifying its financial statements in other respects.  About 97 Merrill Lynch employees, as well as many other individuals and institutions, invested in LJM2 as limited partners.  Three senior MLIM officials -- Jeffrey Peek, Carol Galley, and Stephen Zimmerman -- received copies of the PPM, and one of them, Zimmerman, invested in LJM2.

Based on these premises, plaintiffs allege that the Fund bought Enron stock to: (1) directly benefit the Merrill Lynch employees and clients who had invested in LJM2, by propping up Enron's stock price; and (2) help improve Merrill Lynch's investment banking relationship with Enron and thereby assist Merrill Lynch in generating investment banking fees. (Committee Report Ex. F, Fisher Memorandum at 7.)

---

[3] All three Committee members have extensive investment management experience that is directly relevant to their service on the Fund's Board. Mr. Grills, among other things, served as Chief Investment Officer for IBM's Retirement Funds. (Grills Dec. at ¶ 8.)  Mr. Salomon served as Chairman and CEO of Salomon Brothers Asset Management, Inc. (Salomon Dec. at ¶ 8.)  Mr. Swensrud has extensive experience as an investment adviser, as well as experience running privately owned businesses in which he invested. (Swensrud Dec. at ¶ 8.)

[4] Plaintiffs' theories have been gleaned from the Demand Letter, which simply incorporated the allegations of the Scalisi I complaint, plaintiffs' new complaint ("Scalisi II"), filed in December of 2004, the amended complaint filed in Scalisi II in March, 2006, and a memorandum from plaintiffs' counsel (the "Fisher Memorandum") provided later in the investigation. (Committee Report Ex. F.)

In the alternative, plaintiffs contend that the information in the LJM2 PPM indicated that Enron's financial statements were misleading and unreliable. They further contend that information contained in the PPM either was actually supplied to the FAM employees who served as the Fund's portfolio management team, or should be imputed to them. On this basis, plaintiffs assert that the Fund's purchases of Enron stock were negligent.

## VI.   THE COMMITTEE'S INVESTIGATION

The Committee's investigation focused on answering the three main questions raised by the Demand Letter and plaintiffs' subsequent submissions:

1.  Was the Fund's investment in Enron stock the result of suggestion, pressure, or inducement from someone at Merrill Lynch or MLIM, other than a member of the Fund's portfolio management team, in violation of FAM's fiduciary duties to the Fund or its duties under its Management Agreement with the Fund?

2.  Did the portfolio management team know or, with the exercise of due care, should it have known that Enron's financial condition was different from what was publicly disclosed, or, in the absence of such knowledge, is there a basis for imputing adverse information about Enron possessed by persons at Merrill Lynch or MLIM -- for example, the allegedly adverse information reflected in the LJM2 PPM -- to the portfolio management team?

3.  If the portfolio management team did not know and could not have known the adverse information about Enron, and the adverse knowledge is not imputed to them, is there a basis for finding that the portfolio management team was negligent or otherwise breached a duty to the Fund in buying Enron stock?

To answer these questions, the Committee spent over nine months investigating the facts surrounding plaintiffs' allegations, meeting in formal session (in person or by telephone) ten times, reviewing information, engaging in conversations with each other and counsel, and participating in

witness interviews.  Counsel to the Committee spent more than 3,000 hours assisting the investigation.  The following specific actions were taken:

### A.    The Tolling Agreement

In order to prevent any potential rights of the Fund from lapsing during the investigation, the Fund, at the Committee's express request, entered into a tolling agreement with FAM and MLIM tolling the statute of limitations and other time-based defenses as of August 31, 2004, the date of the Demand Letter. (Committee Report at 19).

### B.    Document Review

The Committee, through its independent counsel, reviewed over 350,000 pages of documents, including, among others: (1) Due diligence documents relating to the Fund's decision to invest in Enron; (2) Documents relating to the Fund's investment model; (3) Documents stored in the offices the FAM portfolio management team for the Fund during the relevant time period, including documents related to the purchases of Enron stock and research reports from various sources; (4) Documents reflecting internal reviews of the Fund's performance; (5) Personnel files and employment contracts for James McCall and Michael Hahn; (6) Messrs. Hahn's, Salberta's, and Beaulieu's electronic files; and (7) Copies of e-mails from FAM's computer back-up tapes for the members of the Fund's portfolio management team. (Committee Report at 19-21.)

The Committee found no evidence in any of these documents that any pressure or influence to purchase Enron stock was exerted on the portfolio management team for the Fund.  Nor was there any evidence in the documents that the portfolio management team received information from the LJM2 PPM. (Committee Report at 63-67.)

There was a substantial amount of documentary evidence, including multiple reports by Wall Street analysts, that showed that the portfolio management team conducted extensive due diligence before investing in Enron.  There was also documentary evidence indicating that the

computer model used by the portfolio management team to assist it in making investment decisions produced very favorable rankings of Enron. (Committee Report at 70-72.)

### C.     Interviews

The Committee and its counsel interviewed those responsible for the Fund's investments, and others who the Committee believed might have relevant information, including the following individuals:

*   <u>FAM Employees who Served as the Fund's Portfolio Management Team</u>.  These individuals -- James D. McCall, the Fund's Portfolio Manager, Michael S. Hahn, its Assistant Portfolio Manager, and Michael Beaulieu and Steve Salberta, analysts -- were responsible for the Fund's investments in 2001.

*   <u>Senior Managers at MLIM</u>.  Terry K. Glenn was President and Director of the Fund and an Executive Vice President of MLIM.  Robert C. Doll, Jr. was a Senior Vice President of the Fund and President of MLIM starting in 2001.

*   <u>Senior Officers of Merrill Lynch and MLIM who received the LJM2 PPM</u>.  Jeffrey M. Peek was President of MLIM from 1997 to 2001, and hired Mr. McCall as Portfolio Manager of the Fund.  Carol Galley and Stephen Zimmerman were formerly members of Merrill Lynch's Executive Management Committee and were joint chief operating officers of MLIM from 1998 to 2001.

*   <u>Past and Present Members of the Fund's Board</u>.  These individuals included James H. Bodurtha, Herbert I. London, André F. Perold, and Roberta Cooper Ramo.

*   <u>MLIM Compliance Employees</u>.  Jerry Weiss, Head of Compliance for MLIM from 2000 through 2003, and Catherine Johnston, Senior Compliance Manager at MLIM, were interviewed.

- Other MLIM Employees. These individuals included Lawrence R. Fuller and Robert J. Martorelli, portfolio managers of other MLIM-sponsored Funds; and Brian Fullerton, Linfeng You, and Anthony Patti, who assisted in managing the Fund's portfolio after the departure of the Fund's original portfolio management team.

- Other Interviews. The Committee interviewed Donato Eassey, a former Merrill Lynch energy analyst who covered Enron.

None of the witnesses was able to identify any instance in which Merrill Lynch, MLIM, or anyone else, pressured the Fund's portfolio management team to buy Enron stock. The witness interviews also produced no evidence that information from the LJM2 PPM was shared with the Fund's portfolio management team.

**D.     Engagement of Experts**

The Committee engaged two experts to assist in the investigation. The first, Dr. Robert Comment, was formerly Deputy Chief Economist for the Securities and Exchange Commission. After reviewing the Fund's investment decisions, including its purchases of Enron stock, he prepared a comprehensive report that, inter alia, concluded:

- The purchases of Enron stock complied with the Fund's general investment objectives (Committee Report Ex. G, Dr. Robert Comment Report at 1.);

- Similar mutual funds held Enron stock at about the same time that the Fund held it (Committee Report Ex. G, Dr. Robert Comment Report at 1.);

- Contrary to plaintiffs' contention that the MLIM funds were engaged in a conspiracy to prop up Enron's share price by purchasing its stock, the MLIM funds "as a whole were substantial net sellers of Enron stock" during the relevant time (Committee Report Ex. G, Dr. Robert Comment Report at 22.); and

- "There is no support for a theory that the Fund's purchases of Enron were part of a scheme to manipulate the trading price of Enron stock." (Committee Report Ex. G, Dr. Robert Comment Report at 1.)

The second expert, Mr. Robert Arnott, is a professional investment manager and chairman of Research Affiliates, LLC, as well as a frequent author of publications relating to investment management. Mr. Arnott concluded, among other things, that:

- "The selection of Enron, as an early non-technology stock in the portfolio, was entirely defensible based on what was known at that time." (Committee Report Ex. H, Robert Arnott Report at 1.); and

- "In terms of industry standards of practice, it would be very surprising if (1) influence was applied, (2) the portfolio manager would have responded to that pressure, or (3) the Fund's share purchases of Enron could have had a non-trivial impact on the value of the stock." (Committee Report Ex. H, Robert Arnott Report at 1.)

Moreover, to show that Enron's true financial condition was unknown outside of a "relatively narrow circle," Mr. Arnott pointed out that "a board member at Enron, serving on the audit committee, also served as Vice-Chairman of Alliance Capital Management, which held large positions in Enron stock almost until its demise." (Committee Report Ex. H, Robert Arnott Report at 4.)

E.    **Meeting with Plaintiffs' Counsel**

Counsel for the Committee met with plaintiffs' counsel on March 30, 2005, and, as noted previously, plaintiffs' counsel provided the Committee's counsel with a memorandum detailing plaintiffs' theory of the case. (Committee Report Ex. F.)

VII.  THE COMMITTEE'S FINDINGS AND RECOMMENDATIONS

The Committee began to draft its Report in the spring of 2005, while the investigation was still being completed, and submitted its final Report to the full Board on May 23, 2005. (See annexed Declarations of Robert S. Salomon, Jr., Joe Grills, Stephen B. Swensrud, Roberta Cooper Ramo, Herbert I. London, and James H. Bodurtha, ¶ 4.) In summary, the Committee's findings were:

- There was no evidence that the purchases of Enron stock were the result of anything other than the standard investment selection process used by the Fund's portfolio management

team, or that the purchases were the result of any suggestion, pressure, or inducement from anyone at Merrill Lynch or MLIM. (Committee Report at 63.)

♦   There was <u>no evidence</u> that the Fund's portfolio management team knew or, with the exercise of due care, could have known that Enron's financial statements were falsified or that its reported financial performance was inflated.  The Committee further determined that there was no factual or legal basis for imputing adverse knowledge about Enron -- for example, the allegedly adverse information contained in the LJM2 PPM -- to the Fund's portfolio management team. (Committee Report at 67.)

♦   There was <u>no evidence</u> that the Fund's portfolio management team failed to exercise the requisite standard of care and skill in its decision to invest in Enron. (Committee Report at 70.)

♦   There was <u>no evidence</u> to support a negligent misrepresentation claim against FAM or the Fund's portfolio management team resulting from the purchases of Enron stock. (Committee Report at 72).

As a result, the Committee concluded that the Fund did not have a meritorious claim against FAM arising from the Fund's purchases of Enron stock, and that to pursue plaintiffs' claims would not be in the best interest of the Fund or its stockholders. (<u>See</u> annexed Declarations of Messrs. Salomon, Jr., Grills, and Swensrud, ¶ 4.)

The Fund's Board, by a vote of all six of its independent directors, approved and adopted the Committee's Report at its June 1, 2005 meeting, and instructed the Fund's counsel to seek termination of this case.[5] (<u>See</u> annexed Declarations of Messrs. Salomon, Jr., Grills, Swensrud, London, and Bodurtha, and Ms. Ramo, ¶ 5.)

---

[5] Robert C. Doll, Jr., who is the only interested director on the Board, did not participate in the Board's decision to adopt the report.

## VIII. PROCEDURAL HISTORY OF THIS CASE

On December 17, 2004, before the Committee completed its investigation, plaintiffs filed the complaint in Scalisi II. On October 31, 2005, the Fund served on plaintiffs' counsel a motion to dismiss or, in the alternative, for summary judgment, together with a supporting memorandum of law. Plaintiffs did not respond to that motion. Instead, in March, 2006, plaintiffs filed the amended complaint, wherein they added Claim II, a claim for breach of fiduciary duty against the individual Committee members. The Fund responded on April 3, 2006 by serving on plaintiffs' counsel a supplemental memorandum seeking dismissal of Claim II. Plaintiffs also did not respond to that motion.

This Court denied the Fund's motion to dismiss or for summary judgment, without prejudice, after a hearing on April 19, 2006, in order to permit plaintiffs to conduct limited discovery. Plaintiffs have now completed that limited discovery, which included depositions of the Committee members, and the production of the documents reviewed by the Committee and its counsel, as well as all interview notes and memoranda.

## ARGUMENT

## I. THE STANDARD OF REVIEW

The Fund is a Maryland corporation. Maryland law therefore supplies the standard by which this Court should review the independent directors' determination that this case should be terminated. Burks v. Lasker, 441 U.S. 471, 486 (1979). Under Maryland law, disinterested directors may move to terminate a shareholder derivative action which has been determined in good faith to be contrary to the corporation's best interests. See, e.g., O'Donnell v. Sardegna, 336 Md. 18, 26, 646 A.2d 398, 401-02 (1994); Grossman v. Johnson, 89 F.R.D. 656, 663 (D. Mass. 1981), aff'd, 674 F.2d 115 (1st Cir. 1982) (applying Maryland law); Strougo v. Padegs, 1 F.Supp.2d 276, 280 (S.D.N.Y. 1998) (applying Maryland law).

Although no Maryland court has addressed directly the standard by which a court should review a motion to terminate under these circumstances, Maryland case law and statutes indicate that Maryland would adopt the standard set forth in <u>Auerbach v. Bennett</u>, 47 N.Y.2d 619, 419 N.Y.S.2d 920 (1979), which limits a court's review to an analysis of the independence, good faith, and thoroughness of the investigation, but precludes a review of the merits of the board's determination.  Maryland's appellate courts have historically refused to substitute their business judgment for the judgment of a corporation's directors.  In <u>NAACP v. Golding</u>, 342 Md. 663, 673, 679 A.2d 554, 558-59 (1996), for example, Maryland's Court of Appeals (the State's highest court) observed that "the business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith," and that "courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence." (citations omitted).  <u>See also</u> <u>Yost v. Early</u>, 87 Md. App. 364, 377, 589 A.2d 1291, 1298 (1991), <u>cert. denied</u>, 324 Md. 123, 596 A.2d 628 (1991), ("the Court will not substitute its business judgment for that of the director.").[6]

Consistent with this case law, Maryland's statutory standard of conduct for corporate directors does not permit a court to substitute its judgment for that of the directors:

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:  (1) in good faith; (2) in a manner he reasonably believes to be in the best interest of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

<u>Md. Code Ann., Corps. & Ass'ns</u> § 2-405.1(a). (**Appendix** at 1.)  Directors are presumed to have satisfied this standard of conduct. <u>Md. Code Ann., Corps. & Ass'ns</u> § 2-405.1(e). (**Appendix** at 2.)

---

[6] Additionally, in the course of dismissing the complaint in <u>Scalisi I</u> for failure to make a demand, this Court observed that "any refusal of demand can subsequently be reviewed under the business judgment rule." <u>In re Merrill Lynch Focus Twenty Fund Investment Company Act Litigation</u>, 218 F.R.D. 377, 381 (E.D.N.Y. 2003).

Accordingly, this Court may review the Board's decision only to determine whether each director satisfied the standard of care set forth in Section 2-405.1(a) -- that is, whether he or she acted in good faith, in a manner he or she reasonably believed to be in the best interest of the Fund, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  See also James J. Hanks, JR., MARYLAND CORPORATION LAW, § 7.21[c], at 274.1 (Aspen Publishers 2004) ("A court reviewing the action of a special litigation committee should limit its inquiry to the question of whether, in conducting its investigation and reaching its determination, the members of the committee complied with the standards of Section 2-405.1."). There is no provision in Maryland law that would permit a Court to review the merits of a board's business judgment or substitute its judgment for that of the board.[7]

## II.   THIS COURT SHOULD DEFER TO THE INDEPENDENT DIRECTORS' DECISION THAT THIS LITIGATION SHOULD BE TERMINATED.

This litigation should be terminated.  The undisputed facts and settled legal principles confirm that the Fund directors were disinterested and independent, and that the Committee's investigation was thorough and conducted in good faith.

### A.   The Fund's Directors Are Independent And Disinterested.

The decision to terminate this litigation was made by the Fund's six independent directors, that is, all of the directors except Robert C. Doll, Jr., who is employed by MLIM.  Therefore, the "independence" prong of this Court's review should focus on these six individuals.

---

[7] At least three federal courts have addressed the issue of what standard the Maryland courts would apply in reviewing a motion to terminate derivative litigation.  In Grossman, supra, the United States District Court for the District of Massachusetts determined that Maryland would likely apply the Auerbach standard, which is limited to an analysis of the independence, good faith, and thoroughness of the investigation, but may not include a review of the merits of the board's determination.  In both Rosengarten v. Buckley, 613 F.Supp. 1493 (D. Md. 1985), and Strougo v. Padegs, supra, 1 F.Supp.2d 276, the courts concluded that Maryland would adopt the test first set forth in Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981), under which a court also may consider the merits of the business judgment made by the board.  These two latter decisions are inconsistent with the standard of conduct set forth in Md. Code Ann., Corps. & Ass'ns § 2-405.1(a), and the presumption that directors have satisfied the standard of conduct, which presumption was codified by the Maryland legislature in 1999 as Md. Code Ann., Corps. & Ass'ns § 2-405.1(e) (after Rosengarten and Strougo were decided).

The Maryland General Assembly has defined the circumstances under which a director of an investment company like the Fund is deemed to be disinterested and independent: "A director of a corporation who with respect to the corporation is not an interested person, as defined by the Investment Company Act of 1940, shall be deemed to be independent and disinterested when making any determination or taking any action as a director." Md. Code Ann., Corps. & Ass'ns § 2-405.3(b). (**Appendix** at 2.)

Under the Investment Company Act of 1940 (the "ICA"), directors who are not interested are defined as:

> Those directors who are not "affiliated" with the fund's investment advisor -- i.e., they are not "controlled" by the investment advisor. See 15 U.S.C. §§80a-2(a)(19) and 80-2(a)(3). "Control" is "the power to exercise a controlling influence over the management or policies of a [fund], unless such power is solely the result of an official position with such fund." 15 U.S.C. §80a-2(a)(9). The ICA, however, expressly creates a presumption against control, stating that a "natural person shall be presumed not to be a controlled person within the meaning of this subchapter." Id. This presumption, however, may be rebutted by "evidence." Id.

Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 329-30 (4th Cir. 2001).

Numerous facts -- none of which can be disputed by plaintiffs -- make it abundantly clear that the Fund's directors who voted to terminate this litigation, including the Committee members, are independent:

⋄       None of the Committee members or other independent directors has a direct financial interest in the Board's decision not to proceed with litigation against FAM. (See annexed Declarations of Ms. Ramo, ¶ 7, and Messrs. Salomon, Jr., ¶ 9, Grills, ¶ 9, Swensrud, ¶ 9, London, ¶ 7, and Bodurtha, ¶ 7.)

⋄       None of them, no members of their immediate families, and no entity in which any of them has a material financial interest, has an interest in the determination whether the Fund should seek recourse against FAM. (See annexed Declarations of Ms. Ramo, ¶ 8, and Messrs. Salomon, Jr., ¶ 10, Grills, ¶ 10, Swensrud, ¶ 10, London, ¶ 8, and Bodurtha, ¶ 8.)

♦      Other than their service on the boards of directors for other MLIM-advised funds, neither the independent directors, nor their immediate families, nor any entity in which any of them has a material interest, has any material financial or contractual relationship with Merrill Lynch, MLIM, their senior executives, or their subsidiaries.[8] Id.

♦      None of them has personal ties with any member of MLIM management or Merrill Lynch that would cause him or her to be conflicted in recommending adverse action against FAM. (See annexed Declarations of Ms. Ramo, ¶ 9, and Messrs. Salomon, Jr., ¶ 11, Grills, ¶ 11, Swensrud, ¶ 11, London, ¶ 9, and Bodurtha, ¶ 9.)

♦      As far as is known by the independent directors, neither MLIM nor Merrill Lynch provides substantial contributions to charitable, political, or other organizations in which they are active. Id.

Plaintiffs attempt to characterize the Fund's directors as "interested" by pointing to the Committee members' service as directors on several mutual funds within the MLIM fund complex, and the substantial compensation received for those services. (Amended Complaint at 20-21). This argument fails as a matter of law.

The fact that a director serves on the boards of multiple funds within a fund complex, and receives substantial compensation for his or her services, does not make that director "controlled" or "interested." Migdal, supra, 248 F.3d at 330, citing, inter alia, Krantz v. Fidelity Management, 98 F.Supp.2d. 150 (D. Mass. 2000), and Olesh v. Dreyfus Corp., No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995). In Migdal, the Court squarely rejected plaintiffs' position, stating:

---

[8] Mr. Salomon has a brokerage account through a broker who at one time was affiliated with Merrill Lynch's retail brokerage but now is employed at a different retail brokerage. Mr. Grills has a current brokerage account with Merrill Lynch's retail brokerage arm. No precedent suggests that the existence of such an account, which is unrelated to MLIM and the Fund, and does not involve a material amount of fees, is sufficient to establish that a director is interested or controlled.

> [N]either the ICA nor the SEC proscribes the use of multi-board membership
> within mutual fund complexes.  In fact, membership on the boards of several
> funds within a mutual fund complex is the prevailing practice in the industry.  The
> SEC has noted that "interlocking boards of directors within an investment
> complex are neither prohibited nor uncommon."

Id. at 330.

Numerous other cases have concluded that membership on multiple boards within a fund

complex and/or the receipt of substantial compensation for directors' services are insufficient to

establish that a director is interested.  See, e.g., Werbowsky v. Collomb, 362 Md. 581, 618, 766

A.2d 123, 143 (2001) (specifically holding that the payment of compensation to directors does not

remove the protection of the business judgment rule, even when they are "paid well for their

services"); Shapiro v. Greenfield, 136 Md. App. 1, 18-19, 764 A.2d 270, 279-280 (2000), citing

American Law Institute, Principles of Corporate Governance: Analysis and Recommendations

(1994) (an "interested" director is one who has "a material pecuniary interest in the transaction or

conduct (other than usual and customary director's fees and benefits) . . .."); In re Evergreen

Mutual Funds Fee Litigation, 423 F.Supp.2d 249, 262-264 (S.D.N.Y. 2006) (membership on

multiple fund boards and receipt of "substantial compensation" for such services is insufficient to

render a director interested, citing Migdal, supra) (applying Delaware law)[9]; Krantz v. Prudential

Investments Fund Management, LLC, 305 F.3d 140, 142-144 (3d Cir. 2002), cert. denied, 537

U.S. 1113 (2003); Kamen v. Kemper Financial Services, Inc., 939 F.2d 458, 460 (7th Cir. 1991),

cert. denied, 502 U.S. 974 (1991) (rejecting assertion that a director's receipt of compensation for

services renders him or her interested or dependent) (applying Maryland law); Stoner v. Walsh,

772 F.Supp. 790, 805 (S.D.N.Y. 1991) (a "director is not interested with respect to all board

---

[9] The Court in Evergreen additionally held that the fact that "an investment advisor was responsible for selecting
board members is an insufficient basis for establishing lack of independence or disinterestedness." Id. at 263, citing
Verkouteren v. Blackrock Financial Management, Inc., 1999 WL 511411, *3 (S.D.N.Y. July 20, 1999), aff'd, 208
F.3d 204 (2d Cir. 2000).

decisions merely because he or she is paid to be a director," because otherwise, "no paid director could ever vote properly to reject a demand."). As a matter of law, therefore, membership on multiple fund boards and receipt of substantial director compensation does not render the Fund directors "interested."

Plaintiffs may also contend that the Fund's directors, including the Committee, are "interested" because they did not immediately investigate the allegations contained in Scalisi I upon the filing of that lawsuit, but instead joined FAM in moving to dismiss the complaint. (Amended Complaint at 21, 24). Such a contention is illogical and misguided, and has been discredited by courts applying Maryland law.

Accepting plaintiffs' argument would in effect mean that no corporation could ever seek to dismiss a derivative lawsuit, even when that lawsuit (as was the case with Scalisi I) was filed without a prior demand and without a showing of demand futility. Doing so, under plaintiffs' theory, would disqualify a corporation's directors from investigating a subsequent demand. This is not the law of Maryland. As the Maryland Court of Appeals stated in Werbowsky, supra, "[o]bviously, if the complaint fails to allege sufficient facts which, if proven true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss." 362 Md. at 620-621, 766 A.2d at 145. In light of this holding, the Maryland courts would not conclude that pursuing a proper and well founded motion to dismiss would disqualify directors from further consideration of the issue once a proper demand is made.

Plaintiffs' argument also was rejected as a matter of Maryland law by the Court of Appeals for the Seventh Circuit in Kamen, supra, 939 F.2d 458. In Kamen, the plaintiff argued that demand was futile (i.e., the directors were interested) because the directors had moved to dismiss the original complaint on substantive grounds as well as on the ground that no demand had been made. Id. at 460. The Seventh Circuit rejected that argument, stating:

This argument confuses futility with failure. A demand is "futile" only if the directors' minds are closed to argument. That the directors disagreed with an argument could show their unwillingness to listen, but also could show that the argument was feeble.

***

So far as we know, no state treats the directors' failure to capitulate in the lawsuit as forfeiting the firm's entitlement to demand before the suit commences. Directors will (and should) oppose weak claims. If that opposition eliminated the need for demand, we would reach the curious pass that claims so weak that they should not be pursued at all could go straight to court, while claims strong enough to litigate about should be presented to the directors. Kamen does not tell us why Maryland would adopt such a topsy-turvy rule … .

Id. at 462-463. This ruling was specifically cited and approved by the Maryland Court of Appeals in Werbowsky, 362 Md. at 618, 766 A.2d at 143-144. See also Allison v. General Motors, 604 F.Supp 1106, 1113-14, aff'd, 782 F.2d 1026 (3d Cir. 1985), (D. Del. 1985) (directors' knowledge of stockholder allegations of wrongdoing for "years" before demand was made was insufficient to render directors "interested").

In short, the factual record shows that the Fund directors, including the Committee members, were independent and disinterested when they investigated plaintiffs' claims and decided not to pursue this action. Plaintiffs have not identified any competent evidence to refute this, let alone overcome the presumption of disinterestedness and independence.

### B.    The Investigation Was Thorough and Conducted In Good Faith.

The Committee conducted its investigation in good faith and in a thorough, reasonable, and prudent manner. In Strougo v. Bassini, supra, 112 F.Supp.2d 355 (applying Maryland law), Strougo v. Padegs, supra, 27 F.Supp.2d 442 (applying Maryland law), Rosengarten, supra, 613 F.Supp 1493 (applying Maryland law), and Grossman, supra, 89 F.R.D. 656 (applying Maryland law), among other cases, committee investigations were deemed sufficient when the committees:

- established their independence;

- took adequate time to conduct their investigations;

♦　　　　interviewed the relevant witnesses, with counsel and in some instances committee members being present;

♦　　　　reviewed, through counsel, the relevant documents;

♦　　　　met regularly regarding the investigation; and

♦　　　　issued comprehensive, well-researched reports that were supported by appropriate exhibits.  See Strougo v. Bassini at 364-367; Strougo v. Padegs at 450-53; Rosengarten at 1495, 1497-98, 1500-01, 1502-03; and Grossman at 664.

In this case, the Committee's investigation was comparable to (or more thorough than) the investigations approved in Bassini, Padegs, Rosengarten, and Grossman.  The Committee identified the key questions raised by plaintiffs' claims and appropriately conducted its investigation to find the answers to those questions.  Among other things, the Committee and its counsel:

♦　　　　interviewed the FAM employees who served as the Fund's portfolio management team, who were the only individuals who had discretionary authority to purchase securities for the Fund during the relevant time period;

♦　　　　interviewed the members of the chain of command for the portfolio management team, including the Presidents of MLIM during the relevant period, Jeffrey Peek and Robert Doll;

♦　　　　interviewed the individuals responsible for maintenance and enforcement of the ethical wall between the portfolio management team and other Merrill Lynch employees;

♦　　　　reviewed over 350,000 pages of documents;

♦　　　　assessed and confirmed, through factual investigation and the use of experts, that the Fund's decisions to invest in Enron were consistent with its investment model and practices;

♦　　　　confirmed that substantial due diligence was done on the Enron investment before and during the time when the Fund held that stock;

- reviewed the available written and electronic communications to and from the Fund's portfolio managers, and determined that there was no evidence of improper pressure or inducement to invest in Enron;

- interviewed all three MLIM employees who received copies of the LJM2 PPM, and thereby confirmed that the information in that memorandum had not been conveyed to the portfolio management team;

- met with plaintiffs' counsel; and

- received independent expert opinions that thoroughly discredited plaintiffs' claims.

These actions, and the investigation as a whole, are presumed under Maryland law to have been taken in good faith, with the care of an ordinarily prudent person, and in a manner he or she reasonably believed to be in the Fund's best interests. Md. Code Ann., Corps. & Ass'ns §§ 2-405.1(a), (e). (**Appendix** at 1-2.)

Plaintiffs' complaint attempts to attack the Committee's investigation with just two allegations: (1) the Committee did not place its witnesses under oath during interviews, and/or conducted some interviews via telephone; and (2) the Committee ignored certain Merrill Lynch policies regarding the imputation of knowledge between broker-dealer personnel and adviser personnel, regarding the LJM2 PPM. (Amended Complaint at 21-22). These allegations, which are insufficient as a matter of law, cannot save plaintiffs' case.

Courts considering similar allegations have repeatedly approved of interviews not taken under oath, including interviews conducted by telephone. For example, in Strougo v. Padegs, supra, 27 F.Supp.2d at 452, the plaintiffs-stockholders argued that an investigation was insufficient because witnesses were not placed under oath, and because many interviews were conducted by telephone. The Court rejected this argument, observing:

In the majority of cases in which derivative actions have been terminated by
special litigation committees, the interviews were not taken under oath or before a
stenographer. See, e.g., Johnson v. Hui, 811 F.Supp. 479, 489 (N.D. Cal. 1991)
("the absence of long transcribed interviews [under oath] does not undermine the
undisputed facts which the [committee] has managed to prove"); Rosengarten v.
Buckley, 613 F.Supp. 1493, 1503 (D. Md. 1985) (holding that the interview
summaries by the committee's counsel "reflect a comprehensive inquiry into the
issues before the committee.").

Id. See also Cutshall v. Barker, 733 N.E.2d 973, 982 (Ind. Ct. App. 2000) ("Although the
interviewees were not placed under oath and their testimony was not transcribed, we are not
convinced that this reveals that the investigation was not conducted in good faith.").

Additionally, the allegation that the Committee ignored Merrill Lynch's internal policies
and the law regarding the imputation of knowledge (Amended Complaint at 22) is simply wrong,
and wholly unsupported by the evidence produced in this case. The issue of whether knowledge
about LJM2 could be imputed from the three MLIM employees who received the PPM to the
individuals directly responsible for the Fund's investment decisions was considered at length by
the Committee -- and it concluded that such knowledge should not be imputed. Specifically, the
Committee found:

- ◊ That there is no evidence that any member of the portfolio management team
  received the allegedly adverse information contained in the LJM2 documents
  (Committee Report at 67-68.);

- ◊ That only three people associated with MLIM or FAM received information
  concerning LJM2, that these people received the information under a duty of
  confidentiality, and that there is no evidence that any of these people breached
  that duty by communicating any information about LJM2 to the portfolio
  management team (Committee Report at 68-69);

- ◊ That the duty of confidentiality under which the LJM2 PPM was received
  precludes the imputation of knowledge from the person who received it to
  members of the Fund's portfolio management team under established principles
  of law (Committee Report at 61-62, citing, inter alia, RESTATEMENT 2D
  AGENCY § 281 (1958) ("there is universal agreement to the effect that where an
  agent's duties to others prevent him from disclosing facts to the principal, the
  latter is not bound because of the agent's knowledge"));

♦ That the Merrill Lynch Ethical Wall Policy forbids the communication of certain information from investment banker personnel to investment adviser personnel, and there is no evidence that this Policy was breached (Committee Report at 69.)[10]; and

♦ In summary, that there is "no evidence to support the proposition that the members of the Fund's portfolio management team had, could have had or should have imputed to them knowledge of Enron's fraudulent financial statements." (Committee Report at 69.)

Plaintiffs, despite over four years of litigation and despite access to over 350,000 pages of documents, cannot present the Court with one bit of credible evidence that even remotely disputes any of these facts.

C.     **Even If The Court Were To Exercise Its Own Business Judgment With Regard To The Independent Directors' Decision That This Case Should Be Terminated, The Independent Directors' Decision Should Be Upheld.**

The Committee's Report demonstrates that plaintiffs' allegations simply have no evidentiary support whatsoever. It would be imprudent and unreasonable for the Fund to expend its shareholders' resources pursuing a claim for which there is simply no factual or legal basis. Accordingly, even if this Court should determine that it is appropriate for it to review the substance of the business judgment made by the independent directors, the Court should uphold that business judgment and dismiss this case with prejudice.

<u>CONCLUSION</u>

This action should be dismissed with prejudice.

---

[10] In any event, plaintiffs have misconstrued the Ethical Wall Policy. (Amended Complaint at ¶ 60.) The Policy states that "information possessed by a single individual associated with an entity is generally attributed to all individuals associated with the entity," not "always." The Policy is only a statement to Merrill Lynch employees about the potential consequences of passing on inside information -- it does not change the applicable law, or require the imputation of knowledge about LJM2 to the portfolio management team under the circumstances of this case.

Date:   Baltimore, Maryland

**February 16, 2007**

_____/s/_____                    _____/s/_____
Benjamin R. Civiletti                            Christopher E. Chang CEC 3271
James J. Hanks, Jr.                              Law Offices of Christopher E. Chang
James A. Dunbar                                  140 Broadway, 46th Floor
Geoffrey R. Garinther                            New York, New York 10005
Daniel P. Moylan                                 Telephone: (212) 208-1470
Venable LLP                                      Facsimile: (212) 208-1468
1800 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201
Telephone: (410) 244-7400
Facsimile: (410) 244-7742

_Attorneys for Nominal Defendant_
_Merrill Lynch Focus Twenty Fund, Inc.,_
_And Defendants Joe Grills, Stephen_
_B. Swensrud, and Robert S. Salomon, Jr._

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 16, 2007, I served true and complete copies of the foregoing NOMINAL DEFENDANT MERRILL LYNCH FOCUS TWENTY FUND, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO TERMINATE DERIVATIVE LITIGATION, **together with the annexed exhibits and declarations** by electronic mail and overnight delivery service to each of the following law firms at the addresses indicated:

>Joel Feffer, Esquire c/o jglass@whesq.com
>Daniella Quitt, Esquire c/o dquitt@whesq.com
>Harwood Feffer LLP
>488 Madison Avenue – 8th Floor
>New York, New York  10022

>       and

>Scott W. Fisher, Esquire c/o sfisher@gbgf-law.com
>Garwin, Gerstein & Fisher LLP
>1501 Broadway – Suite 1416
>New York, New York 10036

>*Attorneys for Plaintiffs*

>Mark Holland, Esquire c/o Mark.Holland@CliffordChance.com
>Mary Dulka, Esquire c/o Mary.Dulka@CliffordChance.com
>Clifford Chance US LLP
>31 West 52nd Street
>New York, New York 10019

>*Attorneys for Defendant Fund Asset Management, L.P.*

_____/s/_____
James A. Dunbar

# APPENDIX

**Md. Code Ann., Corp. & Ass'ns § 2-405.1.**

(a)     A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

    (1)     In good faith;

    (2)     In a manner he reasonably believes to be in the best interests of the corporation; and

    (3)     With the care that an ordinarily prudent person in a like position would use under similar circumstances.

(b)(1)  In performing his duties, a director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:

    (i)     An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

    (ii)    A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or

    (iii)   A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence.

    (2)     A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted.

(c)     A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5- 417 of the Courts and Judicial Proceedings Article.

(d)     The duty of the directors of a corporation does not require them to:

    (1)     Accept, recommend, or respond on behalf of the corporation to any proposal by an acquiring person as defined in § 3-801 of this article;

    (2)     Authorize the corporation to redeem any rights under, modify, or render inapplicable, a stockholder rights plan;

    (3)     Elect on behalf of the corporation to be subject to or refrain from electing on behalf of the corporation to be subject to any or all of the provisions of Title 3, Subtitle 8 of this article;

    (4)     Make a determination under the provisions of Title 3, Subtitle 6 or Subtitle 7 of this article; or

    (5)     Act or fail to act solely because of:

|     |      |                                                                                      |
| --- | ---- | ------------------------------------------------------------------------------------ |
|     | (i)  | The effect the act or failure to act may have on an acquisition or potential acquisition of control of the corporation; or |
|     | (ii) | The amount or type of any consideration that may be offered or paid to stockholders in an acquisition. |

(e)     An act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section.

(f)     An act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director.

(g)     Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation.

**Md. Code Ann., Corp. & Ass'ns, § 2-405.3.**

(a)     This section applies to a corporation that is an investment company, as defined by the Investment Company Act of 1940.

(b)     A director of a corporation who with respect to the corporation is not an interested person, as defined by the Investment Company Act of 1940, shall be deemed to be independent and disinterested when making any determination or taking any action as a director.