UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
APRIL SCALISI as custodian for her minor
children, and SCOTT McDONOUGH,

                    Plaintiffs,                   CV-04-5513 (TCP) (WDW)

      -against-                      **MEMORANDUM** and
                                                  **ORDER**


JOE GRILLS, STEPHEN B. SWENSRUD,
ROBERT S. SALOMON, JR. and
FUND ASSET MANAGEMENT, L.P., et al.,

                    Defendants,

      -against-

MERRILL LYNCH FOCUS TWENTY
FUND, INC.,

                    Nominal Defendant.
--------------------------------------------------------------X

PLATT, District Judge.

           Nominal defendant Merrill Lynch Focus Twenty Fund, Inc. (the "Fund") moves

to terminate this derivative action brought by the Fund's shareholders, asserting claims for

violation of § 36(a) of the Investment Company Act of 1940 ("the 1940 Act")[1] and common law

claims for breach of fiduciary duty, negligence, gross negligence, and negligent

misrepresentation.  A Special Committee (the "Committee") appointed by the Fund's Board of

Directors (the "Board") investigated the claims and concluded that prosecution of the action was

---

[1]Plaintiffs have withdrawn their § 36(a) claim.  <u>See</u> Ptf's Opp. at 20, fn.54 (observing that
"[i]n view of the Second Circuit's recent decision...a private right of action under ICA Section
36(a) is no longer viable."  This Court has jurisdiction over the remaining state law claims based
on diversity, pursuant to 28 U.S.C. § 1332(a).

not in the best interests of the Fund or its shareholders.  This Court is now asked to determine

whether the Committee's recommendation to dismiss the action should be upheld.  For the

following reasons, the Court decides the question in the affirmative.[2]

## FACTUAL BACKGROUND

Plaintiffs are shareholders in the Fund, a Maryland corporation based in New

Jersey and registered under the 1940 Act, that is advised by Fund Asset Management ("FAM"),

a Delaware limited partnership also based in New Jersey.  Both the mutual fund and the

management company are subsidiaries of Merrill Lynch & Co., the global financial services

company.  See In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig., 218 F.R.D. 377, 378

(E.D.N.Y. 2003).  FAM is part of Merrill Lynch Investment Management ("MLIM").

At the behest of FAM, the Fund placed 4% of its portfolio in instalments into the

now-worthless stock of the Enron Corporation.  Id.  When Enron finally collapsed, the mutual

fund's shareholders suffered related economic damages.  Id.  Plaintiffs generally allege that their

losses are actionable because (1) senior officials at FAM caused the Fund to purchase Enron

stock for the benefit of Merrill Lynch and its affiliates and employees in violation of FAM's

duties to the Fund, or (2) FAM was negligent in causing the Fund to purchase Enron stock

because the persons at FAM responsible for the Fund's investment knew or should have known

that Enron's financial condition was far weaker than its public filings disclosed.  To support

---

[2]Separate and apart from the Fund's motion to terminate the action, individual defendants Joe Grills, Stephen B. Swensrud, and Robert S. Salomon, Jr., who are the Committee members, also moved to dismiss Claim II of plaintiffs' amended complaint, asserting a claim for breach of fiduciary duty against them.  Plaintiffs moved for summary judgment on the common law claims brought against the individual defendants.  Additionally, defendant Fund Asset Management moved to dismiss plaintiffs' amended complaint.  The Court's decision on the Fund's motion to terminate the action disposes of these additional motions.

these allegations, plaintiffs point <u>inter</u> <u>alia</u> to a private placement memorandum ("PPM") that

was purportedly circulated at Merrill Lynch and contained inside information on Enron's true

financial picture.  Compl. at ¶¶3; 4(b).  The PPM was generated by Merrill Lynch in

conjunction with Enron's off-balance sheet private partnership, known as LJM2 Co-Investment,

L.P. ("LJM2") that was allegedly designed to "(a) hide billions of dollars in Enron debt; (b)

create illusionary cash flow for Enron; and (c) richly reward partnership investors at the expense

of public investors in Enron common stock."  Compl. at ¶¶ 2-3.  Plaintiffs assert that "at least 97

Merrill Lynch senior executives representing virtually every strategic area within Merrill Lynch

participated [in the LJM2] as investors, including without limitation, executives from FAM,

Executive Management, investment banking, research, equity and bond sales."  Compl. at ¶ 26.


Plaintiffs claim that three MLIM executives received the PPM and therefore any

knowledge they gained in connection with Enron's true financial condition should be imputed to

all FAM employees (including members of the portfolio management team responsible for the

Fund's investment in Enron) because FAM's policies and procedures so dictate.[3]  Compl. at ¶¶

4(a), (b).  Plaintiffs quote the following language from FAM's policies and procedures as

grounds for imputed knowledge:

> "[I]nformation possessed by a single individual associated
> with an entity is generally attributed to all individuals
> associated with the entity.  Thus, a communication of inside

---

[3]Specifically, the complaint states that "MLIM and its affiliate FAM's Co-Chief
Operating Officer Stephen Zimmerman as a direct investor in LJM2, and Jeffrey Peek ("Peek")
and Carol Galley ("Galley") the other most senior officers of MLIM and its affiliate FAM,
received copies of the PPM and had an opportunity to invest and had access to material inside
information regarding LJM2."  Compl. at ¶ 4(a).

> information from any Merrill Lynch-affiliated company to
> any [FAM] employees could be deemed to have been
> communicated to [FAM] and all its employees.  Such a
> communication of inside information could therefore cause
> a violation of law even if the [FAM] employee who receives
> the information does not trade in it, if a [FAM] portfolio
> manager, who did not actually know about the communication,
> traded in the security.  It is therefore crucial to prevent
> communications of inside information from one company
> to another, even if the communications are innocently intended."

Compl. at ¶ 4(b).

Plaintiffs further assert that because senior executives at Merrill Lynch invested in the LJM2 Enron partnership, and for the additional reason that the Merrill Lynch investment banking division desired Enron's lucrative business, Merrill Lynch and FAM caused the Enron stock price to be artificially inflated by inter alia encouraging the Fund to invest in Enron, to the detriment of the Fund's shareholders.  Compl. at 16-19.

## PROCEDURAL HISTORY

Plaintiff April Scalisi[4] initially filed suit in this Court against FAM on October 18, 2002, seeking recovery for losses allegedly sustained by the Fund as a result of its purchase of Enron stock.  The Fund was named as a nominal defendant.  On October 30, 2003, this Court dismissed the action on the ground that under Maryland law, which applies to this action[5], plaintiff was required to make demand on the Fund's Board prior to initiating the action, but failed to do so.  See In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig., 218 F.R.D. 377

---

[4]The caption of the latest complaint lists as plaintiffs April Scalisi, as custodian for her minor children, and Scott McDonough.  Scott McDonough was not listed as a plaintiff in the caption of the initial complaint filed by Scalisi on October 18, 2002.

[5]As the mutual fund in question is a Maryland corporation, Maryland State law applies. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991).

4

(E.D.N.Y. 2003).  Plaintiff appealed this Court's decision to the United States Court of Appeals for the Second Circuit.  On August 17, 2004, the Second Circuit affirmed our opinion.  See Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 142 (2d Cir. 2004).

Subsequent to that affirmance, plaintiff's counsel sent a letter to the Board (the "Demand Letter"), requesting that the Board "take action against FAM and any other Merrill Lynch entity or executive, to recover for the benefit of the Fund, what is believed to be in excess of $30 million of Fund monies, lost as a result of the purchase [of] Enron common stock, which purchase aided and abetted the private pecuniary gain and fraud of Merrill Lynch and its executives."  Pursuant to the Demand Letter, on September 7, 2004, the Board appointed an Independent Investigation Committee (the "Committee") to investigate the claims set forth in the Demand Letter.  The Committee was comprised of three directors (Robert S. Salomon, Jr., Joe Grills, and Stephen B. Swensrud), each of whom was elected to the Board in early 2002, after the Fund's purchases and subsequent sales of Enron stock.[6]  The Committee retained the law firm of Venable LLP ("Venable") to assist it in investigating plaintiff's claims.

On December 17, 2004, allegedly without prior notice to the Committee or its counsel, plaintiffs (including plaintiff Scott McDonough) filed a second complaint with this Court.  That complaint contains substantially similar allegations to the initial complaint, but also contains an additional claim for common law breach of fiduciary duty.  Subsequently, in March of 2005, the Fund filed a motion to stay the proceedings in order to allow the Committee to

---

[6]The Fund purchased Enron shares in 14 separate transactions between February 23, 2001 and July 21, 2001.  See Report of the Independent Investigation Committee of the Board of Directors of Merrill Lynch Focus Twenty Fund, Inc., dated May 23, 2005 (the "Report") at 43. The Fund sold its Enron holdings in seven separate transactions between September 20, 2001 and October 24, 2001.  Report at 53.

complete investigating plaintiffs' allegations and allow the Board to decide whether to pursue plaintiffs' claims.

The Committee recommended to the Fund's directors that the litigation be terminated.  In June 2005, the directors approved that recommendation.  Plaintiffs did not accept the Committee's recommendation or the Board's decision not to pursue plaintiffs' action, and in October of 2005, the Fund served its initial dispositive motion on plaintiffs' counsel.  In April 2006, the Court denied that motion without prejudice, in order to give plaintiffs an opportunity to conduct limited discovery into the nature and scope of the Committee's investigation, which discovery included depositions of all Committee members, and the production of documents reviewed by the Committee and its counsel, as well as all interview notes and memoranda.

In the meantime, on March 15, 2006, plaintiffs filed their first amended and supplemental derivative complaint asserting the same claims for violation of § 36(a) of the Investment Company Act of 1940, and common law claims for breach of fiduciary duty, negligence, gross negligence, and negligent misrepresentation.  The latest complaint added the three Committee members as defendants.

After plaintiffs conducted their discovery into the nature of the Committee's investigation, the Fund moved once again to terminate the derivative litigation and is now asking this Court to defer to the independent directors' decision that the action be terminated.  Plaintiffs oppose the motion.

## DISCUSSION

Based on the Committee's recommendation to the Board that pursuing the claims asserted by the plaintiffs would not be in the best interest of the Fund or its shareholders, the

Fund moves to terminate this derivative litigation on the grounds that (I) the Committee members are independent and (ii) the Committee's investigation was thorough and conducted in good faith.  For the following reasons, this Court agrees.

### A.      Legal standard

The parties disagree as to what is the appropriate standard under Maryland law that a court should apply when ruling on a motion seeking to terminate a derivative action based on a Committee's recommendation and the Board's subsequent determination that pursuing plaintiffs' claims would not be in the best interest of the Fund or its stockholders.  The Fund argues that Maryland case law and Maryland's statutory standard for corporate directors[7] indicate that Maryland would adopt the standard set forth under the same circumstances by the New York Court of Appeals in Auerbach v. Bennett, 47 N.Y.2d 619, 630-31, 634-35, 419 N.Y.S.2d 920 (N.Y. 1979), which precludes reviewing the merits of the board's determination and limits a court's review to an analysis of the adequacy or appropriateness of the investigation and to an inquiry into the independence of the committee members.[8]  To support this proposition, the Fund points out inter alia that Maryland appellate courts in other circumstances have refused to substitute their business judgment for that of the directors.  See, e.g., NAACP v. Golding, 342

---

[7]The Maryland statute provides that "[a] director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) in good faith; (2) in a manner he reasonably believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances."  Md. Code Ann., Corps. & Ass'ns § 2-405.1(a).  A director is presumed to satisfy these standards.  Md. Code Ann. Corps. & Ass'ns § 2-405.1(e).

[8]In this respect, the Auerbach court noted that "questions of good faith or conceivable fraud...would never be shielded by [the business judgment rule]."  Auerbach, 47 N.Y.2d. at 635-36.

Md. 663, 673, 679 A.2d 554, 559 (Md. 1996) (stating that "[t]he business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith," and that "[c]ourts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence.").

Plaintiffs offer a different view as to what is the appropriate standard for judicial review under Maryland law, and urge this Court to apply the standard adopted by the Delaware Supreme Court in Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981), which asks the Court to take the additional step of independently reviewing the merits of the derivative claim before approving the Committee's recommendation to dismiss the action. In other words, the Committee's investigation must also satisfy the business judgment of the Court. The Maryland District Court over twenty years ago applied the Zapata standard in Rosengarten v. Buckley, 613 F.Supp. 1493, 1499-1500 (D. Md. 1985), a case involving similar claims, predicting that "Maryland would be likely to apply the Zapata test to the instant case."

However, as the Fund correctly points out, a very recent decision issued by the Maryland Court of Special Appeals made no reference to Zapata's second prong and held that the business judgment rule creates a presumption of reasonableness[9] with respect to a Committee's investigation, which may be rebutted by a showing that the investigation was not conducted independently and in good faith, and its conclusion was not within the realm of sound business judgment. See Bender v. Schwartz, 172 Md. App. 648, 666-67, 688, 917 A.2d 142 (Md. Ct. Spec. App. 2007). Specifically, the Maryland state court observed that "[i]n

_____

[9]Similarly, a statutory presumption exists in Maryland that corporate directors have satisfied Maryland's statutory standard of conduct applicable to them. See Md. Code Ann., Corps. & Ass'ns § 2-405.1(a), (e) (supra at 7, fn.7).

determining whether a demand was wrongly refused, a court reviews the board's investigation under the business judgment rule, deferring to the decision of the board or committee not to pursue litigation unless the stockholders can show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." Bender at 666. Under Bender, it appears that absent facts that rebut the presumption of reasonableness created by the business judgment rule, a Maryland court must defer to the Committee's conclusions. See Bender, 172 Md. App. at 688. "'The burden is on the party challenging the decision to establish facts rebutting the presumption' that the directors acted reasonably and in the best interests of the corporation." Bender, 172 Md. App. at 667, quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).

Without making a determination on what the appropriate standard for judicial review is under Maryland law, this Court will take the additional step set forth in Zapata and also consider whether it is satisfied with the Committee's conclusion. Based on the following, it finds that the Committee had a reasonable basis for its conclusion and that conclusion is consistent with the Court's own judgment.

### B.    The Committee's independence

Plaintiffs attack the Committee members' independence based on their long-term service on various Merrill Lynch mutual fund boards and the alleged substantial fees they received in connection with their service. Courts, including Maryland's highest state court, have consistently found these types of allegations insufficient to show lack of independence.[10]

---

[10]In fact, this Court has previously found so in this case when it determined that demand on the Fund's directors to sue the Fund's management company was not excused. See In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig., 218 F.R.D. 377 (E.D.N.Y. 2003), aff'd,

Werbowsky v. Collomb, 362 Md. 581, 618, 766 A.2d 123 (Md. 2001) (unwilling to excuse

failure to make demand on the board of directors "simply because a majority of the directors

approved or participated in some way in the challenged transaction or decision, or on the basis of

generalized or speculative allegations that they are conflicted or are controlled by other

conflicted persons, or because they are paid well for their services as directors, were chosen as

directors at the behest of controlling stockholders, or would be hostile to the action"; Migdal v.

Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001) (finding that the shareholders failed

to show that the funds' directors were interested within the meaning of the ICA, citing, inter alia,

Krantz v. Fidelity Mgmt. & Research, Co.,, 98 F.Supp.2d 150 (D. Mass. 2000) for "dismissing

claim that overlapping service on 237 boards with compensation ranging between $220,500 and

$273,500 rendered directors 'interested.'").

       Similarly unavailing in establishing lack of independence is plaintiffs' contention

that the Committee members authorized or participated in efforts by defendants to dismiss the

earlier October 2002 action.  See, e.g., Kamen v. Kemper Fin. Servs., Inc., 939 F.2d 458, 460

(7th Cir. 1991) (applying Maryland law) (finding that the directors' substantive opposition to a

derivative suit did not obviate demand), cited in Werbowsky, 362 Md. at 618, 766 A.2d at 143-

144.  Also unpersuasive are plaintiffs' arguments that the Committee members are not

independent because "[e]ach came to the Merrill Lynch mutual fund 'family' as a result of

contact with Arthur Ziekel...then head of Merrill Lynch's mutual fund business."  (Ptf's Opp. at

13).  Under similar facts, courts have held otherwise.  See, e.g., In re Evergreen Mut. Funds Fee

Litig., 423 F.Supp.2d 249, 263 (S.D.N.Y. 2006) (finding allegations that "an investment advisor

---

380 F.3d 133 (2d Cir. 2004).

was responsible for selecting board members [to be] an insufficient basis for establishing lack of independence or disinterestedness), citing <u>Verkouteren v. Blackrock Fin. Mgmt, Inc.</u>, 1999 WL 511411, at *3 (S.D.N.Y. 1999), aff'd, 208 F.3d 204 (2d Cir. 2000).

In sum, plaintiffs failed to establish that the Committee members lacked independence.

### C.     The nature of the Committee's investigation

Turning to the next aspect of the Court's analysis, i.e. whether the Committee's investigation was thorough and was made in good faith or otherwise comported with the business judgment rule, on the record in this case the Court finds that the Committee acted in good faith and its investigation was reasonable and adequate.  The Court of Special Appeals of Maryland less than six months ago identified six indicia of a reasonable, good faith investigation, namely: (I) whether the committee engaged independent counsel to assist in the investigation; (ii) whether the committee produced a report, its length, and whether it documented the committee's procedures, reasoning, and conclusions; (iii) whether the committee properly identified the claims at issue; (iv) whether the committee reviewed the testimony of or interviewed directors, officers, and employees; (v) whether the committee (or counsel hired to assist it) reviewed documents regarding the questionable transaction; and (vi) the number of times the committee met.  <u>See</u> <u>Bender v. Schwartz</u>, 172 Md.App. 648, 672-73.  Guided by these factors, the Court finds that the Committee's investigation in this case was reasonable.  We will address each factor seriatim.

First, the Committee here engaged the law firm of Venable LLP as independent counsel to assist in its investigation.  Second, the Committee generated a 73-page report setting

forth the Committee's procedures, reasoning and findings. The Report attaches a number of exhibits, including expert reports, research analyst reports relating to Enron, and Enron Model rankings.  Third, the Committee properly identified the claims at issue; the Committee's investigation focused on obtaining answers to the following questions:

- "Was the Fund's investment in Enron stock the result of suggestion, pressure or inducement from someone at Merrill Lynch or someone at MLIM other than a member of the Fund's portfolio management team in violation of FAM's fiduciary duties to the Fund under Section 36(a) of the ICA and common law or its duties under its Management Agreement with the Fund?"

- "Did the Fund's portfolio management team know, or with the exercise of due care could the Fund's portfolio management team have known, that Enron's financial condition was different from what was disclosed by its public financial statements, or, in the absence of such knowledge, is there a legal or factual basis for imputing the adverse information about Enron possessed by persons at Merrill Lynch or by persons at MLIM outside of the Fund's portfolio management team to the Fund's portfolio management team?"

- "If the Fund's portfolio management team did not know and could not have known the adverse information about Enron, and the adverse knowledge possessed by those at Merrill Lynch is not imputed to them, is there a factual or legal basis for finding that the Fund's portfolio management team was negligent or otherwise breached a duty to the Fund in buying Enron stock?"

Report at 18.

Fourth, the Committee and its counsel interviewed the Fund's portfolio management team who was responsible for the Fund's investment in 2001, when the Fund invested in Enron.  The portfolio management team at all relevant times consisted of James D. McCall, Michael Hahn, Steve Salberta and Michael Beaulieu.  McCall was the Fund's portfolio manager from its launch on March 3, 2000 until he left MLIM in November 2001.  Hahn was the associate portfolio manager for the Fund.  Salberta was the Fund's analyst for the technology

companies in which the Fund invested, and was not involved in the decision to buy Enron stock.

Beaulieu was the Fund's analyst for the Fund's biotechnology and energy companies, which

included Enron.  The Committee also interviewed others believed to possibly possess relevant

information, including as set forth in the Fund's dispositive motion:

- <u>Senior managers at MLIM</u>.  Terry K. Glenn was President and Director of the Fund and an Executive Vice President of MLIM.  Robert C. Doll, Jr. was a Senior Vice President of the Fund and President of MLIM starting in 2001.

- <u>Senior officers of Merrill Lynch and MLIM who received the LJM2 PPM</u>. Jeffrey M. Peek was President of MLIM from 1997 to 2001, and hired McCall as Portfolio Manager of the Fund.  Carol Galley and Stephen Zimmerman were formerly members of Merrill Lynch's Executive Management Committee and were joint chief operating officers of MLIM from 1998 to 2001.

- <u>Past and present members of the Fund's Board</u>.  These individuals included James H. Bodurtha, Herbert I. London, Andre F. Perold, and Roberta Cooper Ramo.

- <u>MLIM compliance employees</u>.  Also interviewed were Jerry Weiss, Head of Compliance for MLIM from 2000 through 2003, and Catherine Johnston, Senior Compliance Manager at MLIM.

- <u>Other MLIM employees</u>.  These employees included Lawrence R. Fuller and Robert J. Martorelli, portfolio managers of other MLIM-sponsored Funds, and Brian Fullerton, Linfeng You, and Anthony Patti, who assisted in managing the Fund's portfolio after the Fund's original portfolio management team departed.

- <u>Other interviews</u>.  Also interviewed was Donato Eassey, a former Merrill Lynch energy analyst who covered Enron.

Fund's Brief at 8-9; <u>See</u> <u>also</u> Interview Notes.

Fifth, the Committee's investigation span over nine months.  (Report at 19).  The

Committee, through its counsel, reviewed over 375,000 pages of documents, including:

- documents reflecting internal reviews of the Fund's performance;

- documents related to the Fund's decision to invest in Enron, including the research files maintained by Michael Beaulieu, the research analyst who conducted diligence on Enron;

- research reports from Merrill Lynch and other firms on Enron;

- documents related to the investment model used by the Fund, including hard copies of the back-testing done on the Fund's investment model;

- documents stored in the offices of the Fund's portfolio management team during the relevant time period, including documents related to the purchase or sale of Enron stock and research reports from various sources, including Goldman Sachs & Co., UBS Warburg, Thomas Weisel Partners LLC, Merrill Lynch, Deutsche Banc Alex.Brown, Salomon Smith Barney, Credit Suisse First Boston Corporation, Bloomberg, Morgan Stanley and Lehman Brothers Inc.;

- Mr. Hahn's, Mr. Salberta's and Mr. Beaulieu's electronic files, including 43,000 pages of e-mails and attachments for Mr. Beaulieu, 28,500 pages of e-mails and attachments for Mr. Hahn, and approximately 84,000 pages of e-mails and attachments for Mr. Salberta;

- copies of e-mails from FAM's computer back-up tapes for Mr. McCall, Mr. Hahn, Mr. Beaulieu and Mr. Salberta;

- copies of the portfolio holdings of the Fund for the period March 31, 2000 through and including December 31, 2001;

- the risk department's analysis of the relative performance of the Fund's investment model; and

- documents produced from the Charles River System (a system that provides certain alerts of investments outside of fund parameters).

Report at 19-21.

Sixth, the Committee met in formal sessions on ten separate occasions[11], which the Court finds sufficient to satisfy the reasonableness prong of the investigation.  See, e.g., Genzer v. Cunningham, 498 F.Supp. 682, 694 (E.D. Mich. 1980) (finding sufficient for the

---

[11]See Report at 19.

14

reasonableness inquiry that the Committee met a dozen times), cited in <u>Bender</u>, 172 Md.App. at 673.

   In sum, an application to this case of the factors considered by the courts in determining whether a committee's investigation was reasonable suggests to this Court that the Committee's investigation here was reasonable and was conducted in good faith.

   None of plaintiffs' allegations that the Committee failed to act reasonably and in good faith convince this Court to find otherwise.  Concerning plaintiffs' allegations of bad faith, the Court finds insufficient as a matter of law to show bad faith arguments that the Committee here did not place its witnesses under oath during interviews or conducted some interviews over the telephone rather than in person.  <u>See</u>, <u>e.g.</u>, <u>Strougo v. Padegs</u>, 27 F.Supp.2d 442, 452 (S.D.N.Y. 1998) (applying Maryland law) (noting that "[i]n the majority of cases in which derivative actions have been terminated by special litigation committees, the interviews were not taken under oath....").  Similarly insufficient to challenge good faith as a matter of Maryland law are plaintiffs' allegations that the Committee formed its opinion to dismiss the case prior to conducting follow-up interviews, as in the case of Mr. Peek, MLIM's president.  <u>See</u>, <u>e.g.</u>, <u>Rosengarten v. Buckley</u>, 613 F.Supp. 1493, 1501-02 (D. Md. 1985) (finding that "a tentative conclusion reached after the Committee had interviewed many of the individuals...does not taint the Committee's final recommendation.  Indeed, the absence of such a tentative conclusion would, in the court's mind raise more suspicion.")

   Likewise, plaintiffs have not been able to adduce facts that would support their theory of the case.  This Court allowed plaintiffs discovery related to the Committee's investigation.  As part of that discovery, plaintiffs <u>inter alia</u> had access to all 375,000 or so

documents reviewed by the Committee, but failed to uncover evidence supporting their main contention that the Fund's portfolio management team had access to the infamous LJM2 PPM or that the Fund's purchases of Enron stock were anything other than the result of the standard investment process used by the Fund's portfolio management team.  To the contrary, the Committee's investigation uncovered that the Fund's investment in Enron was made on the basis of the Fund's computer model (the "Model") used by the Fund's portfolio management team to make all its selection of investments, including Enron[12], and also on a recommendation by Mr. Beaulieu, the Fund's analyst who followed Enron, based on extensive due diligence that included reviewing various analyst reports by firms other than Merrill Lynch, commenting favorably on Enron.  (See Fund's Reply at 7; Report at 39-41).

Moreover, the Committee addressed and rejected plaintiffs' contention that knowledge about the LJM2 may be imputed from three MLIM employees who received the PPM to the portfolio management team responsible for the Fund's investment in Enron.[13]  In this vein, the Committee found:

- "That there is no evidence that any member of the portfolio management team received the allegedly adverse information contained in the LJM2 documents (Committee Report at 67-68.);"

_____

[12]The Model produced high ratings for Enron.  (Report at 46-47).  The Model rated the companies based on the following weighted factors: (I) earnings surprise (35%); (ii) earnings revision (25%); (iii) relative strength (15%); (iv) revenue acceleration (15%); and (v) revenue growth (10%).  Report at 39-40.

[13]The Court observes that in this case imputing knowledge to the Fund's portfolio management team would violate the spirit of the business judgment rule, pursuant to which a court "will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence."  NAACP v. Golding, 342 Md. 663, 673, 679 A.2d 554, 559 (Md. 1996).  The record in this case fails to show any evidence that might give rise to a claim that the Fund's portfolio management team engaged in "fraud, dishonesty or incompetence."

- "That only three people associated with MLIM or FAM received information concerning LJM2, that these people received the information under a duty of confidentiality, and that there is no evidence that any of these people breached that duty by communicating any information about LJM2 to the portfolio management team (Committee Report at 68-69);"

- "That the duty of confidentiality under which the LJM2 PPM was received precludes the imputation of knowledge from the person who received it to members of the Fund's portfolio management team under established principles of law (Committee Report at 61-62, <u>citing</u>, <u>inter</u> <u>alia</u>, RESTATEMENT 2D AGENCY § 281 (1958) ('there is universal agreement to the effect that where an agent's duties to others prevent him from disclosing facts to the principal, the latter is not bound because of the agent's knowledge'));"

- "That the Merrill Lynch Ethical Wall Policy forbids the communication of certain information from investment banker personnel to investment adviser personnel, and there is no evidence that this Policy was breached (Committee Report at 69.)..."

Fund's Brief at 22-23.

Therefore, on the record in this case, the Court finds the Committee's investigation to fall within the ambit of the business judgment rule.

**D.     The Committee's recommendation not to pursue the action comports with the business judgment of this Court**

The Court finds that dismissal of the action is appropriate here even under the more stringent <u>Zapata</u> standard.  As a preliminary matter, the Court observes that it does not hold here or otherwise suggests that <u>Zapata</u> is the appropriate standard for judicial review in Maryland.  In fact, the recent decision by the Maryland Court of Special Appeals suggests to the contrary.  Nonetheless, the Court here observes that having reviewed the record in this case, it finds sufficient support for and agrees with the Committee's recommendation that continuing the derivative litigation will not benefit the Fund or its shareholders.

The additional step in <u>Zapata</u> is "intended to thwart instances where corporate

17

actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." Zapata Corp. v. Maldonado, 430 A.2d 779, 789 (Del. 1981). One California District Court has interpreted Zapata's second step to be an "imprecise 'smell test' allowing the court to search between the lines of the SLC's report for the scent of a meritorious claim enclosed within a record that has not been opened by truly adversarial proceedings." Johnson v. Hui, 811 F.Supp. 479, 490 (N.D. Cal. 1991). The Court finds no such meritorious claim within the record here. The Court has not been able to discern any facts that would indicate that the Fund's investment in Enron was anything other than a result of the Fund's typical three-step investment process, which (I) identified a universe of companies with a minimum market capitalization of $5 billion, (ii) evaluated those companies using an earnings momentum model that rated the companies based on five weighted factors, and (iii) applied "fundamental analysis" to the more highly ranked companies. See Report at 39-40; Salberta Interview Notes at 3-4; McCall Interview Notes at 3-5; Peek Interview Notes at 2-3; London Interview Notes at 6; Hahn Interview Notes at 3-5; Beaulieu Interview Notes at 4-6.

For instance, Mr. Beaulieu, the Fund advisor at the time, indicated that he became interested in Enron because it scored well on the Model. He noted that he additionally talked to Wall Street analysts about Enron, and looked at and tested their model earnings. Based on his analysis, Beaulieu concluded that Enron was outperforming: earnings surprises, relative strength and earnings revisions were good and Enron would have scored well on the Model. Beaulieu Interview Notes at 4-6. The Fund's decision to invest in Enron was later evaluated for its appropriateness by the Fund's hired expert, who concluded that "Enron stock complied with the

18

Fund's general investment objectives, which were partly subjective, and Enron had strong model rankings when purchased." Report of Robert Comment, Ph.D. (the "Comment Report") at 1, 15-21.

Additionally, there is no evidence that the individuals involved in the decision to invest in Enron received the LJM2 PPM or had knowledge of Enron's allegedly deteriorating finances.[14] The opportunity to invest in the LJM2 partnership was provided solely to Merrill Lynch executives, i.e. managing directors or higher. See Exh. 16 to Fisher Aff. at 2, fn.2. Plaintiffs allege that Jeffrey Peek, FAM/MLIM's president, and Stephen Zimmerman and Carol Galley, senior vice presidents and members of Merrill Lynch & Company's Executive Management Committee and joint chief operating officers of MLIM were aware of the PPM. (Fisher Mem. § II.A.). However, each of them indicated that they did not give or discuss the LJM2 PPM with the Fund's portfolio management team. See Peek Handwritten Interview Notes; Zimmerman Interview Notes at 2; Report at 52.

Nor will the Court here find liability based on plaintiffs' theory that knowledge of the LJM2 PPM should be imputed to the Fund's portfolio management team. Plaintiffs have not shown any evidence of direct causation between the Enron information purportedly disclosed in the PPM and the Fund's decision to invest in Enron.[15] Unless the evidence shows otherwise, it is appropriate to assume that the ordinary course of business or employment has been followed,

---

[14]In fact, McCall, the Fund's portfolio manager, was heavily invested in the Fund, having invested $700,000 in the Fund at its launch, which constituted a substantial portion of his net worth (approximately 40% of his liquid assets). See McCall Interview Notes at 8.

[15]Similarly, plaintiffs have not shown any evidence of a link between the alleged desire by Merrill Lynch to improve its investment banking relationship with Enron and the Fund's decision to invest in the company.

and that established rules have been observed.  In this case, there is no evidence in the record

that the Merrill Lynch's Ethical Wall Policy has been breached.  The Policy prohibits

communication of inside information between MLIM companies and Merrill Lynch investment

banking, trading and research areas.  Pursuant to that Policy, Merrill Lynch investment banking

employees were prohibited from disclosing information about the PPM to the members of the

Fund's portfolio management team.  Thus, the three MLIM executives who had the opportunity

to invest in Enron's LJM2[16] and are alleged to have received the PPM, did so under a duty of

confidentiality.  Under Merrill Lynch's Ethical Wall Policy, they were prohibited from

disclosing any information related to it to other MLIM employees, including the Fund's portfolio

management team.  There is no evidence in the record that these three MLIM executives violated

Merrill Lynch's Ethical Wall Policy.  Moreover, all of the members of the Fund's portfolio

management team, including McCall, denied receiving or knowing about the PPM, as did their

supervisor, Robert Doll, and the President of the Fund, Terry Glenn.[17]

---

[16]Plaintiffs allege that "[t]he opportunity to invest in LJM2 was provided to Merrill Lynch managing directors or more senior executives...."  Compl. at ¶ 29, fn.5.

[17]This case does not involve a situation where imputing knowledge is appropriate, as the Delaware Chancery Court found in Saito v. McCall, 2004 WL 3029876 (Del. Ch. 2004), where the court imputed knowledge by one Board member to the rest of the Board.  Saito at *7; cf. Ash v. McCall, 2000 WL 1370341, at *15 (Del. Ch. 2000) (refusing to impute knowledge from the company's director of investment relations to the company's board of directors).  In this case, neither of the three MLIM executives who received the PPM were members of the Fund's portfolio management team or exerted any influence in the Fund's decision to invest in Enron.  Both Mr. Zimmerman and Ms. Galley were based in London and were not in the Fund's portfolio management chain of command.  (Report at 52-53).  Similarly, Mr. Peek "explained that his job was to bring people in with the expertise to manage funds and that his expertise and role did not extend to investments," and that "he did not know that [the Fund] invested in Enron."  (Peek Interview Notes at 3).  Moreover, Zimmerman, Galley and Peek received the PPM under a duty of confidentiality and the Ethical Wall Policy prohibited them from disclosing the PPM or any information contained therein to MLIM employees, including the Fund's portfolio management team.

In sum, plaintiffs failed to show that the Fund's investment in Enron was anything other than the result of the Fund's standard investment selection process.

## CONCLUSION

Based on the foregoing, the Fund's motion to terminate this derivative litigation is GRANTED.  The plaintiffs shareholders' derivative litigation is hereby DISMISSED WITH PREJUDICE.

/s/_____

Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York

July 26, 2007